IN THE UNITED STATES DISTRICT COURT FILED 
FOR THE DISTRICT OF NEW MEXICO

06 SEP 13 AM 11: 59

CLERK-ALBUQUERQUE

THE AMERICAN CIVIL LIBERTIES
UNION OF NEW MEXICO; THE
LEAGUE OF WOMEN VOTERS OF ALBUQUERQUE/
BERNALILLO COUNTY, INC., SAGE COUNCIL;
NEW MEXICO COALITION TO END HOMELESSNESS;
ANNE KASS, ALEXANDRA KAZARAS
and BARBARA GROTHUS,

        Plaintiffs,

v.                                    No CV 05-1136 MCA/WDS

MILLIE U. SANTILLANES, ALBUQUERQUE
CITY CLERK,

        Defendant.

### DEFENDANT'S MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Office of the City Attorney

City of Albuquerque

Robert M. White
City Attorney

Mark Shoesmith
Assistant City Attorney
Attorney for Defendant
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500

Paula I. Forney
Assistant City Attorney
Attorney for Defendant
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500



**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................    iii

I.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .........    2

II.   STATEMENT OF ISSUES ..................................................    8

III.  SUMMARY OF ARGUMENT...............................................    9

IV.   ARGUMENT:   Plaintiffs do not have standing to bring this action.    11

      A.   Plaintiffs have no personal interest in the litigation..........    11

      B.   Plaintiffs have the burden of demonstrating that they
           have standing to pursue this litigation.  They do not
           satisfy the requirements of standing ...........................    13

           1.   Plaintiffs lack the requisite personal interest
                for standing ...................................................    14

           2.   The named individual plaintiffs have no "injury-in
                -fact," thus depriving them of standing to assert
                their claims ...................................................    15

           3.   Plaintiff organizations lack standing as organizations.    17

                a)   The organization plaintiffs lack standing
                     in their own right. .....................................    17

                b)   The organizations have no standing to
                     represent their members............................    19

                c)   Plaintiff organizations lack standing on
                     behalf of the individuals served by the
                     organizations.........................................    20

V.    ARGUMENT:   Plaintiffs' Constitutional Challenges to the Voter
                    ID Law should be rejected.  *See* Counts I, II, and
                    VI of the complaint, Dkt. No. 20  .....................    21

      A.   Introduction ...............................................................    21

      B.   The Voter ID Law authorized by Article I, Section 4 Clause
           1 of the United States Constitution does not regulate the
           manner of electing public officials..................................    21

C.  The Voter ID Law does not impose substantive voting criteria; it protects legitimate voters by enforcing substantive criteria that already exist............................................ 23

    1.  The city has the right to regulate elections............. 23

    2.  Governmental interests outweigh the minimal burden on an individual's right to vote .............................. 24

D.  The requirements of the Voter ID Law are not disproportionate to the city's interest in detecting and deterring identity fraud at the polls ................................ 26

E.  Strict Scrutiny of the Voter ID Law is not warranted........... 29

    1.  Plaintiffs have presented no evidence of any individuals who will be severely burdened by the Voter ID Law ..................................................... 29

    2.  Plaintiffs can present no statistical evidence of any group which will be severely or disproportionately impacted ........................................................ 30

    3.  There is no evidence that any alleged difficulty in obtaining photo identification is related to affluence or gender ......................................................... 31

F.  There is a rational basis for the requirements of the Voter ID Law ............................................................. 32

G.  The burden of proof is on plaintiffs to demonstrate that the Voter ID Law is not justified ..................................... 34

H.  Incidental Impact on some voters, if proven, will not invalidate the Voter ID Law ......................................... 35

VI.  ARGUMENT:    Plaintiffs' Equal Protection claims in Counts I and II of the Complaint lack any factual or legal basis and should be dismissed........... 36

A.  Different remedies exist for Absentee and In Person Voting issues............................................................ 36

B.  Plaintiffs' equal protection challenge is the differential treatment of in-person and absentee voters..................... 39

        C.    The "current valid" photo identification requirement........    40

VII.    CONCLUSION.................................................................    41

CERTIFICATE OF SERVICE  ........................................................    42

## TABLE OF AUTHORITIES

**NEW MEXICO CASES**

*City of Albuquerque v. Chavez*, 91 N.M. 559, 556 P.2d 457
        (Ct. App.) *cert. denied*, 91 N.M. 610, 577 P.3d 1256 (1978)........    22

*Apodaca v. Wilson*, 86 N.M. 516, 525 P.2d 876 (1974).....................    22

**CASES**

*Anderson v. Celebrezze,* 460 U.S. 780 (1983) .................................    23, 24

*Brooks v. Elkhart County, Ind.,* 401 F.3d 857 (7th Cir. 2005) ...........    15

*Burdick v. Takushi,* 504 U.S. 428 (1992)...........................    24, 25, 28, 39

*Burson v. Freeman,* 504 U.S. 191 (1992)......................................    28

*Doe v. Stincer,* 175 F.3d 879 (11th Cir. 1999) ..................................    19

*DH2, Inc. v. U.S. S.E.C.,* 422 F.3d 591 (7th Cir. 2005).......................    13

*Fund Democracy, LLC v. S.E.C.,* 278 F. 3d 21(D.C. Cir. 2002)..............    19

*Greidinger v. Davis,* 988 F.2d 1344 (4th Cir. 1993)............................    26

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004)................................    16, 33

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982).....................    17, 18

*Hope, Inc. v. DuPage County Ill.,* 738 F.2d 797 (7th Cir. 1984)....    14, 15, 19, 20

*Hunt v. Washington State Apple Advertising Commission,*
        432 U.S. 333 (1977)......................................................    14

*Indiana Democratic Party v. Rokita,* 2006 U.S.
        Dist. Lexis 20321 ...............    10, 15-17, 24, 25, 30, 33-36, 39, 40, 41

*League of Women Voters v. Blackwell*, 340 F. Supp. 2d 823
  (N.D. Ohio 2004)........................................................……….     26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...........................…..     13

*McKay v. Thompson*, 276 F.3d 752 (6th Cir. 2000)..............................…..     26

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986)......................…...     34

*Pabey v. Pastrick*, 816 N.E.2d 1138 (Ind. 2004) ................................     38

*Schoffstal v. Kaperek*, 457 N.E. 2d 550 (Ind. 1984) ...........….............     38

*Smiley v. Holm*, 285 U.S. 355 (1932) .............................................     24, 33

*Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C. Cir. 1990)...............…..     18

*Storer v. Brown*, 415 U.S. 724 (1974) ..............................................     24

*Summit County Democrat Cent. and Executive Comm. v. Blackwell*,
  388 F.3d 547 (6th Cir. 2004) ................................................     27

*Tashjian v. Republican Party of Conn.*, 479 U. S. 209 (1986)...............     22

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 1997)...............     34

*U.S. v. Saylor*, 322 US 385 (1994) ................................................     23

*United States v. Smith*, 426 F.3d 567 (2nd Cir. 2005) ...........................     26

*Utah Association of Counties v. Bush*, 455 F.3d 1094 (10Th Cir. 2006).....     14

*Washington v. Department of Transp.*, 8 F.3d 296 (5th Cir. 1993).............     31

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ......................................     23

**CONSTITUTION**

U.S. Const., art I, Section 4, Clause 1 .....................................     22, 24, 33

U.S. Const., art I, Section 2........................................................…..     22

U.S. Const., art II, Section 1........................................................…..     22

U.S. Const., art III ..................................................     9, 13, 14, 16, 17, 19

U.S. Const., amend I .................................................................... 22

U.S. Const., amend XIV ............................................................... 22

U.S. Const., amend XV ................................................................ 22

U.S. Const., amend XVII .............................................................. 22

U.S. Const., amend XIX ............................................................... 22

U.S. Const., amend XXIV ............................................................. 22

U.S. Const., amend XXVI ............................................................. 22

Constitution of New Mexico, Article X, Section 6 ............................ 10, 22

## STATUTES

42 USC Section 1971 ................................................................... 9

42 USC Section 1973 ................................................................... 9

Section 1-6-5 D. NMSA 1978 ........................................................ 25

Section 1-12-4.1 NMSA 1978 ....................................................... 25

Section 1-12-7.1 NMSA 1978 ....................................................... 37

Section 3-8-41 A. NMSA 1978 ...................................................... 38

Section 3-8-43 NMSA 1978 .......................................................... 38

Section 3-9-3 NMSA 1978 ............................................................ 5, 16

O.R.S. Section 254.465 ................................................................ 16

## OTHER AUTHORITY

Federal Rule of Evidence 701 ....................................................... 30, 31

Defendant Millie Santillanes, by and through her undersigned attorneys, submits this memorandum in support of her Motion for Summary Judgment. There are no disputed issues of material fact and entry of judgment as a matter of law dismissing plaintiffs' claims in their entirety is appropriate.

