**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**THE AMERICAN CIVIL LIBERTIES UNION OF NEW
MEXICO; THE LEAGUE OF WOMEN VOTERS OF
ALBUQUERQUE/BERNALILLO COUNTY, INC.;
SAGE COUNCIL; NEW MEXICO COALITION TO
END HOMELESSNESS; ANNE KASS; ALEXANDRA
KAZARAS, and BARBARA GROTHUS,**

        Plaintiffs,

        vs.                        No. CIV 05-1136 MCA/WDS

**MILLIE U. SANTILLANES,
ALBUQUERQUE CITY CLERK,**

        Defendant.

---

**BRIEF OF BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

Sidney S. Rosdeitcher
J. Adam Skaggs
PAUL, WEISS, RIFKIND
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

John W. Boyd
Martha E. Mulvany
FREEDMAN, BOYD, DANIELS
HOLLANDER & GOLDBERG P.A.
20 First Plaza, Suite 700
Albuquerque, NM  87102
(505) 842-9960

Wendy R. Weiser
Justin Levitt*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
161 Avenue of the Americas
12th Floor
New York, NY 10013
(212) 998-6730

*ATTORNEYS FOR AMICUS CURIAE BRENNAN CENTER FOR JUSTICE*

*Admitted in California, the District of Columbia, and New Jersey only

# TABLE OF CONTENTS

INTEREST OF THE AMICUS ........................................................................ 1

STATEMENT OF THE ISSUE ..................................................................... 1

SUMMARY OF THE ARGUMENT ............................................................ 1

ARGUMENT.................................................................................................. 4

ALBUQUERQUE'S PHOTO ID REQUIREMENT IS AN
UNREASONABLE AND  TOTALLY UNNECESSARY RESPONSE
TO THE EXTREMELY UNLIKELY AND UNSUBSTANTIATED
THREAT OF IMPERSONATION FRAUD THAT WILL SUPPRESS
VOTER PARTICIPATION ................................................................... 4

A.     Impersonation Fraud Is Highly Unlikely And Exceedingly Rare ......................... 7

B.     Albuquerque's Photo ID Requirement Is Not A Reasonable Or Proportional
Response To Possible Impersonation Fraud ....................................................... 19

1. HAVA Provisions Addressing Election Fraud .............................................. 20

2. Alternative Methods of Voter Identification Used In Other States ................. 21

CONCLUSION................................................................................................ 27

CERTIFICATE OF SERVICE ...................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Borders* v. *King County*, No. 05-2-00027-3 (Wash. Super. Ct. Chelan Cty. June 6, 2005) ........ 12

*Burdick* v. *Takushi*, 504 U.S. 428 (1992) .......................................................................... *passim*

*Common Cause/Georgia* v. *Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) ......................... 3, 24

*Common Cause/Georgia* v. *Billups*, 439 F.Supp. 2d 1294 (N.D. Ga. 2006) ....................... 3, 5, 6

*Common Cause/Georgia* v. *Cox*, No. 05-15784 (11th Cir. Feb. 9, 2006) .................................... 3

*Crawford* v. *Marion County Election Bd.*, No. 06-2218 (7th Cir. docketed May 1, 2006) ........... 3

*Florida Star* v. *B.J.F.*, 491 U.S. 524, 541-42 (1989) ................................................................ 8

*Griffin* v. *Roupas*, 385 F.3d 1128 (7th Cir. 2004) .................................................................. 6

*Hall* v. *St. Helena Parish School Board*, 197 F. Supp. 649 (E.D. La.1961), *aff'd*,
     368 U.S. 515 (1962) ................................................................................................ 19

*Indiana Democratic Party* v. *Rokita*, No. 1:05-CV-0634-SEB-VSS, 2006 WL
     1005037 (S.D. Ind. Apr. 14, 2006) ......................................................................... 3, 24

*Indiana Democratic Party* v. *Rokita*, No. 06-2317 (7th Cir. docketed May 8, 2006) ................... 3

*Jackson County* v. *Missouri*, No. 06AC-CC00587 (Cole Cty. Cir. Ct. Mo. docketed
     July 17, 2006) ........................................................................................................... 3

*Lake* v. *Perdue*, No. 06-cv-119207, Temporary Restraining Order (Fulton Cty.
     Sup. Ct. July 7, 2006) ................................................................................................. 3

*League of Women Voters of Florida* v. *Cobb*, No. 06-21265-CIV-SEITZ/MCALILEY,
     Order Granting in Part Plaintiffs' Motion for Preliminary Injunction
     (S.D. Fla. Aug. 28, 2006) ........................................................................................ 26

*Lucas* v. *Forty-Fourth General Assembly of State of Colo.*, 377 U.S. 713 (1964) ............... 18, 19

*McLaughlin* v. *North Carolina Board of Elections*, 65 F.3d 1215 (4th Cir. 1995) ...................... 6

*NAACP* v. *Carnahan*, No. 06-4200 (W.D. Mo. docketed Sept. 6, 2000) ..................................... 3

*New Alliance Party* v. *Hand*, 933 F.2d 1568 (11th Cir. 1991) ...................................................... 6

*Project Vote* v. *Blackwell*, No. 06cv1628, Memorandum Opinion and Order Granting
    Plaintiffs' Application for a Preliminary Injunction (N.D. Ohio Sept. 8, 2006) .............. 26

*Reform Party of Allegheny County* v. *Allegheny County Department of Elections*,
    174 F.3d 305 (3d Cir. 1999) ...................................................................................... 6

*Storer* v. *Brown*, 415 U.S. 724 (1974) ...................................................................................... 6

*Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351 (1997) ............................................... 4, 6

*Washington Association of Churches* v. *Reed*, No. 06-0726RSM, Order Granting
    Motion for Preliminary Injunction (W.D. Wash. Aug. 1, 2006) ..................................... 26

*Weinshenk* v. *Missouri*, No. 06AC-CC00656 (Cole Cty. Cir. Ct. Mo. docketed Aug. 3, 2006) .... 3

## STATUTES

42 U.S.C. § 1973i(c) ....................................................................................................... 17

Conn. Gen. Stat. § 9-261(a) (2006) .................................................................................. 23

Fla. Stat. Ann. § 97.0535(3)(b) (2005) .............................................................................. 24

Fla. Stat. Ann. § 101.053(2) (2005) .................................................................................. 25

Haw. Rev. Stat. § 11-136 (2005) ....................................................................................... 24

La. Rev. Stat. Ann. § 18:562(A)(2) (2006) ......................................................................... 24

Mass. Gen. Laws ch. 54, § 76 (2006) ................................................................................ 22

N.J. Stat. Ann. §§ 19:31a-8 (2006) ................................................................................... 22

Neb. Rev. Stat. § 32-914 (2006) ....................................................................................... 22

Nev. Rev. Stat. § 293.277 (2006) ...................................................................................... 22

NMSA 1978, § 1-1-24 (2005) ........................................................................................ 19, 23

NMSA 1978 § 1-1-7.1 (2005) ......................................................................................... 19, 23

NMSA 1978, § 1-12-9 (1969) ................................................................................. 17

NMSA 1978 § 3-8-40 (1985) ................................................................................. 17

NMSA 1978 § 31-18-15 (2005) ............................................................................. 17

REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005)........................ 16

Help America Vote Act, 42 U.S.C. § 15301 *et seq* ......................................... *passim*

Utah Code Ann. § 20A-3-104 (2006) .................................................................... 22

S.D. Codified Laws § 12-18-6.2 (2005).................................................................. 25