I.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

The following facts are established in the record and form the basis for defendant's motion for summary judgment:

1.    In June 2005 the Albuquerque City Council placed a proposition on the October 4, 2005 regular municipal election ballot to enact a new section of the City Charter Election Code requiring photo identification to be presented by voters when voting in person (hereinafter the Voter ID Law).  Exhibit A, codified Voter Identification law, attached hereto and incorporated herein by reference; Exhibit B, affidavit of Kelli Fulgenzi, attached hereto and incorporated herein by reference.

2.    Seventy three percent of the people voting in the October 4, 2005 municipal election approved the referendum at that election. Exhibit B, (Fulgenzi affidavit).

3.    The Voter ID Law is codified as City Charter Article XIII, Section 14 [Photo Voter Identification Required}. Exhibit A (Voter ID Law).

4.    The Voter ID Law was first implemented in the special election held in November 2005 for the runoff election for the position of City Councilor for City Council District 9. Exhibit B (Fulgenzi affidavit).

5.    No provisional ballots were issued pursuant to the provisions of the

2

Voter ID Law for lack of photo identification in the runoff election.  Exhibit B
(Fulgenzi affidavit).

     6.     The Voter ID Law provides that any identification showing the
voter's photograph and name is sufficient to meet the requirements of the Voter
ID Law, including but not limited to any card issued by a government agency,
driver's license, student identification card, commercial transaction card such as
a credit or debit card, an insurance card, union card, a professional association
card or the voter identification card issued by the Albuquerque City Clerk.  Exhibit
A (Voter ID Law).

     7.     A voter photo ID may be obtained from the Albuquerque City Clerk
before and after Election Day, as well as on Election Day, Exhibit A (Voter ID
Law).

     8.     No fee is charged by the Albuquerque City Clerk to issue a voter
photo ID to any voter; no fee exists, and the ordinance does not anticipate that
the city will charge any fee for issuance of the ID.  Exhibit A (Voter ID Law),
Exhibit B (Fulgenzi affidavit).

     9.     To obtain a voter ID, two non-photo identifications must be
presented to the City Clerk, including a state issued identification card, a social
security card, student identification card, library card, insurance card, selective
service card, union card, professional association card, utility bill, bank
statement, government check or a pay check.   A birth certificate is not required.
Exhibit A (Voter ID Law), Exhibit B (Fulgenzi affidavit).

     10.     If a voter cannot present two of the non-photo identifications

required by the Voter ID Law when applying for a photo voter ID with the City Clerk, the voter may obtain a voter photo ID by swearing or affirming in writing under penalty of perjury that he or she is presently registered to vote. Exhibit A (Voter ID Law).

11.    Voters voting in person who do not have a photo ID may vote by provisional ballot. Exhibit A (Voter ID Law).

12.    Voters who cast provisional ballots have ten days after the election to present voter photo ID to the City Clerk in order to have their ballot counted. Exhibit A (Voter ID Law).

13.    Voters who cast provisional ballots and do not have the required voter photo ID may obtain a voter photo ID from the City Clerk within the ten-day period after the election to obtain their voter photo ID and thereafter have their provisional ballot counted. Exhibit A (Voter ID Law).

14.    The Voter ID Law does not apply to mail in ballots such as absentee ballots, but does apply to all in person voting, including early voting. Exhibit B (Fulgenzi affidavit).

15.    The Voter ID Law applies only to City elections and does not apply to elections where the ballot contains a Federal question. Exhibit B, (Fulgenzi affidavit).

16.    An identification card issued by the State of New Mexico Division of Motor Vehicle contains a photograph and the name of the person to whom the card is issued. Exhibit B (Fulgenzi affidavit).

17.    A current valid photo identification card must not be a forgery and

4

must be presented prior to the expiration date contained on the identification card. Exhibit A (Voter ID Law); Exhibit B (Fulgenzi affidavit).

18.     There is no requirement in the Voter ID Law that the photo identification card must have an expiration date. Exhibit A (Voter ID Law).

19.     A government issued identification card is a current valid photo identification card issued by any governmental agency. Exhibit A (Voter ID Law); Exhibit C, portions of deposition of Millie Santillanes, attached hereto and incorporated herein by reference, at p. 35.

20.     All voters registered to vote in the city of Albuquerque may vote by absentee ballot. Section 3-9-3 NMSA 1978.

21.     The organization plaintiffs have made no expenditures related to the photo identification requirement. Exhibit D, portions of the deposition of Diane Goldfarb, attached hereto and incorporated herein by reference, at pp. 12, 16, 17 (no impact on the League); Exhibit E, portions of the deposition of Ozawa Bineshi Albert, attached hereto and incorporated herein by reference, at pp. 12, 37, 39, 40 (no tangible impact on Sage Council); Exhibit F, portions of the deposition of Henry Hughes, attached hereto and incorporated herein by reference, pp. 26 and 43.

22.     Plaintiff League took a survey of its members to determine if any did not have a form of photo identification and no member replied that they lacked photo identification. Exhibit D (Goldfarb deposition) pp. 12-13.

23.     One of Plaintiff Grothus' apartment renters did not have a driver's license but Grothus admitted that she did not know if this renter or any of her

other renters had other forms of photo identification cards or if they were registered to vote. Exhibit I, portions of the deposition of Barbara Grothus, attached hereto and incorporated herein by reference, at pp. 8-11.

24.   No Plaintiff or witness submitted the names of individuals who they claim would be unable to vote as a result of the Voter ID Law or could not obtain acceptable photo identification if needed.

25.   According to Grothus, she believes there were some voters who would not be able to vote, but she could not name any. Exhibit I (Grothus deposition), pp. 21-22.

26.   Denise Lamb's mother does not have photo identification but her mother was not registered to vote in Albuquerque, Exhibit K, portions of deposition of Denise Lamb, attached hereto and incorporated herein by reference, pp. 127, 138.

27.   Ozawa Bineshi Albert's mother's driver's license recently expired, but her mother had a current government issued photo identification from the her tribe. Exhibit E (Albert deposition), pp. 18-20, 38.

28.   Plaintiff Kazaras alleged that she does not possess any of the forms of photographic identification required by the Photo ID Law. Complaint, Dkt. no. 20, ¶ 7.

29.   Alexandra Kazaras has current photo identification cards consisting of a photo identification card issued by the University of New Mexico, a Costco photo identification card and a Washington state driver's license. These forms of identification can be used to vote. Exhibit A (Voter ID Law); Exhibit G, portions

6

of the deposition of Alexandra Kazaras, attached hereto and incorporated herein by reference, pp. 3-5 and Exhibit G-1 to deposition.

30.     Diane Goldfarb had not been informed by any member of the League that the person cannot or will not vote because of lack of photo identification, that having to show a photo identification is going to be difficult, that anyone will be prohibited from voting due to lack of photo identification or that they did not have a photo identification.  Exhibit D (Goldfarb deposition), pp. 12, 13, 15, 29-30.

31.     Plaintiff Kass' mother does not have a driver's license but votes absentee, Exhibit H, portions of the deposition of Anne Kass, attached hereto and incorporated herein by reference, at p. 4.

32.     Kazaras will probably vote absentee, Exhibit G (Kazaras deposition), p. 15.

33.     Milton D. Thomas testified that he could not identify anyone who had come to his office or anyone with whom he had met who could not vote because of a lack of identification, Exhibit J, portions of deposition of Milton D. Thomas deposition, attached hereto and incorporated herein by reference at pp. 4, 91.

34.     The Coalition could not identify anyone who has been denied the ability to obtain a voter ID, Exhibit F (Hughes deposition), p. 15.

35.     The Coalition could not identify anyone who has been prohibited from voting or would be unable to vote because of a lack of voter ID, Exhibit F (Hughes deposition), pp. 16, 42.

36.    The Coalition could not identify anyone who needs a photo ID, Exhibit F (Hughes Deposition), pp. 28, 41.

37.    SAGE Council has not conducted a survey of which members do not have photo identification, Exhibit E (Albert Deposition), p. 12, and Exhibit L, portions of deposition of Laurie A. Weahkee, attached hereto and incorporated herein by reference, at pp. 116, 117.

38.    Weahkee, former executive director of SAGE Council, identified several Native Americans she thought did not have photo identification, but then admitted that all of them had a New Mexico photo identification card, Exhibit L (Weahkee deposition), pp. 4, 94, 96, 107-109.