## MISCELLANEOUS

Brennan Center and Spencer Overton, *Response to the Report of the 2005 Commission
  on Federal Election Reform* (Sept. 19, 2005)................................................. 17

Coalition of Homelessness and Housing in Ohio & League of Women Voters
  Coalition, *Let the People Vote* 1 (2005) ............................................... 13, 14

Commission on Federal Election Reform, *Building Confidence in U.S. Elections*
  (Sept. 2005)................................................................................... 15, 16, 26

Dan McKay, *Clerk Seeks Vote-Fraud Review*, Albuquerque Journal, Oct. 29, 2004. .................. 9

Electionline.org, *Election Reform: What's Changed, What Hasn't and Why
  2000-2006* (2006) .......................................................................... 21, 22, 23

Electionline.org, *Voter ID Laws* .......................................................... 22, 23

Glenn E. Mitchell and Christopher Wlezien, *The Impact of Legal Constraints on Voter
  Registration, Turnout, and the Composition of the American Electorate,*
  17 Political Behavior 188 (1995) ..................................................................... 7

Greg J. Borowski, *A New Push To Repair Elections*, Milwaukee Journal-Sentinel,
  May 15, 2005 ........................................................................................... 13

International Institute for Democracy and Electoral Assistance, *Turnout in the World -
  Country by Country Performance* (March 7, 2005) ....................................... 26

Isabel Sanchez, *Clerk is Working Quickly*, Albuquerque Journal, Jan. 3, 2001. ........................ 9

Jimmy Carter and James A. Baker III, *Voting Reform is in the Cards*, N.Y. Times, Sept. 23, 2005, at A19 ........................................................................ 16, 17

John Fund, *Stealing Elections* (2004) ................................................................ 11

Larry J. Sabato & Glenn R. Simpson, *Dirty Little Secrets* (1996) ................................. 11

Letter from John Tanner, Chief, Voting Section, Civil Rights Division, U.S. Dep't of Justice, to Charlie Crist, Florida Attorney General (Sept. 6, 2005) ......................... 25

Letter from Robin Carnahan, Missouri Secretary of State, to Matt Blunt, Missouri Governor (May 11, 2006) ................................................................. 24

Lisa M. Collins, *In Michigan, Even Dead Vote*, The Detroit News, Feb. 26, 2006. .............. 12, 14

Lorraine Minnite and David Callahan, *Securing the Vote: An Analysis of Election Fraud* (2003) ............................................................ 9, 10

Mark John Hansen, *To Assure Pride and Confidence in the Electoral System* (Aug. 2001) ................................................................. 5

M. Margaret Conway, *Political Participation in the United States* (2d ed. 1991) ..................... 7

Media Matters, *John Fund's Book on Voter Fraud is a Fraud* (Oct. 31, 2004) ..................... 11

National Conference of State Legislatures, *State Requirements for Voter Identification* (Aug. 1, 2006) .......................................................... 22, 23, 24

Phuong Cat Le & Michelle Nicolosi, *Dead Voted in Governor's Race*, Seattle Post-Intelligencer, Jan. 7, 2005 ................................................................. 12

*Preliminary Findings of Joint Task Force Investigating Possible Election Fraud* (May 10, 2005) .......................................................... 13

Press Release, DOJ, Fact Sheet:  Department of Justice Ballot Access and Voting Integrity Initiative (July 26, 2006) .......................................................... 10

Spencer Overton, *Establishing Procedures for Credible Advisory Commissions* (2005) ............ 15

Spencer Overton, *Stealing Democracy: The New Politics of Voter Suppression* (2006) ............. 25

Steve Schultze, *No Vote Fraud Plot Found*, Milwaukee Journal-Sentinel, May 5, 2005 ............ 13

*The Poll Tax, Updated*, Editorial, N.Y. Times, Oct. 7, 2004, at A34 ............................... 15

Van Smith, *Elections Nights of the Living Dead*, Baltimore City Paper, June 22, 2005 ............. 12

## INTEREST OF THE AMICUS

With the consent of all parties, the Brennan Center for Justice at NYU School of Law ("Brennan Center") respectfully submits this brief as amicus curiae in support of the plaintiffs' motion for summary judgment.

The Brennan Center is a nonpartisan institute dedicated to a vision of effective and inclusive democracy. Through its Voting & Representation project, a part of its Democracy Program, the Brennan Center seeks to protect rights to equal electoral access and full political participation. The project has extensively addressed issues relating to alleged voter fraud and methods for preventing it. It has tracked the national experience with legislation relating to election fraud, co-authored two major reports on the subject, and participated as counsel or amicus in a number of federal and state cases involving voting and election issues. Of particular relevance here, the Brennan Center has participated as amicus curiae in constitutional challenges to statutes requiring photo identification ("photo ID") as a condition for in-person voting in Georgia and Indiana.

## STATEMENT OF THE ISSUE

Whether the City of Albuquerque's stated interest in preventing impersonation fraud at the polls is sufficient under the First and Fourteenth Amendments to justify the burden imposed by the requirement that voters present photo identification as a condition for in-person voting ("photo ID requirement").

## SUMMARY OF THE ARGUMENT

The Albuquerque law at issue here imposes a photo identification requirement that, if not enjoined by this Court, is likely to disenfranchise many of Albuquerque's qualified voters

1

without any reasonable justification. Amicus curiae submits that the photo ID requirement violates the First and Fourteenth Amendments.

Plaintiffs urge that the strict scrutiny standard should apply in assessing Albuquerque's photo ID requirement, (*see* Pl. Br. at 38-42) which was adopted in an amendment to Albuquerque's City Charter.  (*See* Second Amended Complaint, Ex. A ("Amendment").)  In this brief, amicus demonstrates why the requirement is invalid under the more flexible standard of *Burdick* v. *Takushi*, 504 U.S. 428 (1992).

In evaluating the constitutionality of election regulations, courts frequently apply the *Burdick* balancing test, which requires that "the *precise interests* put forward by the state to justify" any burdens on voting rights must outweigh "those burdens, taking into consideration the extent to which those interests make it *necessary* to burden the plaintiffs' rights."  *Id.* at 434 (emphasis added).  Amicus submits that the Amendment fails this test.

This amicus brief reviews the nationwide experience which, together with the evidence of Albuquerque's own experience, shows that the "precise interest" advanced to support the photo ID requirement—prevention of impersonation fraud at the polls—does not justify imposing any burdens that requiring a photo ID from Albuquerque voters will entail.  This is so because Albuquerque's own experience, and the experience nationally, demonstrate that impersonation fraud rarely if ever occurs, and that it has been adequately addressed throughout the nation by means less onerous than requiring photo ID.  Simply put, impersonation fraud is not only a rare occurrence, but the photo ID remedy imposed by Albuquerque is out of proportion, and totally unnecessary, to address this remote risk.

The District of Columbia, the federal government, and 47 states—including New Mexico—provide voters with less burdensome alternative methods of verifying identity, and there is no evidence that these less onerous policies have been insufficient to address impersonation fraud.  Moreover, constitutional challenges to the photo ID laws are currently pending in the three states which do require photo ID of in-person voters—Georgia,[1] which has been blocked three times from enforcing its photo ID law, Indiana[2] and Missouri.[3]  Here too, because Albuquerque's photo ID requirement advances no interest sufficient to justify requiring photo ID as a condition for in-person voting, this Court should enjoin defendant from enforcing it.