39.    The primary absentee ballot fraud is coercion of legitimate voters, not simply voting in the name of another.  Exhibit K, portions of the deposition of Denise Lamb, attached hereto and incorporated herein by reference at pp. 75, 76, 84, 85, 91-93, 96, 103.

40.    Election officials at the polling places on Election Day do not have the benefit of a computer link to this database.   Exhibit B (Fulgenzi affidavit).

41.    Hughes testified that the New Mexico Coalition to End Homelessness (the "Coalition") has not applied for money to register or to get people voter ID cards and that the Voter ID Law would not have any impact on its member organizations, Exhibit F (Hughes deposition), pp. 26, 43.

II.    STATEMENT OF ISSUES

The issues in this facial challenge to the validity of the photo identification requirements of the Albuquerque City Charter law are as follows.

8

1.      Whether any plaintiff, none of whom is a voter injured by the Voter ID Law, has standing under Article III of the Constitution of the United States to bring this case.

2.      Whether the Voter ID Law is a permissible exercise of authority under the Elections Clause of the United States Constitution, which charges state legislatures with the responsibility for regulating the times, places and manners of elections.

3.      Whether the Voter ID Law impinges severely and impermissibly on the constitutional right to vote, the right to free speech, the right to freedom of association, the right to equal protection or the right to due process.

4.      The Plaintiffs have filed an unopposed motion for voluntary dismissal Counts II, III, IV, and V of the Complaint, Dkt. no. 62. However, at the time this memorandum was due, the order granting dismissal of those counts had not yet been approved by the Court.  Based on the motion to dismiss these counts, Defendant has deleted those portions of this memorandum in support of summary judgment related to the 42 USC Section 1971 and 1973 claims in Counts III, IV and V of the Complaint.

III.   SUMMARY OF ARGUMENT

A.      Standing.     Defendant is entitled to summary judgment because no plaintiff has standing to bring this lawsuit; the Voter ID Law violates no Constitutional provision,

B.      The Complaint.      The Voter ID Law is an important, common sense approach by the City of Albuquerque to advance the interests of the City in

9

protecting the integrity of municipal elections. It does not impose a severe or impermissible burden on the right to vote but merely requires voters to produce one of large array of very common forms of photo identification so that poll workers will be able to detect identity fraud at the polls. The Elections Clause of the United States Constitution expressly authorizes state legislatures to regulate the manner of holding federal and state elections. The City of Albuquerque is a political subdivision of the state and as a home rule municipality under the Constitution of New Mexico, Article X, Section 6, is empowered to regulate its elections. The Voter ID Law is an exercise of appropriate authority by the city. It is not a direct or severe impingement on the right to vote, is not a poll tax, is not a voter qualification, and is not unequally applied. The City has a compelling interest in preserving the integrity of its elections and in preserving the confidence of the public in the integrity of elections. The Voter ID Law is a reasonable, narrowly tailored means of preserving fair elections, protecting the value of legitimate votes, and safeguarding public confidence in the legitimacy of elections.

The issues raised in this case have been recently addressed in Indiana Democratic Party v. Rokita, 2006 U.S. Dist. Lexis 20321, at *114-118 (S.D. In. 2006). Rokita rejected the same challenges asserted here to Indiana's similar, though more stringent, Voter ID Law.[1]

---

[1]     The Indiana statute is more stringent that the Voter ID Law in that Indiana limits photographic identification to that issued by the United States Government or the state of Indiana, the photo identification had to contain an expiration date and the name on the identification must conform to the name in the individual's voter registration record, Rokita at *12. As in Rokita, Plaintiffs in the case at bar offer no reliable statistical data about the number of individuals adversely

IV.    ARGUMENT:        Plaintiffs do not have standing to bring this action.

     A.    Plaintiffs have no personal interest in the litigation.

     There are two groups of plaintiffs. The first is the League of Women Voters of Albuquerque/Bernalillo County (hereinafter the League), the Sage Council and the New Mexico Coalition to End Homelessness (hereinafter the Coalition), referred to collectively as the organizational plaintiffs.[2]  The second group is comprised of three individuals, Anne Kass, Alexandra Kazaras and Barbara Grothus, referred to as the individual plaintiffs.

     1.    The League is a not-for-profit organization whose mission is to encourage the participation by citizens in government and to influence public policy through education and advocacy. Second Amended Complaint, Dkt. no. 20, ¶2 (hereinafter referred to as the complaint). The League has 312 members who must fill out a membership form and pay dues in order to join and is governed by a board of 18 people, Exhibit D, (Goldfarb deposition), pp. 5, 6, 19-20. The League does not maintain any records identifying its members who do or do not possess photo identification, Exhibit D (Goldfarb deposition), pp.12, 15. The Voter ID Law would does not impact the League as an organization, Exhibit D (Goldfarb deposition), pp.16, 17.

     2.    Sage Council is a non-profit organization whose mission includes protecting and advancing the voting rights of Native Americans in the City of

---

affected by the Voter ID Law and have presented no evidence of any individuals who will be severely burdened by the Voter ID Law.

[2]    ACLU-NM has voluntarily dismissed its claims and is no longer a party, Dkt. no. 53.

Albuquerque and registers and encourages voting by Native Americans.  SAGE

Council consists of 45 members who are required to pay dues, Exhibit L

(Weahkee deposition), p. 17.   SAGE Council has not conducted a survey of

which members do not have photo identification, Exhibit E, (Albert Deposition), p.

12, and Exhibit L (Weahkee deposition), pp. 116, 117.

       3.     The Coalition[3] is a non-profit organization of individuals and other

associations that claims to have standing to vindicate the interests of its

members who are qualified and registered voters in Albuquerque. Complaint,

Dkt. no. 20, ¶ 4.   The Coalition and their member organizations have not

identified any voter registered in Albuquerque who does not have photo

identification or would not vote because of the Voter ID Law, Exhibit F (Hughes

deposition), pp. 28.  The Coalition does not provide any direct assistance to the

homeless, Exhibit F (Hughes deposition), pp. 3, 14.  The Coalition could not

identify anyone who has been denied the ability to obtain a voter ID, Exhibit F

(Hughes deposition), p. 15, or identify anyone who has been prohibited from

voting or is unable to vote because of a lack of voter ID, Exhibit F (Hughes

deposition), pp. 16, 41, 45.

       4.     Plaintiffs Anne Kass, Alexandra Kazaras and Barbara Grothus are

individual plaintiffs who are registered voters residing in Albuquerque. Complaint,

Dkt. no. 20, ¶ 7. These individual plaintiffs possessed photo identification cards

and none of the identification cards were past their expiration dates.  Exhibit G,

(Kazaras deposition), pp. 3-5, 13 and Exhibits G-1 and G-2 to her deposition;

---

[3]   Plaintiffs' filed their unopposed motion for voluntary dismissal of the Coalition
as a party, Dkt. no. 62.  However at the time this memorandum was filed, the
motion had not yet been approved by the Court.

Exhibit H (Kass deposition), p. 3 and Exhibit H-1 to her deposition; Exhibit I,

(Grothus deposition), pp. 3, 4, 12 and Exhibit I-1 to her deposition.  No individual

plaintiff had knowledge of any registered voter in the City of Albuquerque who did

not have a photo identification card.  Exhibit G (Kazaras deposition), p. 10;

Exhibit I (Grothus deposition) pp. 8-11, 21-22.   Anne Kass stated that her mother

did not have a driver's license but that she votes absentee and Kass did not

know of any one else that did not have a driver's license, Exhibit H (Kass

deposition), pp. 4-5.

> B.     Plaintiffs have the burden of demonstrating that they have standing
>        to pursue this litigation.  They do not satisfy the requirements of
>        standing.

Standing is an essential and unchanging part of the case or controversy

requirement of Article III. Standing contains three elements. First, the plaintiff

must have suffered an "injury in fact," an invasion of a legally protected interest

which is concrete and particularized, and "actual or imminent, not 'conjectural' or

'hypothetical.'" Second, there must be a causal connection between the injury

and the conduct complained of: the injury has to be "fairly . . . trace[able] to the

challenged action of the defendant, and not . . . the result [of] the independent

action of some third party not before the court." Third, it must be "likely," as

opposed to merely "speculative," that the injury will be "redressed by a favorable

decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations

omitted).  The burden to establish standing is on the party invoking federal

jurisdiction. DH2, Inc. v. U.S. S.E.C., 422 F.3d 591, 596 (7th Cir. 2005).