---

[1]  A federal court preliminarily enjoined Georgia's original photo ID requirement as an unconstitutional burden on voting in 2005.  *See Common Cause/Georgia* v. *Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) ("*Common Cause I*").  After Georgia amended the law, the Eleventh Circuit remanded the case to the district court for consideration in light of the amendments, *see Common Cause/Georgia* v. *Cox*, No. 05-15784 (11th Cir. Feb. 9, 2006), and the district court again preliminarily enjoined the amended law, *see Common Cause/Georgia* v. *Billups*, 439 F.Supp. 2d 1294 (N.D. Ga. 2006) ("*Common Cause II*").  In a parallel, state-court case, Fulton County Superior Court Judge Melvin K. Westmoreland issued a temporary restraining order barring enforcement of Georgia's photo ID law.  *See Lake* v. *Perdue*, No. 06-cv-119207, Temporary Restraining Order (Fulton Cty. Sup. Ct. July 7, 2006), *available at* http://www.fcdr.com/Editorial/pdf/pdf%20archive/a_m.pdf.

[2]  A federal district court upheld Indiana's photo ID law, *see Indiana Democratic Party* v. *Rokita*, No. 1:05-CV-0634-SEB-VSS, 2006 WL 1005037 (S.D. Ind. Apr. 14, 2006), but that decision is currently on appeal before the Seventh Circuit.  *See Crawford* v. *Marion County Election Bd.*, No. 06-2218 (7th Cir. docketed May 1, 2006), *Indiana Democratic Party* v. *Rokita*, No. 06-2317 (7th Cir. docketed May 8, 2006).

[3]  *See NAACP* v. *Carnahan*, No. 06-4200 (W.D. Mo. docketed Sept. 6, 2000); *Jackson County* v. *Missouri*, No. 06AC-CC00587 (Cole Cty. Cir. Ct. Mo. docketed July 17, 2006); *Weinshenk* v. *Missouri*, No. 06AC-CC00656 (Cole Cty. Cir. Ct. Mo. docketed Aug. 3, 2006).

## ARGUMENT

**ALBUQUERQUE'S PHOTO ID REQUIREMENT IS AN UNREASONABLE AND TOTALLY UNNECESSARY RESPONSE TO THE EXTREMELY UNLIKELY AND UNSUBSTANTIATED THREAT OF IMPERSONATION FRAUD THAT WILL SUPPRESS VOTER PARTICIPATION**

The First and Fourteenth Amendments to the U.S. Constitution protect the right to vote as a fundamental right.  *See, e.g., Burdick*, 504 U.S. at 433 ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'") (citation omitted).  In *Burdick*, the Supreme Court made clear that election regulations pass constitutional muster only when they are reasonable and proportional responses to the state interests advanced to justify them.

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights.

*Burdick*, 504 U.S. at 434 (quotation marks and citation omitted).

Election laws that "impos[e] severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens, however, trigger less exacting review, and a State's important regulatory interest will usually be enough to justify reasonable, nondiscriminatory restrictions."  *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quotation marks and citation omitted).  But as the Court has made clear, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."  *Id.* at 359 (citation omitted).

The Albuquerque City Charter Amendment adds an additional obstacle that is likely to suppress voting by many eligible voters currently lacking a photo ID—an obstacle that is not eliminated by the fact that, under the Amendment, such voters may apply to the City Clerk to obtain a photo ID free of charge.  To most voters who already possess some form of photo ID, the process of acquiring a free ID may appear simple.  But for those disadvantaged groups most likely to lack a photo ID—low income, elderly, disabled, or homeless persons—the process of obtaining a free photo ID is not so straightforward.  Many will have to take time off from work to go to the City Clerk's office, and because they lack driver's licenses, they must find some means of transportation to get to and from the City Clerk's office.  The time and inconvenience involved are likely to be significant burdens that will discourage many voters in these disadvantaged categories.[4]

Whether these burdens are considered "severe"—warranting strict scrutiny—or less than severe, the *Burdick* test requires the Court to balance these burdens against the "precise interests" the government puts forward, and "the extent to which those interests make it *necessary* to burden the plaintiffs' rights."  504 U.S. at 434 (emphasis added); *see also Common Cause II*,

---

[4]   The Amendment is not saved by the fact that its extra burdens do not apply to absentee voting.  As discussed *infra* at 8, the fact that absentee voting is available without the need to show photo ID shows the flimsiness of the asserted need for the photo ID requirement.  Moreover, for many voters absentee voting is not an adequate substitute for in-person voting. (*See*, *e.g.*, Pl. Br. at 27-30.)  And less educated voters and members of certain racial minorities are statistically less likely to vote absentee than white citizens and voters with higher educational attainment.  *See*, *e.g.*, Mark John Hansen, *To Assure Pride and Confidence in the Electoral System* ch.5, p.3 (Aug. 2001), *available at* http://www.millercenter.org/programs /natl_commissions/commission_final_report/task_ force_report/hansen_chap5_early.pdf ("People with better educations, higher incomes, and more prestigious jobs are more likely to vote absentee. . . . [Also,] use of absentee ballots varies by race.  Blacks are only half as likely as whites to vote absentee.").

2006 WL 2089771, at *58 ("[T]he Court must examine the extent to which the . . . interest in preventing voter fraud makes it *necessary* to burden the right to vote.") (emphasis added). "[T]he constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves."  *Griffin* v. *Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). The test is a pragmatic one, and under it there is "'no substitute for the hard judgments that must be made.'"  *Timmons*, 520 U.S. at 358 (quoting *Storer* v. *Brown*, 415 U.S. 724, 730 (1974)).

In assessing laws whose burdens on voting rights are less than "severe," courts do not simply apply the deferential "rational basis" test applied to economic and social legislation; rather, they apply an "intermediate level of scrutiny."  *Reform Party of Allegheny County* v. *Allegheny County Dep't of Elections*, 174 F.3d 305, 315 (3d Cir. 1999) (en banc).  Balancing is still required, and the burden is on the government to establish that a regulation is reasonable in light of the interest it serves.  As the Fourth Circuit noted, "a regulation which imposes only moderate burdens could well fail the [*Burdick*] balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational."  *McLaughlin* v. *North Carolina Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995); *see also New Alliance Party* v. *Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991) ("Although the Court finds that the burden imposed . . . is not insurmountable, the Court determines that plaintiffs are due to be granted the relief requested because the interests put forth by the defendant do not adequately justify the restriction imposed.").

It is within this framework that we address Albuquerque's claimed interest in requiring a photo ID as a condition of voting in person.  Even if the burdens imposed by Albuquerque's photo ID requirement are considered less than severe, it plainly erects hurdles to voter

participation.  And though these hurdles may not be insurmountable, it is obvious that they will discourage many voters who are among the most disadvantaged citizens from participating in Albuquerque elections.  The United States already has one of the lowest voter turnout rates in the world, which has been attributed to obstacles that function to discourage widespread participation in elections, including, for example, onerous registration requirements and the need for working people to vote take time off to vote on weekdays.  *See*, *e.g.*, M. Margaret Conway, *Political Participation in the United States* 109 (2d ed. 1991); Glenn E. Mitchell and Christopher Wlezien, *The Impact of Legal Constraints on Voter Registration, Turnout, and the Composition of the American Electorate*, 17 Political Behavior 188-89 (1995).  Given this context, Albuquerque's imposition of an additional barrier to voter participation cannot be sustained under the *Burdick* balancing test, because it is totally unnecessary, will further suppress voter turnout, and will do little, if anything, to actually prevent voter fraud.