13

An association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977). Representational standing requires that the association demonstrate that the members whose rights it is asserting "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Hope, Inc. v. DuPage County Ill., 738 F.2d 797, 813 (7th Cir. 1984). For a similar result, see Utah Association of Counties v. Bush, 455 F.3d 1094, *18 (10Th Cir. 2006) where the court found Plaintiff to lack standing

> Because MSLF relies solely on Mr. Wood's declaration for the "specific facts" necessary to support its standing allegations, our conclusion that Mr. Wood's affidavit does not demonstrate an injury-in-fact "as of the time the action [wa]s brought" means that MSLF has not met its burden of establishing constitutional standing to bring this action.

1.    Plaintiffs lack the requisite personal interest for standing.

Standing is not conferred because plaintiffs are personally offended at being required to provide identification to vote. Offense alone in response to government policies or requirements does not suffice to create standing. "Otherwise there would be universal standing: anyone could contest any public policy or action he disliked. There must be a concrete injury." In determining Article III standing, "the psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury in fact' for

constitutional purposes." <u>Brooks v. Elkhart County, Ind.</u>, 401 F.3d 857, 870 (7[th]

Cir. 2005); <u>Rokita</u>, at *85.

Likewise there is no standing merely because plaintiffs' self-proclaimed

purposes include asserting the rights of those registered voters who associate

with them and who will be voting, or who desire to vote, in future elections for

public office.  Complaint, Dkt. No. 20, ¶ 2 (the League), ¶ 3 (SAGE Council), ¶¶ 4

and 6 (the Coalition).  "The Supreme Court has not seen fit to extend

representational capacity standing to entities other than associations which

actually represent interests of parties whose affiliation with the representational

litigant is that of membership with the representative or substantial equivalent of

membership." <u>Hope</u>, 738 F.2d at 814. Thus neither the desire of SAGE Council

to register Native Americans to vote, Exhibit E (Albert deposition), pp. 3, 17, nor

voter registration efforts by the League, Exhibit D (Goldfarb deposition), p. 3, nor

voter registration attempts by the Coalition, Exhibit F (Hughes deposition), p. 23,

create a basis for standing.

> 2.    The named individual plaintiffs have no "injury-in-fact," thus
>        depriving them of standing to assert their claims.

No one of the individual plaintiffs has presented an "injury in fact" sufficient

to confer Article III standing to challenge the photo identification requirement.  All

individual plaintiffs had photo identification cards.  No one of the individual

plaintiffs could identify any intended voter who could not obtain a free voter

identification card from the city clerk.  No one of the individual plaintiffs was

prohibited from voting absentee.  Plaintiff Kazaras stated that if she did not have

a photo identification card that was valid she "would probably vote absentee,"

Exhibit G (Kazaras deposition) p. 15. Plaintiff Grothus stated that even with the photo identification requirement that she still intended to vote. Exhibit I (Grothus deposition), p. 22.

Voting by absentee ballot instead of in person does not, by itself, constitute an injury in fact since there is no established constitutional right to vote in person. Griffin v. Roupas, 385 F.3d 1128 (7th Cir. 2004) held there was no constitutional right to vote by absentee ballot and, in so doing, implicitly held there was no constitutional right to vote in person. With respect to voting methods, "[o]ne size need not fit all." While some states allow every registered voter to vote by absentee ballot other states, such as Indiana, "have struck a compromise between concern with fraud and concern with turnout by allowing only certain classes of voter to cast an absentee ballot." Griffin, 385 F.3d at 1131. Different jurisdictions have addressed concerns with the integrity of their voting system differently, ranging from Oregon, in which "all ballots are absentee", Griffin, 385 F.3d at 1185 (citing  O.R.S. Section 254.465); Rokita, at *93, to New Mexico, which has taken the position of allowing, but not requiring, all registered voters vote by absentee ballot, without providing a reason, such as being out of town or illness. Section 3-9-3 NMSA 1978.

No one of the individual plaintiffs has presented any evidence that voting absentee would be an actual hardship individually or to any voter. The mere "offense" in having to vote absentee is insufficient to confer Article III standing. The assertion by the individual plaintiffs that they do not want to vote absentee amounts to no more than a frustrated desire to vote in person and is not an injury

16

in fact. There is no recognized legal right to vote in the specific manner an individual may prefer.  If there were a constitutional right to vote in person, in Oregon, where everyone votes by absentee ballot, every single Oregon voter would have had their constitutional rights infringed. Rokita, at *93-94. The photo identification requirement of the Voter ID Law will cause none of the individual plaintiffs any injury in fact, thus depriving each plaintiff of standing to assert these rights.

      3.     Plaintiff organizations lack standing as organizations.

While not clearly articulated, the organization plaintiffs attempt to establish standing to seek relief (1) in their own right, (2) based on the rights of their members, and (3) based on the rights of the individuals they serve. The legal theories upon which the organization plaintiffs rely, however, have all been rejected by the courts and there is no basis of standing for any of these organizations.

      a)     The organization plaintiffs lack standing in their own right.

Although the organization plaintiffs have not directly alleged, much less proven, any direct injury to themselves as a result of the Voter ID Law they imply that they have standing in their own right because, if the law is upheld, it will require them to shift resources away from existing programs to efforts aimed at helping voters comply with the Voter ID Law's requirements.  The only basis for this interpretation of direct injury would be premised on Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982):

If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities -- with the consequent drain on the organization's resources -- constitutes far more than simply a setback to the organization's abstract social interests. We therefore conclude, as did the Court of Appeals, that in view of HOME's allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

455 U.S. at 379. Havens is not applicable because (1) its reasoning applies only in the context of fair-housing agencies involved in investigating instances of housing discrimination, (2) the plaintiffs had already expended resources to investigate and uncover defendant's illegal discrimination, (3) such injury would be of the organization plaintiffs' own making because it was based on an optional programming decision which does not confer Article III standing, and (4) if an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit. Such an interpretation violates well-established standing principles. "[A]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990).

Plaintiffs here have demonstrated no greater organizational standing than was rejected in Havens. This is not a fair housing case. There has been no allegation that any plaintiff has expended funds addressing the requirements of

the Voter ID Law. If any organization shifted funding, it would be creating its own injury which does not confer standing and simply filing this lawsuit is not the type of financial impact which supports standing. The organization plaintiffs have no standing in their organizational capacity.

                b)     The organizations have no standing to represent their members.

      The organization plaintiffs will claim that they have standing on behalf of their members to "vindicate the interests of its members who are qualified and registered to vote in Albuquerque." Complaint, ¶¶ 2, 3, 4. What the organization plaintiffs have presented to support standing for the alleged injury to their members is nothing more than unsupported assertions. No one of the organization plaintiffs has identified a single member who does not already possess the required photo identification and has an injury beyond the mere offense at having to present photo identification to vote. The organization plaintiffs' "have not alleged, much less proven that any of [their] members or directors either suffered an injury or was threatened with immediate injury to the extent that the member or director would be able to make out a justiciable case had he brought suit himself." Hope, Inc. v. DuPage County, Ill., 738 F. 2d 797, 814 (7th Cir. 1984). Since the organization plaintiffs have failed to identify any member who has standing, the organizations do not have representational standing. Fund Democracy, LLC v. S.E.C., 278 F. 3d 21, 27 (D.C. Cir. 2002) (plaintiff lacked Article III standing because it did "not identify a single affiliate who has invested or is considering investing in Hillview Funds"); Doe v. Stincer, 175 F.3d 879, 888-87 (11th Cir. 1999) (the right to sue on behalf of its

constituents does not relieve the Advocacy Center of its obligation to show that one of its constituents otherwise had standing to sue").

The standing of the organization plaintiffs here suffers the same lack of injury. None of the organizational plaintiffs have been able to claim that any member of their organizations lack a photo ID card. As a result the organizations lack representational standing.

    c) Plaintiff organizations lack standing on behalf of the individuals served by the organizations.

To the extent the organization plaintiffs imply that their standing is derived from the standing of the individuals they serve, such standing has been explicitly rejected: "The Supreme Court has not seen fit to extend representational capacity standing to entities other than associations which actually represent interests of parties whose affiliation with the representational litigant is that of membership with the representative or substantial equivalent of membership. We likewise decline to further extend representational standing." Hope, 738 F.2d at 814. An organization cannot unilaterally expand its representational capacity to include all the individuals it serves.

Hope declined to expand the Supreme Court's reasoning beyond the legislatively created advocacy agencies. The individuals served by the plaintiff nonprofit advocacy group "are not and cannot be considered members." Hope, 738 F.2d at 814. If the organization plaintiffs in this case are attempting this extension of representational standing, this claim has been specifically rejected.