## A.     Impersonation Fraud Is Highly Unlikely And Exceedingly Rare

Supporters of photo ID requirements like Albuquerque's repeatedly invoke the specter of "voter fraud," but Albuquerque's photo ID requirement addresses only a single type of alleged voter fraud:  impersonation of a registered voter at the polls.  The photo ID requirement does not address more common types of voter fraud, such as fraud by absentee ballot or vote buying.  Nor does it address voting by ineligible persons with felony convictions, or double voting at two different addresses, which can only be addressed through the regular updating of voter registration lists.  Effective maintenance of voter registration lists is also the best means of combating voting in the name of deceased persons, since that problem may be virtually

eliminated by the timely updating of registration lists.[5]  Moreover, many reported incidents of

voting in the name of the deceased—"ghost voting"—involve either mistaken reports (e.g.,

clerical errors by poll workers or flawed attempts to match names on lists to each other) or the

use of absentee ballots, neither of which are remedied by Albuquerque's photo ID requirement.

*See infra* at 12 & n.9.

The drafters of the Amendment sought to justify it by listing examples of various types of

election irregularities that are not addressed by the photo ID requirement.  (*See* Amendment at 1-

2.)  The Amendment lists incidents of the registration of ineligible voters, (*see id.*) but

registration irregularities are not remedied by requiring in-person voters to show a photo ID.

Indeed, because Albuquerque's photo ID requirement imposes no restrictions on the use or

verification of absentee ballots, under the policy, ineligible individuals who register may actually

cast ballots that are counted by registering and voting absentee.  Thus, the photo ID requirement

is entirely irrelevant to—and will do nothing to prevent—the kinds of election fraud its defenders

used to justify it.  "[A] law cannot be regarded as protecting an interest of the highest order, and

thus as justifying a restriction . . . when it leaves appreciable damage to that supposedly vital

interest unprohibited."  *Florida Star* v. *B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J.,

concurring in judgment) (quotation marks and citation omitted).

The Amendment does state that one example of impostor fraud occurred during the 2004

election, (*id.* at 2) but this purported example of voter fraud has not been conclusively verified.

More significantly, Albuquerque's voting history amply demonstrates that it has far greater

---

[5]     Under the Help America Vote Act ("HAVA"), 42 U.S.C. § 15301 *et seq.*, states are required
to implement centralized, computerized registration lists, to update them regularly, and to
remove ineligible registrants.  *See* 42 U.S.C. § 15483(a)(4); *see also infra*, Part B.1.

problems with forms of voter fraud that are not addressed by the photo ID requirement.  For example, in the 2000 election, approximately 250 ballots went missing in Bernalillo County, and were later found in a locked ballot box in the voting machine warehouse.  *See* Isabel Sanchez, *Clerk is Working Quickly*, Albuquerque Journal, Jan. 3, 2001.  There have also been reports of fraudulent registrations involving persons ineligible to vote.  *See* Dan McKay, *Clerk Seeks Vote-Fraud Review*, Albuquerque Journal, Oct. 29, 2004.  A photo ID requirement like Albuquerque's could not even conceivably remedy any of these election irregularities—which involved far larger numbers of votes than there are allegations of impersonation fraud.

That reports of impersonation fraud in Albuquerque are so rare—and far overshadowed by other, more troublesome forms of election fraud—is not surprising, as it mirrors the experience across the rest of the nation.  Indeed, studies of election fraud reveal that there have been virtually no confirmed instances of impersonation fraud, notwithstanding photo ID advocates' repeated claims that impersonation fraud is rampant; rather, there is real cause for concern over election irregularities involving vote buying, absentee ballot fraud and voter intimidation and suppression.

In the most comprehensive survey of election fraud to date, Professor Lorraine Minnite of Barnard College and David Callahan of Demos conducted a review of news and legal databases and interviewed attorneys general and secretaries of state in 12 states[6] about incidences of election fraud from 1992 to 2002.  *See* Lorraine Minnite & David Callahan, *Securing the Vote:*

---

[6]  The twelve states surveyed, Alabama, California, Florida, Georgia, Illinois, Minnesota, Mississippi, New York, Oregon, Pennsylvania, Texas and Wisconsin, collectively represent about half of the national electorate.  Lorraine Minnite and David Callahan, *Securing the Vote: An Analysis of Election Fraud* 15 (2003), *available at* http://www.demos.org/pubs/EDR_-_Securing_the_Vote.pdf.

*An Analysis of Election Fraud* (2003) ("Minnite Study").   The study found that voter fraud of any kind is "very rare," is not more than a "minor problem" and "rarely affects election outcomes."  Minnite Study at 4, 17.  Notably absent from the study are any confirmed cases of in-person impersonation fraud.  According to Minnite and Callahan, even where cases of alleged election fraud have received significant attention in the news media, such as the 2000 election in St. Louis, Missouri, the allegations have proved baseless.  *Id.* at 17.[7]

To the limited extent fraud has been detected, the study concludes, it generally takes the form of organized fraud such as vote buying, use of fraudulent absentee or mail-in ballots, ballot box stuffing, or wrongful purging of registration rolls to exclude eligible voters.  *Id.* at 14.  Instances of these types of fraud far outweigh incidents of individual fraud.  *Id.*  Most importantly, the study concludes that the wrongful *disenfranchisement of voters* is a "far bigger problem" than voter fraud.  *Id.* at 15.

Similarly, a 2006 Department of Justice ("DOJ") report describing various election fraud investigations indicates that election irregularities other than impersonation fraud constitute the real threat to the integrity of elections.  *See* Press Release, DOJ, Fact Sheet:  Department of Justice Ballot Access and Voting Integrity Initiative (July 26, 2006), *available at* http://www.usdoj.gov/opa/pr/2006/July/06_crt_468.html ("DOJ Report").  The DOJ Report details 86 convictions for election-related misconduct since 2002, but not a single one of these convictions involved impersonation fraud.  The report describes incidents of vote buying in

---

[7]   The 2000 Election in St. Louis featured allegations of illegal registrations, multiple voting, and voting by deceased individuals, felons and people whose addresses appeared to be vacant lots.  Reporters' subsequent investigations into these allegations, however, proved that many of the allegations were simply incorrect, and revealed little or no actual voter fraud.  *Id.* at 43.

Kentucky and West Virginia, improper use of personal information by local officals in Alabama, various campaign finance convictions, and harassment to keep voters from the polls in New Hampshire. *None* of these crimes could be prevented by requiring voters to show a photo ID.

Supporters of photo ID requirements also frequently cite two books that discuss allegations of voter fraud generally, *see* Larry J. Sabato & Glenn R. Simpson, *Dirty Little Secrets* (1996) ("Sabato"), and John Fund, *Stealing Elections* (2004) ("Fund"), but these books contain almost no allegations of voting irregularities that could even conceivably have been remedied by a photo ID requirement. The Sabato book, for example, describes thousands of incidents of possible absentee ballot fraud and numerous problems plaguing California's registration rolls. *See* Sabato at 291-92. But Sabato describes only a single hearsay allegation of attempted impersonation fraud that, in any event, was foiled without a photo ID requirement. *Id.* at 292.

Likewise, Fund retails numerous reports of voting by felons and double voting—for which a photo ID requirement is no solution. Fund at 64.[8] And though Fund describes 14 allegations of ghost voting in Missouri, there is no indication that any of these involved in-person, rather than absentee, voting. *Id.*

Finally, while press reports have repeatedly recycled allegations of voter fraud in Washington State, Milwaukee, Ohio, and Detroit, the incidents of election misconduct that have been confirmed in these areas are types that can not be addressed by a photo ID requirement— not impersonation fraud.