No plaintiff has demonstrated the requisite injury in fact, organizational or representational capacity to assert standing. The complaint should be dismissed

on this basis alone, as dictated by the Supreme Court's Article III jurisprudence.

V.    ARGUMENT:    Plaintiffs' Constitutional Challenges to the Voter ID Law
      should be rejected. *See* Counts I, II, and VI of the complaint, Dkt. No. 20.

      A.    Introduction.

Although Plaintiffs have not articulated the basis of their claim that the

Voter ID Law is unconstitutional, the complaint references the burden the Voter

ID Law places on voters. Because the complaint does not clearly articulate the

bases for the claims, defendant has responded to what it believes to be the

claims. For example, plaintiffs' allegations that the Voter ID Law imposes undue

burdens, although not severe burdens, on the right to vote is treated as claim of

the imposition of a severe burden for purposes of this motion.[4] Plaintiffs' basic

claim in this lawsuit is that the photo identification requirements of the Voter ID

Law violate the First and Fourteenth Amendments of the Constitution because

they burden the right to vote. Plaintiffs are contending that the Voter ID Law is

subject to strict scrutiny. Regardless of the basis of plaintiffs' claim, they have

failed to demonstrate that strict scrutiny of the Voter ID Law is warranted. They

have failed to adduce evidence establishing that any actual voters will be

adversely impacted by the Voter ID Law. Strict scrutiny being inapplicable, the

Voter ID Law is subject to a less stringent analysis that dictates dismissal of

plaintiffs' constitutional challenges.

      B.    The Voter ID Law authorized by Article I, Section 4 Clause 1 of the

---

[4] The burdens alleged by plaintiffs include obtaining and keeping an identification
card, complaint, Dkt. no. 20, ¶ 6, voting by absentee ballot rather than showing
identification at in person voting, complaint, Dkt. no. 20, ¶ 7, and the broad
allegation that the Voter ID Law imposes undue burdens on the fundamental right
to vote, Complaint, Dkt. no. 20, ¶ 21.

United States Constitution does not regulate the manner of electing public officials.

Article 1, Section 4 of the United States Constitution provides the States with the power to determine the "Times, Places and Manner of holding elections for Senators and Representatives," subject to Congressional oversight.  U.S. Const., Art. I, Section 4, Cl. 1.  The Elections Clause applies to elections conducted by states and their political subdivisions.  Tashjian v. Republican Party of Conn., 479 U. S. 209, 217 (1986).  The City of Albuquerque is a political subdivision of the state and is a home rule municipality under Article X, Section 6 of the Constitution of New Mexico.  City of Albuquerque v. Chavez, 91 N.M. 559, 556 P.2d 457 (Ct. App.) cert. denied, 91 N.M. 610, 577 P.3d 1256 (1978).   As a home rule municipality, the city may exercise all legislative powers and perform all functions not expressly denied by general law or charter including the administration of municipal elections.  Chavez, 556 P. 2d at 457.  A home rule municipality in New Mexico may act unless expressly limited by the state. Apodaca v. Wilson, 86 N.M. 516, 525 P.2d 876 (1974). The Elections Clause, in conjunction with Article I, section two and Article II, section one, is the basis of the judicially recognized right to vote, enforced by Amendments I, XIV, XV, XVII, XIX, XXIV and XXVI.

The Voter ID Law is an exercise of the city's Elections Clause authority; it is fundamentally different from voter qualifications laws, such as age and residency requirements.  It does not establish any criteria or barrier to voting and is simply an enforcement method for insuring that eligibility requirements are met. Rather than limit the franchise to a certain subset of the population, the Voter ID

Law protects voting by insuring that those who meet substantive eligibility

requirements have their votes counted without being diluted by ineligible voters.

Questions on how best to enforce legitimate criteria are legislative policy

questions and are not subject to judicial invalidation.

> C. The Voter ID Law does not impose substantive voting criteria; it protects legitimate voters by enforcing substantive criteria that already exist.

>> 1. The city has the right to regulate elections.

"No right is more precious in a free country than that of having a voice in

the election of those who make the laws under which, as good citizens, we must

live." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). It is just as important that the

right to vote is not simply the right to cast a ballot, but also the right to have that

vote counted.  U.S. v. Saylor, 322 US 385, 387; 64 S. Ct. 1101, 1103; 88 L. Ed.

1341, 1343 (1994).  To protect that right, states must undertake reasonable

efforts to ensure that those who cast ballots are actually entitled to do so.

Without such safe guards, the right to vote, and the right to have that voted

counted, would become increasingly diluted amidst a poll of fraudulent ballots.

> State regulation of elections, such as is at issue here, has been upheld:

>> States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote... Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).

> Among the important interests that justify such regulations is the interest in

23

preserving the "integrity and reliability of the electoral process itself." 460 U.S. at

788 n.9.   And while "nothing in the language of [Article I, Section 4] gives

support to a construction that would immunize" state laws that destroy a citizen's

right to vote the ability of the States to determine the procedures and

mechanisms of elections held within their borders is unquestioned.   Smiley v.

Holm, 285 U.S. 355, 366 (1932) (citation omitted).

The Court has rejected the "the erroneous assumption that a law that

imposes any burden upon the right to vote must be subject to strict scrutiny."

Burdick v. Takushi, 504 U.S. 428, 432 (1992).   Otherwise, "to subject every

voting regulation to strict scrutiny and to require that the regulation be narrowly

tailored to advance a compelling state interest . . . would tie the hands of States

seeking to assure that elections are operated equitably and efficiently." 504 U.S.

at 433; see also Rokita, *114-118.  Because "the States are given the initial task

of determining the qualifications of voters who will elect members of Congress,"

not every substantial restriction on the right to vote is presumptively invalid.

Storer v. Brown, 415 U.S. 724, 729-30 (1974)("as a practical matter, there must

be a substantial regulation of elections if they are to be fair and honest and if

some sort of order, rather than chaos, is to accompany the democratic process").

> 2.     Governmental interests outweigh the minimal burden on
>        an individual's right to vote.

Anderson explained the critical process of balancing the government and

individual interests when election laws are challenged.

> [The Court] must first consider the character and magnitude of the
> asserted injury to the rights protected by the First and Fourteenth
> Amendments that the plaintiff seeks to vindicate.   It then must

identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789. When modest, nondiscriminatory restrictions on the right to vote are placed on this scale, the general interests of the electorate in preserving the integrity of free and fair elections are sufficiently weight to justify the restrictions. 460 U.S. at 788; *see also* Burdick, 504 U.S. at 434; Rokita at *117-118.

Many election regulations that may exclude some otherwise legitimate voters are permissible under this standard. For example, requiring voters to register in advance of elections may help prevent fraud, but it also undoubtedly excludes otherwise qualified and willing voters who do not register or have access to the voter registration process. Similarly, requiring voters to vote in public at a specified polling place is a means burdens the right to vote as does a requirement that voters who register by mail submit identification when voting absentee. *See* Section 1-6-5 D. NMSA 1978. Likewise, voters may not want to vote because of the requirement that identification must be shown at all state elections and that at the request of two or more precinct board members of different political parties, a voter is required to present the required physical form of identification, Section 1-12-4.1 NMSA 1978. Other provisions of the state law further burden the right to vote, Section 1-12-4.1 NMSA 1978 (voter required to present the physical form of identification in certain circumstances).

Even with the possibility of such collateral disenfranchisement, there can no serious dispute with advance registration, polling-place requirements, or self-identification at the polls or in absentee voting. Requiring voters to provide proof of identity with commonly possessed documentation is no different.[5]

The Voter ID Law imposes no more onerous burden on city voters than do the restrictions upheld in other cases. The Voter ID Law does not impose any undue burden on Albuquerque voters.

D.    The requirements of the Voter ID Law are not disproportionate to the city's interest in detecting and deterring identity fraud at the polls.

Photo identification is universally accepted as proof of identification in the United States. The vast majority of the population that is of voting age operates automobiles requiring driver's licenses which include the name and photo of the driver. There can be no serious contention that, if a motor vehicle operator does not want his or her picture on a license, the license will be issued without the picture. The Transportation Security Administration demands to see government-issued photo identification before travelers can pass through security checkpoints at airports. The United States Marshal's Service requires presentment of government-issued photo identification before allowing anyone to enter United States Courthouses. *See* United States v. Smith, 426 F.3d 567,

---

[5]    *See also* League of Women Voters v. Blackwell, 340 F. Supp. 2d 823, 828-29 (N.D. Ohio 2004) (upholding the requirement that first-time voters who register by mail provide acceptable proof of identity even though some voters may be disenfranchised; McKay v. Thompson, 276 F.3d 752, 756 (6th Cir. 2000) (upholding Tennessee statute requiring disclosure of the voter's Social Security number as a condition for voter registration); Greidinger v. Davis, 988 F.2d 1344, 1352-55 (4th Cir. 1993) (holding that state may require voters to reveal their social security numbers though it may not publicly disclose such numbers).