---

[8]   A review characterizes Fund's book as filled with "distortions and half truths" and provides a point by point refutation of many of Fund's claims. *See* Media Matters, *John Fund's Book on Voter Fraud is a Fraud* (Oct. 31, 2004), *available at* http://mediamatters.org/items/printable/200411010001.

In one of the most substantial investigations into voter fraud in recent history, conducted in Washington State after a bitterly contested gubernatorial election, evidence revealed voting by ineligible voters that would not have been stopped by requiring these voters to present photo ID. *See Borders* v. *King County*, No. 05-2-00027-3 (Wash. Super. Ct. Chelan Cty. June 6, 2005), reprinted at 4 Election L.J. 418 (2005).  Out of a total of 2,812,675 ballots cast, this investigation uncovered only 19 cases of alleged fraudulent voting that could even possibly have been remedied by a photo ID requirement, involving ghost voting.  Subsequent investigations suggested that the overwhelming majority of these cases of ghost voting would not have been prevented by a photo ID requirement for in-person voting, because they involved absentee ballots.  *See* Phuong Cat Le & Michelle Nicolosi, *Dead Voted in Governor's Race*, Seattle Post-Intelligencer, Jan. 7, 2005, *available at* http://seattlepi.nwsource.com/local/206969_dead07.html (noting that only one of eight investigated cases of ghost voting may have involved in-person fraud).[9]  Moreover, even if some small number of ghost voting incidents involved in-person impersonation fraud, these could have been prevented had the state removed the names of deceased persons from its voter rolls, as required by federal law.  Finally, even assuming that all

_____

[9]    Other evidence suggests that publicized cases of ghost voting involving in-person, rather than absentee, voting are often the result of clerical errors, as when election clerks mistakenly have a voter sign the registration card of a deceased voter whose name is strikingly similar, rather than signing for the correct name.  *See* Lisa M. Collins, *In Michigan, Even Dead Vote*, The Detroit News, Feb. 26, 2006 ("It's impossible to say whether [purported cases of ghost voting] are names used by someone else to cast fraudulent votes or whether they simply represent clerical errors. . . .  Among the most common mistakes occur when election workers record a vote under a similar name, or confuse voters with their parents or other relatives."); *see also* Van Smith, *Elections Nights of the Living Dead*, Baltimore City Paper, June 22, 2005 (discussing likely mistakes involving, e.g., a son confused with his deceased father of the same name, or a "Charles A. Price" confused with a "Charles W. Price").

19 instances involved in-person, rather than absentee, voting, this would yield a rate of ineligible votes preventable by a photo ID requirement of 0.0007%.

The same pattern emerges from an investigation into an alleged scheme to alter the result of the 2004 election in Wisconsin. *See Preliminary Findings of Joint Task Force Investigating Possible Election Fraud* (May 10, 2005), *available at* http://www.wispolitics.com/ 1006/electionfraud.pdf.  But this year-long joint federal and state investigation did not confirm any reports of impersonation fraud. *See id.* at 1.  And though the investigation ultimately turned up severe administrative and recordkeeping problems with the Milwaukee elections board, it produced very little evidence of voter fraud. *See id.*; *see also* Greg J. Borowski, *A New Push To Repair Elections*, Milwaukee Journal-Sentinel, May 15, 2005 (administrative problems and "jumbled records made confirmation [of voter fraud allegations] a near impossibility"). Moreover, those few incidents that were substantiated involved registration fraud, double voting and voting by ineligible persons with felony convictions, not voter impersonation. *See* Steve Schultze, *No Vote Fraud Plot Found*, Milwaukee Journal-Sentinel, Dec. 5, 2005, *available at* http://www.findarticles.com/p/articles/mi_qn4196/is_20051206/ai_n15901055.

That impersonation fraud rarely, if ever, occurs is also confirmed by a study by the Coalition of Homelessness and Housing in Ohio ("COHHIO") and The League of Women Voters of Ohio. *See* COHHIO & League of Women Voters Coalition, *Let the People Vote* 1 (2005), *available at* http://www.cohhio.org/alerts/Election%20Reform%20Report.pdf. Researchers conducted telephone interviews with either the Director or Deputy Director of each of the state's 88 county Boards of Elections during the first week of June 2005, and concluded that in-person voter fraud as a whole was an "exceedingly rare" occurrence, as evidenced by the

13

fact that, out of a total of 9,078,728 votes cast, there were only four reported instances of ineligible persons voting or attempting to vote in 2002 and 2004, confined to three of the state's 88 counties. *Id.* at 2. And even these few instances involved "registration fraud," not impersonation fraud. *Id.*

Widely reported tales of voter fraud in Detroit have, likewise, produced no verified examples of impersonation fraud. Supporters of photo ID requirements frequently point to the troubled election administration in Detroit in arguing that photo ID requirements are necessary, but Detroit's experience actually suggests otherwise. Detroit's elections have involved widespread problems with the city's registration rolls, including duplicate records for voters who have moved, as well as "documented instances of violations of election law . . . relating to absentee ballots." Lisa M. Collins, *In Michigan, Even Dead Vote*, The Detroit News, Feb. 26, 2006, *available at* http://www.detnews.com/apps/pbcs.dll/article?AID=/20060226/METRO/ 602260301. And while there have also been reports of ghost voting in Detroit, it is likely that these reports resulted from clerical errors, not impersonation fraud, since there were "[c]lerical errors so pervasive that it is difficult to determine in many instances who actually voted." *Id.* Indeed, a Michigan political consultant noted that the problems with Detroit's elections would be most effectively addressed by cleaning up the registration rolls—not by requiring photo ID— because "keeping the names of deceased and nonresidents on the rolls is the problem, for it allows votes to be accidentally marked in those names." *Id.*

That reports of impersonation fraud have not been confirmed in Detroit is fully consistent with the Minnite Study's conclusion that the impersonation fraud which might be remedied by a photo ID law is of far less concern than voter intimidation and suppression: after all, it was

14

Detroit's reputation for voting democratic that led Republican State Representative John Pappageorge (and veteran team leader for the Bush-Cheney re-election campaign) to observe that "[i]f we do not suppress the Detroit vote, we're going to have a tough time in this election." *The Poll Tax, Updated*, Editorial, N.Y. Times, Oct. 7, 2004, at A34.

Finally, supporters of photo ID requirements frequently cite the final report of the Carter-Baker Commission on Federal Election Reform[10] for the proposition that impersonation fraud occurs, and that photo ID requirements are necessary to prevent it. *See* Commission on Federal Election Reform, *Building Confidence in U.S. Elections* (Sept. 2005) ("Carter-Baker Report"). But while the Carter-Baker Report did opine that "there is no doubt that [fraud] occurs," *id.* at 18, it also concluded that "there is no evidence of extensive fraud in U.S. elections," *id.*, and noted that there was division among the members of the Commission on the magnitude of the problem. Most significantly, the Commission cites no credible evidence of impersonation fraud, instead simply referring to the since-discredited reports of such fraud in Milwaukee and Washington State. Carter-Baker Report at 2-4, 18. Moreover, as one of the dissenters notes, the Commission "did not call as witnesses many of the most established experts on the issue [of voter ID requirements]. A commission's reliance on anecdotes and political sound bites—rather than empirical data, testimony by top experts, and rigorous analysis—undermines its credibility." Spencer Overton, *Establishing Procedures for Credible Advisory Commissions* (2005), *available at* http://www.carterbakerdissent.com/procedure.php.