571-72 (2nd Cir. 2005). Photo identification is needed for virtually any commercial transaction such as renting a car, cashing a check, or even purchasing goods at Costco. The Voter ID Law allows any of these forms of photo identification that contains the voters name and photograph on the identification. To make the voter ID requirement even less onerous, the Voter ID Law accepts identification already in place rather than creating an entirely new system.[6] The Voter ID Law promotes a substantial state interest of utmost importance. Any incidental, marginal deterrence of legitimate voters, while unfortunate, is more than outweighed by the protection afforded to legitimate voters as a whole. *See* Summit County Democrat Cent. and Executive Comm. v. Blackwell, 388 F.3d 547, 551 (6th Cir. 2004).

The balancing test established by the courts supports imposition of the city's Voter ID Law. Preventing fraud far outweighs any minimal impact on voting in the city. Plaintiffs must provide proof that the Voter ID Law interferes with the right to vote and that the interference should yield to voters' interests. While plaintiffs initially disclosed several "experts" who attempted to provide evidence of such interference, after depositions were conducted, plaintiffs withdrew those experts from the litigation, leaving plaintiffs with no proof of any burden being imposed on city voters. Because there is no evidence of any individual voter who has been burdened and no expert testimony to establish the existence of such burdens, any claim of plaintiffs should fail for lack of factual proof, as well as legal

---

[6] This is, in fact, a distinguishing feature of the Voter ID Law that dispels any notion that it is a poll tax. Whereas a poll tax would be a universal predicate for voting requiring every voter to pay the tax, here nearly everyone already has the required identification and those who do not, can obtain it without cost.

justification.

      E.     Strict Scrutiny of the Voter ID Law is not warranted.

Voting regulations may be subjected to strict judicial scrutiny only if they impose "severe" burdens on the right to vote.   *See* <u>Burdick</u>, 504 U.S. at 434. The Voter ID Law does not impose severe burdens on the right to vote as evidenced by plaintiffs' inability to identify any voter or potential voter who has been burdened at all.

Strict scrutiny means "the State must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." <u>Burson v. Freeman</u>, 504 U.S. 191, 198 (1992).  Plaintiffs have failed to submit: (1) evidence of any individuals who will be unable to vote or who will be burdened to vote; or (2) any statistical or aggregate data identifying particular groups which will be disenfranchised or burdened in voting.  All that plaintiffs have presented is the vague assertion that the homeless will be burdened if they are required to obtain and retain photo identification.  *E.g.*, Complaint, Dkt. no. 20, ¶ 7; Exhibit F (Hughes deposition), pp. 32, 33; cost of a driver's license or identification card from the state of New Mexico and cost of travel; Exhibit D (Goldfarb deposition), pp. 9-11.  One witness opined that requiring a homeless individual to obtain a Voter ID would be so intimidating that the individual would choose not to vote rather than to obtain the Voter ID.  This opinion, however, was based on the erroneous assertion that the only means for obtaining the requisite identification to permit an individual to vote would be to obtain the ID from the city clerk.  Exhibit F (Thomas deposition), pp. 32, 36, 37.

Plaintiffs have, at most, attempted to demonstrate that there will be some burden resulting from the Voter ID requirement on some unidentified homeless person who does not currently possess a photo ID.  They have failed to adduce evidence as to what will cause the burden, the extent of the burden or to identify any specific individual who has been so burdened.  In the absence of such evidence, strict scrutiny analysis is not appropriate.

       1.     Plaintiffs have presented no evidence of any individuals who will be severely burdened by the Voter ID Law.

Plaintiffs have produced no evidence of any identifiable registered voter in Albuquerque who would be prevented from voting pursuant to the Voter ID Law because of his or her inability to obtain the necessary photo identification. Similarly, plaintiffs have failed to identify any individual, registered or unregistered, who would have to obtain photo identification to vote, let alone any individual who would undergo any appreciable hardship to obtain such identification to be qualified to vote.  At most, some of the plaintiffs assert that they know of people, or know of people who know of people, who claim those people will not be able to vote as a result of the Voter ID Law.  None of these allegedly affected individuals has been identified by name, submitted an affidavit or become a party to this litigation. Facts Nos. 22 – 38.  There was no testimony that any member of plaintiff organizations or any individual who the plaintiff organizations sought to represent lacked photo identification.  There is no evidence that any plaintiff organization would be burdened by imposition of the Voter ID requirement.  While other plaintiffs or organization representatives knew of some people (without specifying a single name) who might not have a voter

29

ID, there was no evidence that these individuals were unable to vote or could not

obtain acceptable photo identification if needed or that the individual was even

registered to vote in Albuquerque.

> As the court stated in <u>Rokita</u>, at *125,

>> We do not doubt that such individuals exist somewhere, even
>> though Plaintiffs were unable to locate them. However, it is a
>> testament to the law's minimal burden and narrow crafting that
>> Plaintiffs have been unable to uncover anyone who can attest to
>> the fact that he/she will be prevented from voting despite the
>> concerted efforts of the political party and numerous interested
>> groups who arguably represent the most severely affected
>> candidates and communities. Lacking any such individuals who
>> claim they will be prevented from voting, we are hard pressed to
>> rule that [the Indiana Voter ID Law] imposes a severe burden on
>> the right to vote. To the contrary, we conclude that Plaintiffs' lack of
>> evidence confirms that [the law] is narrowly tailored because every
>> hypothetical individual who Plaintiffs assert would be adversely
>> affected by the law actually benefits from one of its exceptions.

The Voter ID Law at issue here imposes even less of a burden on the right to

vote than does the Indiana law at issue in <u>Rokita</u>.  The same analysis applies,

however, and dictates that the city's law imposes no improper burden.

> 2.    Plaintiffs can present no statistical evidence of any group
>       which will be severely or disproportionately impacted.

Plaintiffs have not adduced statistical data in an effort to show the number

of individuals affected by the Voter ID Law.  While plaintiffs originally tendered

five individuals to provide expert testimony to demonstrate that individuals would

be adversely impacted, after their depositions, plaintiffs withdrew the tender of

the five witnesses, leaving them with no evidence to statistically establish that

any group will be severely or disproportionately burdened.  Notice of Withdrawal

of Plaintiff's Expert Witnesses, Dkt. no. 51.  Under F.R.Evid. Rule 701, such

statistical evidence may not be given by a lay witness;  Rule 701 requires that any opinion rendered be based on personal knowledge.  The Rule does not permit completely hypothetical testimony.  The judge may exclude all opinion evidence if it is confusing, not helpful in clarifying the testimony of the witness to assist understanding the facts of the case, or if it goes well beyond the facts presented. *See* Washington v. Department of Transp., 8 F.3d 296 (5th Cir. 1993) ("speculative opinion testimony by lay witnesses -- *i.e.*, testimony not based upon the witness' perception -- is generally considered inadmissible").

With no expert testimony and no competent evidence to support a lay opinion, plaintiffs cannot present a statistical case that voters have been unduly burdened.  There is no evidentiary basis for invalidating the Voter ID Law.

    3.    There is no evidence that any alleged difficulty in obtaining photo identification is related to affluence or gender.

Plaintiffs have argued that the requirements for obtaining photo identification from the State of New Mexico and other sources impose an "unconstitutional requirement demonstrating affluence and gender discrimination" and therefore an "undue discriminatory burden on the fundamental right to vote." Complaint, Dkt. no. 20, Count II.  There is no evidence presented by plaintiffs that any individual or group will be discriminatorily burdened.  No evidence has been presented that any significant number of people in Albuquerque who are of voting age lack some adequate form of identification card.  There is no evidence that any individual or organization cannot obtain a voter ID because the individual cannot afford to obtain the identification.  In fact, several plaintiffs' organizations provide assistance to different populations to obtain drivers' licenses or

identification cards which satisfy the voter ID requirements. Given the lack of evidence that any individual has been unable to obtain an ID because of financial inability, the Voter ID Law cannot be deemed to impose any new or impermissible burdens on these voters.

Moreover, based on the evidence produced in the depositions, the individuals and groups that plaintiffs contend will be disproportionately impacted by the Voter ID Law all appear to be able to obtain or produce adequate photo identification at no cost. For example, while one plaintiff, Kazarus, had an out-of-state drivers license, which she mistakenly did not believe was sufficient to allow her to vote, she also had a Costco ID which was clearly adequate under the Voter ID Law.