---

[10]   The Carter-Baker Commission was not a commission of the federal government. It was an independent project organized by the Center for Democracy and Election Management at American University.

Moreover, although the majority of Commissioners supported the use of the REAL ID,[11] which includes a photo, for in-person voter identification, they recognized that 12% of voters lack any photo ID and that the costs of obtaining such identification could disenfranchise low income voters. *See* Carter-Baker Report at 73 n.22.  In addition, the majority recommended that REAL IDs be used for voter identification only if: (1) there is a uniform national identification standard, eliminating the risk of discrimination from state or local requirements; (2) states make the ID free and widely available; and (3) states actively seek out and register unregistered citizens, effectively shifting the burden of voter registration from citizens to the states. *See id.* at 19-20.  Albuquerque's photo ID requirement does not meet the first and third requirements. Indeed, far from eliminating the risk of discrimination, as plaintiffs have demonstrated, the Amendment's terms leave it particularly vulnerable to discriminatory enforcement.  (*See* Pl. Br. at 18-26.)  Moreover, although the Amendment provides for free IDs for those who lack one, as demonstrated above, the requirement that voters lacking them incur the cost, time, and inconvenience of obtaining photo IDs from the City Clerk is a burden that will likely discourage voting by many of the most disadvantaged voters.

Simply put, the Commission's recommendation of a uniform, national photo ID policy under which the government bears the burden of registering voters and equipping them with voter IDs provides no support for Albuquerque's policy.  Tellingly, even President Carter and Secretary Baker, the Commission's co-chairs, rejected Georgia's initial photo ID law as

---

[11]   *See* REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005), which will require a standardized "REAL ID" for such purposes as boarding airplanes, effective in 2008.  Three Commissioners dissented from the majority's proposal to use the REAL ID for voting purposes.

"discriminatory" because "it was costly or difficult for poor Georgians."  Jimmy Carter and

James A. Baker III, *Voting Reform is in the Cards*, N.Y. Times, Sept. 23, 2005, at A19.[12]

In sum, the evidence relied on by those who would attempt to justify a photo ID

requirement like Albuquerque's is virtually nonexistent.  The national experience indicates that

the "problem" of voter impersonation is hardly a real problem at all.

There are obvious reasons why impersonation fraud occurs so rarely, if ever.  *First*, if the

impostor is impersonating a live, registered voter, the risks of getting caught are substantial.  The

impostor takes the chance that the real voter will appear to vote either before or after the

impostor, thus exposing the fraud.  *Second*, even if the impostor tries to impersonate a person

who is deceased or has moved out of state, he risks getting caught if the registration list has been

kept up-to-date, as is now required under HAVA.  *See* 42 U.S.C. § 15483(a)(2).  *Finally*, the

impersonator risks exposure if any poll worker is familiar with either the impostor or the

legitimate voter, or if the impostor is challenged by a poll worker or other challenger.

Moreover, the punishment for getting caught is severe.  Conviction for voter

impersonation in a federal election can result in five years maximum imprisonment and $10,000

maximum fines.  42 U.S.C. § 1973i(c).  New Mexico classifies impersonation fraud as a fourth-

degree felony, *see* NMSA 1978 § 1-12-9 (1969); NMSA 1978 § 3-8-40 (1985),  punishable by

eighteen months' maximum imprisonment, and a $5,000 maximum fine, *see* NMSA 1978 § 31-

18-15 (2005).

---

[12]   For a full critique of the majority's proposal to use the REAL ID, *see generally* Brennan
Center and Spencer Overton, *Response to the Report of the 2005 Commission on Federal
Election Reform* (Sept. 19, 2005), *available at* www.brennancenter.org/resources/down
loads/Response%20to%20Federal%20Election%20Reform%20Commission%20Report.pdf.

Successful impersonation also requires a series of events to favorably align themselves. An impostor must first gain access to an up-to-date registration list, and identify a registered voter that is unlikely to vote. Then, even under New Mexico's less onerous identity verification regime, the impostor would have to in some way discover the year of birth and identifying number of the real voter, or steal identification papers like a government check or bank statement and present them at the polls, potentially exposing the impostor to additional criminal penalties. Finally, the impostor must undertake all these risks for a very limited pay-off: it is unlikely in the great majority of cases that a single vote would decide the outcome of a race or ballot initiative. To succeed in influencing any election, then, an impostor would have to conspire with multiple other impostors, a scenario that, in light of the above discussion, is virtually inconceivable. It is, therefore, unsurprising that there is so little confirmed evidence of impersonation fraud in Albuquerque.

Faced with the fact that there is little to no confirmed evidence of impersonation fraud, defenders of photo ID requirements cite polls showing widespread support for anti-fraud measures. Similarly, supporters of Albuquerque's photo ID requirement invariably rely on the referendum in which a majority of Albuquerque's voters supported the Amendment. But as noted, since a majority of voters already have driver's licenses or other IDs, they cannot be expected to understand or empathize with those vulnerable citizens who lack photo IDs and are put to the additional trouble of scaling yet another hurdle to voting. Most importantly, under our Constitution, the fundamental rights of the most vulnerable members of our society may not be stripped away by majority vote. *See*, *e.g.*, *Lucas* v. *Forty-Fourth General Assembly of State of Colo.*, 377 U.S. 713, 736-37 (1964) ("[F]undamental rights may not be submitted to vote; they

depend on the outcome of no elections.  A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.") (quotation marks omitted); *see also Hall* v. *St. Helena Parish School Bd.*, 197 F.Supp. 649, 659 (E.D. La.1961), *aff'd*, 368 U.S. 515 (1962) ("No plebiscite can legalize an unjust discrimination.").

Nevertheless, we do not suggest that a city or state may not take prophylactic measures to prevent even rare or unlikely types of fraud, provided those measures are not wholly disproportionate to the nature of the problem.  We therefore examine whether the photo ID requirement is a reasonable response to the remote—and unproven—risk of impersonation fraud.

**B.     Albuquerque's Photo ID Requirement Is Not A Reasonable Or Proportional Response To Possible Impersonation Fraud**

A review of the procedures adopted by Congress and other states—including New Mexico—demonstrates that Albuquerque's photo ID requirement is neither necessary nor reasonable to address Albuquerque's interest in preventing impersonation fraud.

In New Mexico, an in-person voter must provide some form of "required voter identification," NMSA 1978, § 1-12-7.1 (2005), but this identification is not limited to photo ID. Upon approaching the polls, a voter is requested to furnish either a photo ID or "an original or copy of a utility bill, bank statement, government check, paycheck, student identification card or other government document, including identification issued by an Indian nation, tribe or pueblo, that shows the name and address of the person, the address of which is not required to match the voter's certificate of registration."  NMSA 1978, § 1-1-24 (2005).  If, however, a voter lacks all of these forms of documentary identification for any reason, she may still vote a regular ballot by providing "a verbal or written statement by the voter of the voter's name, year of birth and unique identifier."  *Id.*

As demonstrated below, by providing a range of alternatives for identity verification, New Mexico is well within the mainstream.  In evaluating Albuquerque's claim that the photo ID requirement is necessary to prevent impersonation fraud, we think it pertinent that Albuquerque's photo ID requirement is so at odds with the approaches of the federal government under HAVA, and of New Mexico and its sister states, described below.

**1.      HAVA Provisions Addressing Election Fraud**

HAVA was enacted in response to the deep flaws in the 2000 presidential election, and to improve the administration of elections.  *See generally* 42 U.S.C. § 15301.  Three of HAVA's requirements are especially relevant here.