Plaintiffs claim with no evidentiary support that the Voter ID Law discriminates against them on the basis of gender. The Voter ID Law itself is gender neutral; it does not require a photo ID only for women. Plaintiffs have not stated how the Voter ID Law could be discriminatory and have not presented any evidence to support such an assertion. Even when plaintiffs identified experts, no expert opined that the law was discriminatory on the basis of gender and no expert presented statistical evidence of such discrimination. Because plaintiffs have withdrawn even these experts, there can be no statistical evidence to support a claim of gender discrimination.

F.     There is a rational basis for the requirements of the Voter ID Law.

Having determined that strict scrutiny is not warranted, "the constitutional question is whether the restriction and resulting exclusion are reasonable given

32

the interest the restriction serves." Griffin v. Roupas, 385 F.3d 1128, 1130 (7th

Cir. 2004). The city has a recognized interest in ascertaining a voter's identity as

a means of discouraging voter fraud which justifies the photo identification

requirements of the Voter ID Law.

The city has a compelling interest in insuring that the individual who

appears to vote is registered and has not previously voted. It is also well

established that the City has an important interest in preventing voter fraud. As

the Supreme Court has observed:

> It cannot be doubted that these comprehensive words [of Article I §
> 4] embrace authority to provide a complete code for congressional
> elections, not only as to times and places, but in relation to . . .
> *prevention of fraud and corrupt practices* . . . to enact the numerous
> requirements as to procedure and safeguards which experience
> shows as necessary in order to enforce the fundamental right
> involved.

Smiley v. Holm, 285 U.S. at 366 (*emphasis added*). In examining an election

regulation aimed at combating fraud, courts are to give deference to the

legislative judgment because "the striking of the balance between discouraging

fraud and other abuses and encouraging turnout is quintessentially a legislative

judgment with which we judges should not interfere unless strongly convinced

that the legislative judgment is grossly awry." Griffin v. Roupas, 385 F.3d at 1131.

Rokita, at *131-132, found no basis to conclude that the legislative

judgment in enacting the Indiana Voter ID Law was grossly awry:

> The State Legislature sought through this statute to advance the
> interest of combating voter fraud by requiring that in-person voters
> present a form of photo identification that virtually all registered
> voters already possess. The State repeatedly notes in defending its
> enactment that presentation of photo identification is routinely
> required for a multitude of everyday activities-from boarding a

33

plane, entering a federal building, to cashing a check. The incontrovertible fact that many public and private entities already require individuals to present photo identification substantially bolsters the State's contention that "among all the possible ways to identify individuals, government-issued photo identification has come to embody the best balance of cost, prevalence, and integrity."

We therefore accept and concur in the State's "important regulatory interest" in combating voter fraud and find it sufficient to justify the "reasonable, nondiscriminatory restrictions" contained in [the Indiana law]. *See* Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358-59, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997).

Preventing fraud provides the rational justification for imposition of a voter

identification requirement. The legislative means of preventing fraud is to be

given deference. Albuquerque's Voter ID Law is a valid enactment.

G.    The burden of proof is on plaintiffs to demonstrate that the Voter ID Law is not justified.

The Voter ID Law contains findings of voter registration and voter-identify

theft. It is not the City's obligation to justify the voter identification requirements

but plaintiffs' obligation to provide evidence that the law is invalid. There is no

requirement of "elaborate, empirical verification of the weightiness of the State's

asserted justifications." Timmons v. Twin Cities Area New Party, 520 U.S. 351,

364 (1997); *see also* Munro v. Socialist Workers Party, 479 U.S. 189, 195-196

(1986) ("Legislatures . . . should be permitted to respond to potential deficiencies

in the electoral process with foresight rather than reactively, provided that the

response is reasonable and does not significantly impinge on constitutionally

protected rights").

Rokita reiterated this justification:

34

> Assuming *arguendo* that the State was required to empirically
> substantiate its justification for [the Indiana voter ID law], in our
> view it has clearly done so. The State cites incidents of reported in-
> person fraud in recent elections in Florida, Georgia, Missouri, New
> York, Washington, and Wisconsin as well as reports of individual
> voters using the names of dead persons, according to published
> reports in Georgia, Illinois, Maryland, Missouri, Pennsylvania, and
> Wisconsin. . . The State also points to the findings of the Barker-
> Carter Commission which found that "fraud and multiple voting in
> U.S. elections" occurs and that such fraud "could affect the
> outcome of close elections." State's Ex. 1 at 18. ... Finally, as the
> State maintains, without a photo identification requirement it is
> nearly impossible to detect in-person voter impersonation. These
> factual assertions sufficiently establish a justification on the part of
> the Indiana General Assembly to enact the photo identification
> requirements in [the law].

Rokita, at * 133. The same justifications apply to the city's Voter ID Law:

reported incidents of fraud, findings of federal commissions and factual

assertions by the legislating body all justify imposition of the Voter ID

requirements.

>      H.    Incidental Impact on some voters, if proven, will not invalidate the
>            Voter ID Law.

Plaintiffs complain that some voters such as the homeless may have their

photo identification cards stolen and otherwise may not be able to retain

possession of such identification, even though social services agencies provide

identification to the homeless. Complaint, Dkt. no. 20, ¶ 6; *see e.g.*, Exhibit J

(Thomas Deposition), pp. 31, 64, 72. Rokita addressed and rejected the same

argument that, through no fault of his or her own, a potential voter may not be in

possession of a valid ID at the time he or she appears to vote:

> If these hypothetical situations materialized, they would obviously
> be unfortunate, but in no event would they rise to the level of a
> constitutional violation because "unavoidable inequalities in
> treatment, even if intended in the sense of being known to follow

> ineluctably from a deliberate policy, do not violate equal protection."
> Moreover, none of the hypothetical, would-be voters conjured up by
> the Democrats would be prevented by [the Indiana law] from voting,
> given that all would be permitted to vote through a provisional
> ballot, after which they would have approximately two weeks to
> obtain photo identification, appear before the circuit court clerk or
> county election board, and have their provisional ballot validated.
> There is no constitutional concern here deserving of a remedy,
> based on such incidental impact on voters.

Rokita at *139 (citations omitted). The city's Voter ID Law provides the same

accommodation for voting by provisional ballot in a situation where the voter

appears but, for lack of an ID, cannot vote. Rokita rejected a challenge to the

voter ID requirement based on some nebulous incidental impact. Both Indiana

and Albuquerque have provided alternate means of voting in such situations and

the ID requirements should be upheld.

VI.    ARGUMENT:    Plaintiffs' Equal Protection claims in Counts I and II
                    of the Complaint lack any factual or legal basis and
                    should be dismissed.

    A.    Different remedies exist for Absentee and In Person Voting issues.

    Plaintiffs complain that the Voter ID Law violates the Equal Protection

Clause because it does not apply equally to absentee voters. Complaint, Dkt.

no. 20, ¶ 15. Plaintiffs' argument is that the allegedly discriminatory Voter ID Law

should be expanded to apply to absentee voting. Plaintiffs' two arguments are

internally inconsistent. If, as argued by plaintiffs, the Voter ID Law violates their

First Amendment rights by imposing a burden, then expanding its application

would presumably burden more voters. As argued above, there is no basis for

applying strict scrutiny to the Voter ID Law. Thus the appropriate equal

protection analysis is whether the city had a rational basis for applying the Voter

ID Law to in-person, but not absentee voting. The Voter ID Law satisfies this requirement.

The Voter ID Law helps protect against identity fraud as to in-person voting at the polls. Application of the Voter ID Law to mail-in or absentee ballots would not prevent fraud. The type of fraud addressed by the Voter ID Law occurs when an individual who is not entitled to vote arrives at a precinct-polling place and claims the identity of someone whose name is on the voter registration list for that precinct. Because state law requires that a list of voters be posted at the entrance of each polling place, Section 1-12-7.1 NMSA 1978,[7] identity theft becomes fairly simple: rather than the fraudulent voter being required to view the registration list at the City or County Clerk's office, that voter can simply review the list posted at the poll. Requiring voters to present photo identification provides election officials with the opportunity to check the name on the identification card against the information in the poll book and simultaneously check the photograph on the identification card against the name of the person who will cast the ballot. The photo identification thus becomes a link between the persons presenting themselves at the polls and the previously established record in the registration database.