*First*, HAVA requires states to maintain complete and accurate registration lists by implementing a uniform, official, centralized, interactive and computerized statewide voter registration list that is regularly updated.  The statute requires states to establish a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."  *Id.* § 15483(a)(4)(A).  This HAVA requirement will eliminate most of the potential for voting by ineligible voters, including ghost voting.

*Second*, HAVA requires all voter registration applicants to provide their driver's license number or the last four digits of their social security number (if they have such numbers) with their applications.  *Id.* § 15483(a)(5)(A).  The state must then try to match the numbers and other information provided by applicants against state motor vehicle authority or Social Security Administration databases.  *Id.* § 15483(a)(5)(B).  HAVA exempts applicants whose information is successfully matched from the ID requirements for first-time voters who register by mail.  *See id.* § 15483(b)(3)(B).

*Third,* if a first-time voter who registered by mail is unable to provide any of the above numerical identifiers or the state is unable to match that number, HAVA requires these voters to produce certain documentation to confirm their identities.  *Id.* § 15483(b).  HAVA allows voters to use any of the following means of verifying identity:  a current and valid photo ID, a current utility bill, bank statement, government check or paycheck, or another government document that shows the name and address of the voter.  *Id.* § 15483(b)(2).

HAVA's list of acceptable identification documents represents Congress's reasoned view of what is sufficient to combat impersonation fraud, and is considerably more flexible than Albuquerque's photo ID requirement.  And, unlike Albuquerque, Congress deemed identification requirements necessary only for first-time voters who have not registered in person and whose information does not match data in existing government databases.

### 2.      Alternative Methods of Voter Identification Used In Other States

Like Congress, 47 other states and the District of Columbia have found it unnecessary to make a photo ID the exclusive requirement for voting.  They provide alternative means for confirming voters' identities, and as the absence of any meaningful evidence of impersonation fraud indicates, these alternatives are sufficient to protect the integrity of elections.

Most states required no documentary proof of voters' identity until very recently.  Prior to 2002, only 11 states required all voters to show any documentary identification before voting in person.  *See* Electionline.org, *Election Reform:  What's Changed, What Hasn't and Why 2000-2006* 13 (2006), *available at* http://www.electionline.org/Portals/1/Publications/ 2006.annual.report.Final.pdf ("Electionline Study").  And although all states have now implemented HAVA's identification requirements and request some form of documentary

identification—including non-photo ID—from first-time voters who registered by mail and have

not been "matched" against government databases, *see id.* at 17, only three states—Indiana,

Georgia, and Missouri—currently require all voters to produce photo identification before

allowing them to vote without allowing some alternate means of verifying identity.  *See* National

Conference of State Legislatures, *State Requirements for Voter Identification* (Aug. 1, 2006), *at*

http://www.ncsl.org/programs/legman/elect/taskfc/voteridreq.htm ("NCSL Study").

Twenty-six states and the District of Columbia have adopted HAVA's identification

requirements for first-time voters registering by mail.  *See* NCSL Study; *see also* Electionline

Study at 17.[13]  These states utilize a variety of mechanisms to verify the identities of non-first-

time, or "repeat" voters.  *See* Electionline.org, *Voter ID Laws*, *available at*

http://www.electionline.org/Default.aspx?tabid=364 ("*Voter ID Laws*"); *see also* NCSL Study.

For example, some states permit repeat voters to verify identity by having them sign a

registration card or book and comparing that signature with one on a master list.  *See*, *e.g.*, Nev.

Rev. Stat. § 293.277; N.J. Stat. Ann. §§ 19:31a-8.  Other states confirm repeat voters' identities

by having the voter orally recite or affirm identifying information.  *See*, *e.g.*, Mass. Gen. Laws

ch. 54, § 76 (2006); Neb. Rev. Stat. § 32-914 (2006); Utah Code Ann. § 20A-3-104 (2006).

Seventeen states,[14] including New Mexico, request that all voters—both first-time and

repeat voters—produce some form of documentary identification, but accept both photo and non-

---

[13]   Kansas and Pennsylvania require photo or non-photo ID from all first-time voters, not only
"unmatched" first-time voters who registered by mail.

[14]   Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Kentucky, Montana
New Mexico, North Dakota, Ohio, South Carolina, Tennessee, Texas, Virginia, and
Washington.

photo ID.  *See* Electionline Study at 17; *Voter ID Laws*.  The list of acceptable forms of ID varies, but almost every state's list includes options for voters that are either contained in the text of HAVA, or closely related to its model.  *See generally Voter ID Laws*.  Various states have augmented HAVA's list of acceptable IDs with other documentary proof.  Voters in Alabama and Arizona, for example, can verify identity with a hunting or fishing license, Kentucky and Tennessee voters can use credit cards, and North Dakotans can also use a U.S. Postal Service change of address verification letter.  *See id.*

Moreover, in some of these states, voters lacking the form of documentary identification requested by the state can still prove identity through non-documentary verification.  *See Voter ID Laws*; *see also* NCSL Study.  In New Mexico, as explained above, a voter may confirm identity by stating her name, year of birth, and unique identifier.  *See* NMSA 1978, §§ 1-12-7.1, 1-1-24 (2005).  Similarly, in Connecticut, voters unable to produce identification documents may verify their identity at the polls by signing an affidavit.  In that state, if a voter is unable to provide a "form of identification which shows the elector's name and either the elector's address, signature or photograph," she may cast a regular ballot after signing an affidavit affirming her identity, under penalty of perjury.  Conn. Gen. Stat. § 9-261(a) (2006).

Only seven states—Florida, Georgia, Hawaii, Indiana, Louisiana, Missouri, and South Dakota—ask all voters to display a photo ID when they vote in person, but only three of these seven states fail to provide meaningful alternatives that allow voters lacking a photo ID to cast votes that are counted.  Only Indiana, Georgia, and Missouri fail to provide a non-photo ID alternative to all in-person voters.  And, as explained above, constitutional challenges are

currently pending with respect to the laws in these states that require—with extremely limited exceptions—that in-person voters may not vote regular ballots without furnishing a photo ID.[15]

The four remaining states that request photo IDs of all voters provide various less burdensome alternatives.  In Hawaii, for example, voters are initially asked to provide a photo ID, but if a voter is unable to produce one, she is not prevented from voting.  Instead, she is asked to recite her date of birth and home address to corroborate the information provided in the poll book.  If the recited information is accurate, she may vote a regular ballot.  *See* Haw. Rev. Stat. § 11-136 (2005); *see also* NCSL Study.

In Louisiana, a voter without a photo ID may vote after signing an affidavit so long as she provides either a current voter registration certificate or other information requested by the election commissioners of the precinct in which the individual is voting.  *See* La. Rev. Stat. Ann. § 18:562(A)(2) (2006).