Absentee ballot fraud typically occurs in a different way and is not readily detectable by checking photo identification. As Denise Lamb testified, the primary absentee ballot fraud is coercion of legitimate voters, not simply voting in

---

[7]    1-12-7.1. A. Each precinct board using voter lists shall post securely at or near the entrance of the polling place one copy of the precinct voter list for use of the voters prior to voting. The posted copy shall not contain a listing of voter social security numbers.

the name of another. Fact No. 39, see also, <u>Pabey v. Pastrick</u>, 816 N.E.2d 1138, 1145-46 (Ind. 2004); <u>Schoffstal v. Kaperek</u>, 457 N.E. 2d 550, 552-54 (Ind. 1984). Requiring voters to enclose some form of photo identification obviously would not detect the sort of fraud found in absentee ballots.

Even if absentee ballot fraud occurs through voter impersonation, a photo identification requirement would be of little use. The only means for applying an absentee voter identification requirement would be to have absentee voters include some form of picture identification with their absentee ballot or ballot application. While requiring absentee voters to enclose a copy of photo identification with their ballots would provide election officials with a trustworthy source to establish a link with the name of the registered voter, the absence of a person standing before those same election officials precludes linking the enclosed identification with the person actually casting the ballot. A critical link in the chain of identity verification is thereby lost, meaning that the photo identification is of little practical significance in detecting absentee ballot fraud.

In addition, the voter roster signature requirement of Section 3-8-41 A. NMSA 1978[8] is of little benefit to detect voter identity theft at the polling place because election officials are both untrained in signature analysis and under

---

[8] 3-8-41. Conduct of election; voter's name, address, signature; entries by precinct board. (1985) A.  When a person presents himself at the polls to vote, he shall announce his name and address in an audible tone of voice and locate his name and number in the registered voter list posted for such purpose. An election clerk shall locate the person's name and number in the signature roster. The person shall then sign his name in the signature roster, or if he is unable to write, the election clerk shall sign his name in the signature roster which shall be initialed by an election judge in the signature roster. Thereupon, a challenge may be interposed as provided in the Municipal Election Code [As to challenges to the voter, see Section 3-8-43 NMSA 1978].

pressure to keep voter lines moving. With absentee voting, the election officials

can check the name and address of the voter against the voter registration rolls

on the County Clerk's computer database of registered voters, without time

pressure. Election officials at the polling places on Election Day do not have the

benefit of a computer link to this database. Exhibit B (Fulgenzi affidavit).

    B.    Plaintiffs' equal protection challenge is the differential treatment of
            in-person and absentee voters.

Implicit in this argument is that voters have a right to choose their method

of voting and the Voter ID Law may limit this choice, dictating absentee rather

than in-person voting. Complaint, Dkt. no. 20, ¶ 7. There is no constitutional right

to vote in any specific manner and there is no right to First Amendment

associational right to vote without restriction, for political or other purposes.

Burdick v. Takuski, 504 U.S. 428, 432 (1992).

The equal protection argument fails to address the obvious fact that

absentee voting is an inherently different procedure from in-person voting:

> Indeed, it is axiomatic that a state which allows for both in-person
> and absentee voting must therefore apply different requirements to
> these two groups of voters. Not surprisingly, [plaintiffs] cannot cite
> to a single case in support of their contention that a state may not
> impose different requirements on absentee and in-person voters,
> nor do [plaintiffs] challenge Indiana's authority to allow for absentee
> voting or Indiana's limitation on the classes of voters who are
> permitted to vote absentee. Accordingly, the mere fact
> that[the]photo identification requirements apply only to in-person
> voters and not to absentee voters does not offend the Equal
> Protection Clause.

Rokita, at *147.

> Even assuming that SEA 483 violated the Equal Protection clause,
> the State has provided an eminently reasonable explanation for this
> exception: "Election officials would have no way to compare photo
> identification included with an absentee ballot . . . with the face of

> the person who actually marked the ballot;" thus "requiring voters to
> include a photocopy of the identification would . . . have little, if any,
> benefit in terms of fraud prevention and detection." ... While the
> Democrats question the logic of this explanation, ... they have not
> presented any evidence or argument suggesting that, in not
> applying the photo identification requirement to absentee voters,
> the Indiana General Assembly was motivated by discriminatory
> animus. Accordingly, we find the State's explanation for the
> absentee ballot exception to be self-evident and non-discriminatory
> and, thus, overcomes any Equal Protection concerns.

Rokita, at *149.

C.    The "current valid" photo identification requirement.

In the Complaint, ¶¶ 17, 25, Plaintiffs seem to complain that the words

"current" and "valid" that precede "photo identification card" are not defined.

Unlike the Indiana law, which is the subject of Rokita, the Voter ID Law does not

require an expiration date to be present on the identification.  Should a photo

identification card contain an expiration date, it must be a date after the date the

voter presents the identification card, Exhibit B (Fulgenzi affidavit).  Photo

identification cards must be valid and not be forgeries, Exhibit B (Fulgenzi

affidavit).  Plaintiffs seem also to contend that only photo identification cards

issued by the state of New Mexico and the Federal government may be accepted

by election officials. Exhibit C (Santillanes deposition), p. 35, even though the

Voter ID act only requires an identification card issued by a government agency,

Exhibit A (Voter ID Law).  Plaintiffs have not articulated which theory of law is

offended these alleged deficiencies. Each of these requirements is directly

related to the material requirement of establishing an individual voter's identity.

The requirement of a current valid photo allows poll workers to compare the

individual's face to the identification tendered to ensure the individual is who

he/she professes to be; the expiration date, if any, is relevant to the reliability of the identification presented. Even if the Plaintiff's contention that there are governmental limitations on the sources of permissible identification is accepted by the Court, this limitation also helps ensure that the identification card utilized by a voter is reliable, Rokita, at 182.

VII.    CONCLUSION

For the reasons discussed in this memorandum, defendant respectfully requests that this court dismiss plaintiffs' complaint in its entirety. First, plaintiffs lack standing to pursue the claims asserted. Second, the Voter ID Law is a valid exercise of the city's authority to regulate its elections. The law does not impose any undue burden on the right to vote. Third, imposition of the Voter ID Law does not violate the First or Fourteenth Amendments. There are no material issues of fact in dispute and plaintiffs' claims should be denied as a matter of law.

Respectfully submitted,

CITY OF ALBUEQUERQUE
Robert M. White
City Attorney

Mark Shoesmith
Assistant City Attorney
Attorney for Defendant
P.O. Box 2248
Albuquerque, New Mexico 87103
(505) 768-4500

Paula I. Forney
Assistant City Attorney
Attorney for Defendant
P.O. Box 2248

41

Albuquerque, New Mexico 87103
(505) 768-4500

I hereby certify that true copy of the foregoing and the exhibits thereto were mailed to the following:

James Scarantino
1410 Coal S.W., #110
Albuquerque, N.M. 87104
(505) 242-6724
Attorney for Plaintiffs

John Boyd
Freedman Boyd Daniels Hollander Goldberg PA
20 First Plaza NW # 700
Albuquerque, NM 87102
(505) 834-9960
Attorney for Amicus Brennen Center

Patrick J. Rogers
Modrall Sperling Roehl Harris & Sisk PA
500 – 4th St. NW #1000
Albuquerque, NM 87102
(505) 848-1800
Attorney for Amicus American Center for Voting Rights

On this 13th day of September 2006

Mark Shoesmith
Assistant City Attorney

42

## NUMBERED INDEX LISTING OF EXHIBITS TO DEFENDANTS
## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Exhibit A:    City Charter Article XIII, Section 14 [Photo Voter Identification Required]

Exhibit B:    Affidavit of Kelli A. Fulgenzi

Exhibit C:    Portions of the deposition of Millie Santillanes

Exhibit D:    Portions of the deposition of Diane Goldfarb

Exhibit E:    Portions of the deposition of Ozawa Bineshi Albert

Exhibit F:    Portions of the deposition of Henry Hughes

Exhibit G:    Portions of the deposition of Alexandra Kazaras

Exhibit H:    Portions of the deposition of Anne Kass

Exhibit I:    Portions of the deposition of Barbara Grothus

Exhibit J:    Portions of the deposition of Milton D. Thomas

Exhibit K:    Portions of the deposition of Denise Lamb

Exhibit L:    Portions of the deposition of Laurie A. Weahkee

**THE EXHIBITS ATTACHED TO THIS**

**PLEADING ARE TOO VOLUMINOUS**

**TO SCAN..  SAID EXHIBITS ARE**

**ATTACHED TO THE ORIGINAL**

**PLEADING IN THE CASE FILE WHICH**

**IS LOCATED IN :**

**THE RECORDS DEPARTMENT**
**CLERK'S OFFICE**
**U.S. DISTRICT COURT......**