Florida permits first-time voters to verify identity using various forms of non-photo ID, *see* Fla. Stat. Ann. § 97.0535(3)(b) (2005).  And Florida allows repeat voters who lack photo ID to sign an affidavit, and will count the ballot if the signature on the affidavit matches her

---

[15]   Moreover, as is the case in Albuquerque, the photo ID laws in Indiana, Georgia, and Missouri were passed despite the absence of any evidence of impersonation fraud.  Georgia's Secretary of State stated that in her nine-year tenure, she had not heard of a single instance of such fraud.  *See Common Cause I*, 406 F. Supp. 2d at 1332.  Similarly, Indiana's law was adopted by its legislature without any record of impersonation fraud occurring in the state, and in defending a constitutional challenge to the law, Indiana conceded that there was no confirmed case of such fraud.  *See Indiana Democratic Party*, 2006 WL 1005037, at *9. Finally, in opposing Missouri's photo ID law, that state's highest election official stated that there was no evidence of voter fraud in Missouri, and that the state's existing voter identification requirements were fully adequate.  *See* Letter from Robin Carnahan, Missouri Secretary of State, to Matt Blunt, Missouri Governor (May 11, 2006), *available at* http://www.sos.mo.gov/inc/05-11-06Carnahan-to-Blunt-VoterID.pdf.

registration form: the voter is not required to make an additional trip to an election office or to return to the polls with ID. *See* Fla. Stat. Ann. § 101.053(2) (2005); *see also* Letter from John Tanner, Chief, Voting Section, Civil Rights Division, U.S. Dep't of Justice, to Charlie Crist, Florida Attorney General (Sept. 6, 2005), Att. A, at 2 (on file with Brennan Center) (preclearing Florida's photo ID law on the understanding that Florida will count ballots cast by voters lacking acceptable ID if the affidavit signature matches registration files).

Finally, South Dakota voters without a photo ID may complete an affidavit before voting. *See* S.D. Codified Laws § 12-18-6.2 (2005). But even this affidavit option does not eliminate the risk that a photo ID requirement will suppress voter participation. Data from the first election conducted under South Dakota's photo ID law, in June 2004, indicate that numerous voters who lacked photo IDs were either not informed of the affidavit alternative, or were expressly refused the option. *See* Spencer Overton, *Stealing Democracy: The New Politics of Voter Suppression* 149-50 (2006) ("*Stealing Democracy*"). Moreover, the data also establishes that Native Americans were far less likely than other South Dakotans to bring photo IDs to the polls,[16] *id.*, raising the specter of uneven, discriminatory enforcement of photo ID laws that rely on the discretion of local election officials.

In sum, not only does a photo ID requirement like Albuquerque's run the risk of suppressing voter turnout, but 47 states and the federal government have determined that the integrity of elections may be adequately ensured while still offering less burdensome alternatives.

---

[16]   While the affidavit option was relied on by less than 2 percent of South Dakota voters statewide, it was utilized by between 5.3 and 16 percent in the five predominantly Native American counties of the state. *See Stealing Democracy* at 149.

*     *     *

The United States already suffers from shamefully low voter turnout rates:  based on election participation between 1945 and 1998, the U.S. ranks 139th out of 172 nations.  *See* International Institute for Democracy and Electoral Assistance, *Turnout in the World—Country by Country Performance* (Mar. 7, 2005), *available at* http://www.idea.int/vt/survey/ voter_turnout_pop2.cfm.  The Carter-Baker Report notes that the 2004 elections produced as many problems, if not more, than 2000.  *See* Carter-Baker Report at 3.  Among other things, "voters were discouraged or prevented from voting by the failure of election offices to process voter registration applications or to mail absentee ballots in time, and by the poor service and long lines at polling stations in a number of states.  There were also reports of improper requests for voter ID and of voter intimidation and suppression tactics.  Concerns were raised about partisan purges of voter registration lists and about deliberate failures to deliver voter registration applications to election authorities."  *Id.*  As the 2006 election approaches, moreover, the enactment of burdensome election regulations threatens to further disenfranchise voters.  In fact, voter registration requirements have recently been invalidated in Florida, Ohio and Washington State for this very reason.[17]

---

[17]   *See League of Women Voters of Florida* v. *Cobb*, No. 06-21265-CIV-SEITZ/MCALILEY, Order Granting in Part Plaintiffs' Motion for Preliminary Injunction (S.D. Fla. Aug. 28, 2006), *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/ fladecision.pdf; *Project Vote* v. *Blackwell,* No. 06cv1628, Memorandum Opinion and Order Granting Plaintiffs' Application for a Preliminary Injunction (N.D. Ohio Sept. 8, 2006), *available at* http://moritzlaw.osu.edu/electionlaw/litigation/documents/ordergranting preliminjunction.pdf; *Washington Ass'n of Churches* v. *Reed*, No. 06-0726RSM, Order Granting Motion for Preliminary Injunction (W.D. Wash. Aug. 1, 2006), *available at* http://projectvote.org/fileadmin/ProjectVote/Legal_Documents/WAC__PI_Decision.pdf.

Even where photo ID laws provide alternative means of identity verification, they are subject to abuse, and may have the effect of suppressing voter participation, as South Dakota's experience with the disenfranchisement of Native American voters in the 2004 election demonstrates.  Accordingly, voting regulations like Albuquerque's photo ID requirement that unnecessarily burden qualified voters require careful scrutiny—whether it be "strict scrutiny" or some intermediate level of scrutiny—to be sure that these requirements do not operate as exclusionary devices that further reduce competitive elections, unfairly disenfranchise disadvantaged groups, and undermine democracy.

Albuquerque's photo ID requirement does not pass any level of scrutiny.  There is no evidence that impersonation fraud represents a genuine, rather than a hypothetical or speculative problem, and the additional hurdle to voter participation erected by Albuquerque cannot be considered a reasonable, nondiscriminatory response to the potential for impersonation fraud, given the variety of effective and less restrictive alternatives that prevail throughout the rest of the nation.  Albuquerque's decision to impose an additional obstacle to electoral participation by its most vulnerable voters by requiring them to present a photo ID before voting is a totally unnecessary and unreasonable response to the possible problem of impersonation fraud.  It, therefore, violates the First and Fourteenth Amendments.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be granted.

September 14, 2006

Respectfully submitted,

FREEDMAN, BOYD, DANIELS
HOLLANDER & GOLDBERG P.A.

/s/
John W. Boyd
Martha E. Mulvany
20 First Plaza, Suite 700
Albuquerque, NM  87102
(505) 842-9960

Sidney S. Rosdeitcher
J. Adam Skaggs
PAUL, WEISS, RIFKIND
WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

Wendy R. Weiser
Justin Levitt*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
161 Avenue of the Americas
12th Floor
New York, NY  10013
(212) 998-6730

*Attorneys for the Brennan Center for Justice at NYU School of Law
as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment*

*Admitted in California, the District of Columbia, and New Jersey only

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused a true and correct copy of the foregoing

**BRIEF OF BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW AS**

**AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY**

**JUDGMENT** to be served by United States first class mail upon the following:

Robert  M. White
City Attorney
Paula I. Forney
Mark Shoesmith
Assistant City Attorneys
P.O. Box 2248
Albuquerque, NM  87103-2248
(505) 768-4500

Patrick J. Rogers
Megan T. Muirhead
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
P.O. Box 2168
Bank of America Centre, Suite 1000
500 Fourth Street, N.W.
Albuquerque, NM  87103-2168
(505) 848-1800

Joseph P. Kennedy
Shannon L. Oliver
Kennedy & Oliver, P.A.
1000 Second Street, N.W.
Albuquerque, NM  87104-1138
(505) 244-1400

James R. Scarantino
1410 Coal S.W., #110
Albuquerque, NM  87104
(505) 242-6724

Scott Cameron
P.O. Box 37351
Albuquerque, NM  87176
(505) 331-2052

George Bach
Staff Attorney
ACLU of New Mexico
P.O. Box 566
Albuquerque, NM  87103-5916
(505) 243-0046

September 14, 2006

/s/_____
Martha E. Mulvany

29