IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE AMERICAN CIVIL LIBERTIES UNION OF
NEW MEXICO; THE LEAGUE OF WOMEN
VOTERS OF ALBUQUERQUE/BERNALILLO
COUNTY, INC.; SAGE COUNCIL; NEW MEXICO
COALITION TO END HOMELESSNESS; ANNE
KASS; ALEXANDRA KAZARAS, and BARBARA
GROTHUS,

   Plaintiffs,

  vs.            No. CIV 05-1136 MCA/WDS

MILLIE U. SANTILLANES,
ALBUQUERQUE CITY CLERK,

   Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the *Defendant's Motion for Summary*

*Judgment* [Doc. 63] filed on September 13, 2006, and the *Plaintiffs' Motion for Summary*

*Judgment* [Doc. 65] filed on September 14, 2006.  Both motions address the constitutionality

of an amendment to the Election Code of the Albuquerque City Charter that a majority of

voters approved in a municipal election held on October 4, 2005.[1]  [Doc. 1.]  The October

---

   [1]Albuquerque voters also passed another City Charter amendment in October 2005 that
addresses campaign-finance reform.  The campaign-finance amendment is not at issue in this
litigation, and all references to the "October 2005 City Charter amendment" in this *Memorandum*
*Opinion and Order* are to the photo ID amendment now codified at Article XIII, Section 14 of the
Albuquerque City Charter.

2005 amendment to the City Charter generally requires Albuquerque voters to display a current and valid photographic identification card ("photo ID") in order to be able to vote at all future municipal elections, unless they choose to vote by means of an absentee ballot. The City contends that the new law helps to advance its interest in preventing voter fraud.

Defendant Millie Santillanes is the City Clerk for the City of Albuquerque and is charged with administering City elections.  She is sued in her official capacity only.

The Plaintiffs in this case consist of three organizations and three individuals. Plaintiff League of Women Voters of Albuquerque/Bernalillo County, Inc. (the League) is a non-partisan, non-profit membership organization with members who are registered to vote and who customarily vote on election day in the City of Albuquerque's municipal elections. The League engages in a number of voter-education efforts in proximity to each election date.  Plaintiff SAGE Council (the Council) is a New Mexico non-profit corporation engaged in efforts to protect the voting rights of Native Americans and educate them about voting procedures in order to increase their participation in elections in which they are eligible to vote.  Plaintiff Coalition to End Homelessness (the Coalition) is a New Mexico non-profit corporation engaged in efforts to end homelessness.  Some of the Coalition's organizational members are involved in registering their homeless clients to vote in Albuquerque.  Plaintiffs Anne Kass, Alexandra Kazaras, and Barbara Grothus are all individuals voters who reside in Albuquerque and have expressed an intention to vote in person at their respective precinct polling places on the next municipal election day, and to make use of all the information that becomes available before election day in choosing who and what to vote for.

All of the Plaintiffs contend that the October 2005 City Charter amendment imposes an unconstitutional burden on their right to vote in Albuquerque's municipal elections. They object to being subjected to more stringent identification requirements because they (or their members or constituents) choose to vote in person at their precinct polling place on municipal election day instead of applying for and casting an absentee ballot. Plaintiffs also object to being subjected to different identification requirements based on how the October 2005 amendment is interpreted by different election officials within city government or at the polling places.

Striking an appropriate balance between the Plaintiffs' right to vote and the City's interest in regulating its elections is a task that requires careful consideration by this Court. There is no question that the City of Albuquerque has a compelling interest in preventing voter fraud and protecting the integrity of its municipal election procedures. It is also beyond dispute that home-rule municipalities such as the City of Albuquerque have the authority to regulate the manner in which their municipal elections are conducted.

Such authority is limited, however, by the Equal Protection Clause of the Fourteenth Amendment. Our Supreme Court has long recognized that voting is a "fundamental political right, because preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. For this reason, the Equal Protection Clause requires, and I apply here, heightened judicial scrutiny of an election law which substantially burdens the fundamental right to vote and provides election officials with such

unbridled discretion that arbitrary or disparate treatment of similarly situated voters is almost certain to result.  See Bush v. Gore, 531 U.S. 98, 105 (2000) (per curiam).

After careful consideration of the evidence of record in this case, and for the reasons articulated below, I conclude that the October 2005 City Charter amendment, as written, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  The proper remedy for this violation is to declare the October 2005 City Charter amendment unconstitutional and enjoin City officials from enforcing it in future municipal elections.  In order to ensure that the parties are clear on what election procedures apply in the absence of the October 2005 City Charter amendment, the Court will allow further briefing on this issue before entering a final judgment in this matter.

I reach a different conclusion with respect to Plaintiffs' alternative theory that the City's photo ID requirement implicates their right to free expression under the First Amendment to the United States Constitution.  This alternative theory has no application to the facts of this case.  Therefore, my decision to enjoin the City from enforcing the October 2005 City Charter amendment rests solely on the conclusion that the specific photo ID requirement at issue here violates the Equal Protection Clause.  My decision is limited to the evidence of record in this case and does not imply that all photo ID legislation relating to elections is unconstitutional *per se*.

Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the parties' cross-motions for summary judgment in part and denies those motions in part for the reasons set forth below.

I.    **BACKGROUND**

A.    **Procedural History**

On October 27, 2005, Plaintiffs filed this civil action against Defendant Millie Santillanes in her official capacity as the City Clerk charged with administering the City of Albuquerque's municipal elections.  With the consent of the Defendant, Plaintiffs amended their *Complaint* on January 3, 2006, and again on April 24, 2006.  [Doc. 5, 20.]  Plaintiff American Civil Liberties Union of New Mexico (ACLU) was dismissed by stipulation of the parties on August 29, 2006, in conjunction with the withdrawal of a motion for a protective order concerning Defendant's deposition questions that sought disclosure of the sources of the ACLU's funding.  [Doc. 49, 50, 52, 53.]  On September 13, 2006, the Court granted Plaintiffs' motion to voluntarily dismiss Counts II, III, IV, and V of their *Second Amended Complaint.*[2]  [Doc. 20, 69.]  As a result, Counts I and VI of the *Second Amended Complaint* are the only claims which remain pending in this action.  These two remaining counts assert violations of the First and Fourteenth Amendments to the United States Constitution.

After completing discovery, the parties filed cross-motions for summary judgment on Plaintiffs' remaining claims.  [Doc. 63, 65.]  The American  Center for Voting Rights Legislative Fund (ACVR) and the Brennan Center for Justice at NYU School of Law (Brennan Center) each were granted leave to file amicus briefs in conjunction with the

---

[2]Plaintiffs' motion also sought dismissal of the New Mexico Coalition to End Homelessness as a party to this suit; however, the motion does not indicate counsel for Defendant's concurrence in this request, and the proposed order submitted with the motion only addresses Counts II, III, IV, and V of the *Second Amended Complaint*.  [Doc. 62, 69.]

briefing on the parties' summary-judgment motions.[3]  [Doc. 42, 57.]  The parties and amici also were granted an extended briefing schedule on those motions [Doc. 67, 72, 73], with briefing completed on October 25, 2006.  [Doc. 79, 81.]  The parties requested and received an extension of time to complete a proposed pretrial order until they receive a ruling on their cross-motions for summary judgment.  [Doc. 83, 84, 85.]

### B.    The Existing Framework of Federal and State Election Laws

The amendment to the City Charter that a majority of Albuquerque voters approved in the October 2005 municipal election takes its place against a backdrop of other federal, state, and local laws which regulate the conduct of elections and the powers of home-rule municipalities.  It is important to first review the history of these pre-existing laws and explain how they relate to one another in order to understand the significance of Albuquerque's recent City Charter amendment.   Because several of these pre-existing laws would apply in the absence of the October 2005 amendment, they establish a baseline of voting procedures to which the new law can be compared.

The source of the elective franchise in the State of New Mexico is found in Article VII, Section 1 of the New Mexico Constitution, which provides that:

> Every citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety

---

[3]In a prior *Memorandum Opinion and Order* [Doc. 42], the Court denied a motion to intervene filed by Vickie S. Perea, Dwight Adkins, and Glen Stout.  These applicants and ACVR are represented by the same counsel, and the applicants' *Motion to Intervene* [Doc. 32] was filed in conjunction with ACVR's *Motion for Leave to File Amicus Curiae Briefing* [Doc. 34] on June 13, 2006.

days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons and persons convicted of a felonious or infamous crime unless restored to political rights, shall be qualified to vote at all elections for public officers.  The legislature may enact laws providing for absentee voting by qualified electors.  All school elections shall be held at different times from other elections.

The legislature shall have the power to require the registration of qualified electors as a requisite for voting, and shall regulate the manner, time, and places of voting.  The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise.  Not more than two members of the board of registration, and not more than two judges of election shall belong to the same political party at the time of their appointment.

N.M. Const. art. VII, § 1.

Since this provision of the New Mexico Constitution was last amended in 1967, it has been superseded in some respects by the Twenty-Sixth Amendment to the United States Constitution, which sets the voting age at eighteen years, and by the 1970 amendments to the Voting Rights Act, which set a durational residency requirement of thirty days in elections for certain federal offices.  See U.S. Const. amend XXVI; 42 U.S.C. §§ 1973aa to 1973bb-4.  Thus, as modified by the Twenty-Sixth Amendment to the United States Constitution and the federal Voting Rights Act, the basic criteria for being eligible to vote under Article VII, Section 1 of the New Mexico Constitution are:  (1) United States citizenship, (2) an age requirement of 18 years or older, and (3) a durational residency requirement of at least 30 days.  See N.M. Const. art. VII, § 1; U.S. Const. amend. XXVI; 42 U.S.C. §§ 1973aa to 1973bb-4.

Albuquerque's October 2005 City Charter amendment is not the first law to face the problem of reconciling these eligibility requirements for voting with the eligibility requirements for obtaining the documents necessary to identify oneself as a voter. The New Mexico Legislature faced a similar problem when it amended the State Election Code in 2005.

The 2005 amendments to the State Election Code respond to and implement the Help America Vote Act of 2002 (HAVA), which Congress passed in response to problems identified in the 2000 presidential election. Section 303 of HAVA provides, in relevant part, that states must create and maintain a "computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 42 U.S.C. § 15483(a)(1)(A). In addition, HAVA requires applicants for voter registration for an election for federal office to include certain identifying information, such as the last four digits of a social security number, for purposes of establishing a "unique identifier" for each voter. 42 U.S.C. §§ 15483(a)(5), 15483(b).

Building upon the foundation required under HAVA, the 2005 amendments to New Mexico's State Election Code establish the following voting procedure in statewide elections:

A. When a voter presents himself at the polls to vote, he shall announce his name and address in an audible tone of voice. When an election judge finds the voter's name in the signature roster, he shall in like manner repeat the name of the voter. The election judge shall then ask the voter to provide the required voter identification. The voter shall then sign his name

or make his mark on the signature line in the copy of the signature roster to be returned to the county clerk.  Upon the voter's name or mark being written in the signature roster, a challenge may be interposed as provided in the Election Code.

      B.  If a voter fails to provide the required voter identification, the voter shall be allowed to vote on a provisional ballot.

N.M. Stat. Ann. 1-12-10 (Michie Supp. 2006).[4]  The State Election Code elsewhere defines

"required voter identification" to include

any of the following forms of identification as chosen by the voter:

 A. a physical form of identification, which may be:

 (1) an original or copy of a current and valid photo identification with or without an address, which address is not required to match the voter's certificate of registration or a voter identification card; or

 (2) an original or copy of a utility bill, bank statement, government check, paycheck, student identification card or other government document, including identification issued by an Indian nation, tribe or pueblo, that shows the name and address of the person, the address of which is not required to match the voter's certificate of registration; or

 B. a verbal or written statement by the voter of the voter's name, year of birth and unique identifier; provided, however, that the statement of the voter's name need not contain the voter's middle initial or suffix.

N.M. Stat. Ann. § 1-1-24.  The "unique identifier" means "the last four digits of a voter's

social security number."  Id. § 1-1-23.

     Similar requirements for a physical form of identification or the use of birth dates and

unique identifiers apply to voter registration and absentee voting under the State Election

---

     [4]All further citations to the State Election Code in this *Memorandum Opinion and Order* refer to the version in effect after the 2005 amendments unless otherwise noted.

Code as amended in 2005.  See id. § 1-4-5.1 (voter registration); id. §§ 1-6-4 to 1-6-9 (absentee voting).  The 2005 amendments also include provisions for educating voters and election workers about the law's requirements, see N.M. Stat. Ann. §§ 1-2-4, 1-2-17, 1-11-12.1, 1-12-10.1, and protecting the privacy of personal information (such as social security numbers and dates of birth) that voters supply to election officials.  See N.M. Stat. Ann. §§ 1-4-5(E), 1-5-21, 1-5-22, 1-5-24, 1-6-5.4.  Responsibility for administering the State Election Code falls on the Secretary of State and the County Clerk for each county, who are elected officials in their own right.  See N.M. Const. art. V, § 1 (providing for election of secretary of state); N.M. Stat. Ann. § 4-38-6(C) (Michie 2002) (providing for election of county clerks).

## C.   The Applicability of HAVA to Municipal Elections in New Mexico

The requirements of HAVA and the 2005 amendments to the State Election Code do not necessarily apply to municipal elections in New Mexico.  The New Mexico Legislature has enacted a separate Municipal Election Code for that purpose, which provides that:

> The Municipal Election Code shall govern the conduct of all aspects of all municipal elections except when the Municipal Election Code is silent or is in conflict with the state Election Code with respect to any procedures or protections required of the state by federal law, then the state Election Code shall govern, as appropriate.  The provisions of the Municipal Election Code shall not apply to home rule municipalities or municipalities incorporated under special act unless the Municipal Election Code is adopted by reference by such municipality.

N.M. Stat. Ann. § 3-8-1(E) (Michie 1999); see also N.M. Stat. Ann. § 1-1-19(B) (stating conditions under which State Election Code applies to municipal elections).

The City of Albuquerque is a "home rule municipality" and, as such, may "exercise all legislative powers and perform all functions not expressly denied by general law or charter."  N.M. Const. art. X, § 6(D).  See Cottrell v. Santillanes, 120 N.M. 367, 368, 901 P.2d 785, 786 (Ct. App. 1995).  Under the Municipal Charter Act, the charter of a home-rule municipality

> may provide for any system or form of government that may be deemed expedient and beneficial to the people of the municipality, including the manner of appointment or election of its officers, the recall of the officers and the petition and referendum of any ordinance, resolution or action of the municipality;  provided, that the charter shall not be inconsistent with the [C]onstitution of New Mexico....

N.M. Stat. Ann. § 3-15-7 (Michie 1999); see Cottrell, 120 N.M. at 368, 901 P.2d at 786.

Article II of the City of Albuquerque's municipal charter provides for the election of the City's Mayor and City Councillors; however, the City Clerk and City Attorney are appointees of the Mayor rather than elected officials in their own right.  Under the City's Merit System Ordinance, the City Clerk, City Attorney, and all Assistant City Attorneys are "unclassified employees" who may be dismissed "for any or no reason."  Albuquerque, N.M., Code of Ordinances § 3-1-6(C), (D) (2006), available at http://www.amlegal.com/library/nm/albuquerque.shtml.[5]

Albuquerque's City Charter defines the terms "elector" or "voter" as:

[a] person who is a resident of the city and who is entitled to vote for candidates for municipal office in a municipal election under the Constitution

---

[5]This website contains both the City Charter and the City's municipal ordinances, updated through September 18, 2006, as of the date the site was last visited on February 12, 2007.

and statutes of New Mexico as amended and supplemented from time to time and who is registered pursuant to the applicable statutes of New Mexico as amended and supplemented from time to time or who is registered pursuant to any ordinance of the Council which expressly provides that it is to take precedence over such statutes and which is enacted after the effective date of this Section.

Albuquerque, N.M., City Charter, art. II, § 5.  According to the schedule set forth in the City

Charter, Albuquerque's next regular municipal election will occur on Tuesday, October 2,

2007.  See id., art. II, § 1.

Albuquerque's City Charter also selectively incorporates the Municipal Election Code

as well as city ordinances governing municipal elections, as follows:

(a)    The Municipal Election Code, Chapter 3, Articles 8 and 9, NMSA 1978, as amended and as supplemented from time to time, shall govern the conduct of all aspects of municipal elections, except where inconsistent with the terms of this Charter, in which event this Charter shall control.

(b)    Any ordinance adopted subsequent to the effective date of this Section by a majority of the entire membership of the Council plus two additional members thereof voting in favor of such ordinance, and said ordinance being otherwise governed by Article XI of this Charter, which ordinance expressly provides that it is to take precedence over the Municipal Election Code, shall take precedence over such Code except where such ordinance is inconsistent with the terms of this Charter, in which event this Charter shall control.

Id., art. II, § 2.  The City of Albuquerque's Municipal Election Ordinance similarly provides

that:

The purpose of this chapter is to prescribe certain rules of procedure concerning municipal elections by implementing the Constitution of the State of New Mexico and the Charter of the City of Albuquerque [i.e., Article XIII of the Charter] and by supplementing and modifying the statutes of the state and their application to the city. In the event any of the provisions of this chapter conflict with the Constitution of the state or the Charter of the city, the

Constitution and Charter shall prevail, and if any provision of this chapter conflicts with any otherwise applicable provision of the general statutes of the state, the provisions of this chapter shall prevail.

Albuquerque, N.M., Code of Ordinances § 2-4-2.

Under the Municipal Election Ordinance, " [t]he City Clerk shall administer all municipal elections.  The City Clerk may delegate to Deputy City Clerks and Assistant City Clerks any of the duties of the City Clerk in the administration of municipal elections." Id. § 2-4-4.

With certain exceptions not directly at issue here, the Municipal Election Ordinance provides that absentee voting in the City of Albuquerque's municipal elections shall be conducted in accordance with the Municipal Election Code.  See id. § 2-4-18.  Under the Municipal Election Code, absentee voting is available to "any voter . . . entitled to vote in the municipal election," N.M. Stat. Ann. § 3-9-3 (Michie 1999), so long as he or she complies with the application and voting procedures for absentee ballots.

### D.    The Procedure for Voting Under the Municipal Election Code

The Municipal Election Code was last amended in 2003 and does not expressly incorporate the identification requirements of HAVA or the 2005 amendments to the State Election Code cited above.  In particular, the Municipal Election Code does not require absentee voters to produce a photo ID at the time they apply for or cast an absentee ballot. See N.M. Stat. Ann. § 3-9-4, 3-9-7 (Supp. 2006).  An absentee voter proceeding under the Municipal Election Code need not personally appear before an election official at any time. In lieu of appearing in person, the Municipal Election Code allows a voter to request an

-13-

absentee ballot by telephone, by mail, or through an immediate family member such as a spouse, child, parent, brother, or sister.  See id. § 3-9-4(D).  Completed absentee ballots may be mailed to the municipal clerk in lieu of delivering them in person.  See id. § 3-9-7(B).

The Municipal Election Code also sets forth a procedure for voting in person at one's regular precinct polling place on election day, which does not expressly include the identification requirements of HAVA or the 2005 amendments to the State Election Code:

> A.   When a person presents himself at the polls to vote, he shall announce his name and address in an audible tone of voice and locate his name and number in the registered voter list posted for such purpose.  An election clerk shall locate the person's name and number in the signature roster.  The person shall then sign his name in the signature roster, or if he is unable to write, the election clerk shall sign his name in the signature roster which shall be initialed by an election judge in the signature roster.  Thereupon, a challenge may be interposed as provided in the Municipal Election Code.

> B.  If no challenge is interposed, an election clerk shall issue a voting machine permit to the person upon which shall be written his voter registration list number.  The person shall present the voting machine permit to the precinct board member activating the machine and the person shall be allowed to vote.  The precinct board member shall enter the public counter number onto the voting machine permit as shown on the voting machine after the person has voted.  All voting machine permits shall be retained in consecutive order and made part of the election returns.

N.M. Stat. Ann. § 3-8-41 (Michie 1999).

The October 2005 amendment to the Albuquerque City Charter modifies this procedure for voting in person at one's regular precinct polling place on election day, because the October 2005 amendment takes precedence over conflicting provisions of the Municipal Election Code pursuant to the choice-of-law provisions in N.M. Stat. Ann. § 3-8-1(E), and Article II, Section 2 of the City Charter.  There is no corresponding modification

to the procedure for absentee voting, which is still governed by reference to the Municipal

Election Code under these choice-of-law provisions.

E.      **The October 2005 Amendment to Albuquerque's City  Charter**

The October 2005 amendment has been codified as Article XIII, Section 14 of

Albuquerque's City Charter, which reads as follows:

> When a voter approaches the election polling place seeking to vote, the voter
> must identify himself or herself audibly by name.  The Municipal Election
> Clerk shall locate in the election rolls the name spoken and ask the individual
> seeking to vote for one current valid identification card containing the voter's
> name and photograph.  Such photo identification card may include any card
> issued by a government agency, driver's license, student identification card,
> commercial transaction card such as a credit or debit card, insurance card,
> union card, a professional association card or the voter identification card
> issued by the City Clerk.  If the individual is unable to provide a photo
> identification card, he or she shall be allowed to vote on a provisional ballot,
> but only if he or she swears or affirms under penalty of perjury in an affidavit
> provided by the City Clerk that he or she is the registered voter listed on the
> voter registration rolls at the precinct at which he or she presented himself or
> herself to vote and provides his or her date of birth and the last four digits of
> his or her social security number.  Provisional ballots shall be issued for no
> other reason than the failure to present photo identification.  Provisional
> ballots shall be counted only by the Municipal Canvassing Board and only
> upon the voter's presentation to the City Clerk within the ten day canvassing
> period one of the photo identification cards described in this section.  The
> Municipal Canvassing Board shall also verify that the voter who cast the
> provisional ballot was registered to vote for the election and did not vote
> elsewhere in the same election.  If a voter who cast a provisional ballot under
> this section swears or affirms under penalty of perjury in an affidavit provided
> by the City Clerk within the ten day canvassing period that he or she has a
> religious objection to being photographed, such voter shall not be required to
> submit photo identification.  The Municipal Canvassing Board shall otherwise
> verify that the provisional ballot was valid.  The City Clerk shall develop and
> provide instructions for elections judges concerning the requirements of this
> Section and a method of complaint and resolution for individuals who feel
> they have been discriminated against by election officials  or the City Clerk's
> administration  of  this  Section,  in  accordance  with  federal  intimidation

guidelines.  Knowingly executing a false statement constitutes perjury as provided in Section 30-25-1 NMSA 1978 and voting on the basis of a falsely executed statement constitutes false voting as provided in Section 1-20-8 NMSA 1978. Voter photo identification cards shall be issued by the City Clerk without charge to any voter who presents any two of the following identification documents that show the name and address of the voter: a state issued identification card, social security card, student identification card, library card, insurance card, selective service card, union card, professional association card, utility bill, bank statement, government check or a paycheck. If the individual is unable to present any two of these documents to the City Clerk, then the voter shall swear or affirm in writing under penalty of perjury that he or she is the registered voter and shall be issued a voter photo identification card upon confirmation with the County Clerk that such person is presently registered to vote.  The City Clerk issued voter photo identification card shall state on its face that it shall not be valid for identification other than for the purpose of voting in City Elections and shall not be valid if the voter is subsequently purged from the voter rolls. The Municipal Canvassing Board shall certify the results of the Municipal Election by the end of the tenth day after the day on which the election is held. Pursuant to Article II, Section 2 (b) of the City Charter, this Section shall take precedence over the State Municipal Election Code. The provisions of this Section shall apply only to City of Albuquerque Municipal Elections.

Albuquerque, N.M., City Charter, art. XIII, § 14 (as amended Oct. 4, 2005).

Before this amendment appeared on the ballot for Albuquerque's municipal election of October 4, 2005, it was proposed by the City Council pursuant to Article VI, Section 1 of the City Charter.  The only legislative history concerning this proposal that appears in the record is the City Council's written resolution to submit this amendment to the voters, which was approved by a vote of five councillors in favor and two opposed at the City Council meeting of June 20, 2005, and then signed by Mayor Martin Chavez on June 23, 2005.

The City Council's proposal contains the following preliminary remarks and findings:

WHEREAS, the integrity of the voting process is essential for the public to have confidence in the election process; and

WHEREAS, present law has no general requirement for presenting a photo identification when voting so as to prevent voting fraud; and

WHEREAS, Louisiana, South Carolina, South Dakota, Florida, Indiana and Hawaii currently require voters to provide photo identification before he or she may vote; and

WHEREAS, the use of photo identification will help to eliminate the fraudulent voter registration that exists in Albuquerque and prevent vote from becoming fraudulent as shown by these 2004 examples:

    1.    A community organization admitted that one of its employees submitted falsified voter registrations forms for a 13-year-old boy and a 15-year-old neighbor;

    2.    A voter registration card arrived in the name of a resident's father who had been dead for two and one-half years;

    3.    The Albuquerque Police Department's Gang Unit, while executing a search warrant, found voter registration forms. The occupant admitted to being paid to have people fill out these forms;

    4.    Voter registration cards were turned in to the County Clerk containing faulty or no addresses, no social security numbers and bogus signatures. The Bernalillo County Clerk estimated that the County had 3,000 voter registration cards with problems that may have rendered them invalid; and

WHEREAS, requiring all voters to show photo identification eliminates the possibility of having a person's vote stolen by an impostor, as was the case with at least one Albuquerque citizen in the 2004 election; and

WHEREAS, voting is one of our most important rights and no one should lose that right through the fraudulent behavior of another.

Albuquerque, N.M., Council Bill No. R-05-295 (2005). [Ex. A to Doc. 66.]

Two of the incidents referenced in this City Council Resolution appear to correspond

to allegations in the *Motion to Intervene* [Doc. 32] filed on June 13, 2006. In that motion,

counsel identified Dwight Adkins as the person whose vote was stolen by someone who voted in his place in the 2004 election.  Counsel also identified Glen Stout as the parent of the thirteen year-old who was fraudulently registered by a voter-registration entity during the 2004 election campaign.

### F.    The Tendered Evidence Relating to Voter Fraud and Enforcement

Apart from the text of the City Council Resolution itself and the representations of counsel in the *Motion to Intervene*, the parties have presented no evidence of voter fraud or voting irregularities among Albuquerque voters who vote in person at their precinct polling place on election day.  The parties' primary witnesses on this subject are the current City Clerk, Defendant Millie Santillanes, and a former State Election Director in the Secretary of State's office, Denise Lamb.

Under Section 2-4-4 of the City's Municipal Election Ordinance, Defendant Santillanes is the City Clerk charged with administering all municipal elections.   She was appointed to that position by Mayor Chavez in December 2005 and also served in the same position eight or more years ago during Mayor Chavez's first term of office.  [Santillanes Dep. at 3, Ex. G to Doc. 66.]

In her deposition testimony, Defendant Santillanes could identify no instances of complaints, charges, or prosecutions regarding individuals who have impersonated someone else when voting at the polls, except for the one incident listed in the 2005 Council Resolution, which did not occur during a municipal election.  [Santillanes Dep. at 7-9.]  In

response to Plaintiffs' discovery requests, Defendant also produced no documents of such complaints, charges, or prosecutions regarding voter impersonation. [Ex. I to Doc. 66.]

While Defendant Santillanes's deposition testimony indicates that she is "in charge of municipal elections" and that she "conduct[s] them with help of the legal department, with the help of staff," she also testified that she does not "register voters" because that task is "done through the county clerk." [Santillanes Dep. at 5-6.] From this evidence, it is apparent that the October 2005 amendment has no discernible relationship to correcting problems with *voter registration* (such as invalid registration cards, the appearance of voter-registration forms in suspicious locations, or the registration of children or deceased persons as voters) because the City Clerk is not charged with overseeing voter registration.

Defendant also submitted the affidavit of Kelly A. Fulgenzi, an Assistant City Clerk, concerning a runoff election held in City Council District 9 on November 21, 2005, which attracted the participation of only 3,687 out of 28,925 eligible voters. That runoff election was conducted shortly after voters approved the October 2005 amendment to the City Charter adding the photo ID requirement. [Fulganzi Aff. ¶ 8, Ex. B to Doc. 64.] The parties point to no evidence of voter fraud and no evidence that provisional ballots were used due to a voter's lack of an acceptable photo ID during that election. Of the votes cast, twenty percent were cast by absentee ballot even though the runoff election was announced less than two months before the election date of November 21, 2005. [Ex. L to Doc. 74; Fulganzi Aff. ¶ 9.]

The evidence submitted with the parties' briefing on their cross-motions for summary judgment also does not contain any expert testimony on the subject of voter fraud. Defendant filed an expert report of Dr. Jonathan Katz on July 21, 2006, but the parties did not include any of his testimony with their briefing on the cross-motions for summary judgment.  [Doc. 45.]  Plaintiffs produced an expert report by Denise Lamb, but later withdrew all their proposed expert-witness testimony in response to a motion to exclude such testimony filed by Defendant.  [Doc. 43, 44, 48, 51.]

Nevertheless, both parties have cited testimony from Ms. Lamb in her capacity as a fact witness concerning the prevalence of voter-fraud complaints during her tenure as New Mexico's State Election Director in the Secretary of State's office from November 1994 to September 1997 and again from January 1999 to January 2005.  Ms. Lamb states in her affidavit that she never received a single affidavit or complaint of anyone impersonating a voter at the polls in any of the elections she supervised throughout the state, including Bernalillo County, during her entire tenure in that position.  She further states that she is unaware of any instance of voter impersonation, or any instance where there was a law-enforcement investigation or prosecution of an alleged impersonation of a voter, during her tenure as an election supervisor.  [Lamb Aff. ¶¶ 1-4, Ex. J to Doc. 66.]

In her deposition testimony, Ms. Lamb explained that her duties as State Election Director encompassed administration of the Municipal Election Code, which she interpreted as directing the Secretary of State to investigate complaints regarding municipal elections and forwarding them to the applicable law-enforcement authorities.  These duties included

handling calls from city clerks about complaints during an election.   At her deposition, Ms. Lamb again confirmed that she has no personal knowledge of anybody ever being accused of impersonating someone else at the polls.  [Lamb Dep. at 9, 67, 72; Ex. N to Doc. 75.]

Ms. Lamb tells a different story with respect to absentee voting.  Ms. Lamb's affidavit states that she "received reports or complaints of irregularities in absentee voting every election, without fail."  [Lamb Aff. ¶ 5, Ex. J to Doc. 66.]  In the portions of her deposition testimony attached to *Defendant's Memorandum in Support of Motion for Summary Judgment* [Ex. K to Doc. 64], Ms. Lamb cites several examples of schemes or ploys that reportedly were used to defraud or disenfranchise voters using absentee-voting procedures. [Lamb Dep. at 84-96, 103-08.]  Defendant Santillanes also admitted in her deposition testimony that it is possible to steal someone's vote by means of absentee voting.  She agreed with counsel that it would be possible, for example, for a husband to obtain an absentee ballot in his wife's name and then send it in to cast the vote for her.  [Santillanes Dep. at 11-14.]

The parties have not presented evidence of any specific efforts, besides the enactment of the October 2005 amendment to the City Charter, that Defendant or other city officials have undertaken to prevent voter fraud or to educate voters about the new requirements imposed by this amendment since the date of its enactment.  Defendant Santillanes was questioned about such topics at her deposition on May 4, 2006.  As of the date of her deposition, Defendant Santillanes had not yet drafted any instructions to election officials with regard to training them in administering and enforcing the new requirements of the

October 2005 amendment to the City Charter.  [Santillanes Dep. at 17-20.]  Her testimony

of record also is silent with respect to whether her office has established any procedure for

issuing the photo ID cards specified in the October 2005 amendment, or educating voters on

how to obtain them.   The affidavit of her assistant, Ms. Fulgenzi, indicates that such a photo

ID card can be obtained from the City Clerk before, during, and after an election day, but

provides no details that go beyond the text of the City Charter amendment itself.  [Fulganzi

Aff. ¶¶ 10-13.]  There is no evidence of record that anyone has actually obtained a photo ID

card from the City Clerk.

        Unlike the 2005 amendments to the State Election Code, see N.M. Stat. Ann. § 1-11-

12.1, the October 2005 amendment to the City Charter does not place an affirmative

obligation on government officials to provide every registered voter with an ID card that can

be used for identification purposes on election day.  Rather, the October 2005 amendment

leaves it up to each Albuquerque voter to learn about and properly invoke the procedure for

obtaining a city-issued identification card from the City Clerk if they so desire.

        At her deposition, Defendant Santillanes offered her interpretation of the requirement

that photo ID cards presented by voters must be "current" and "valid."  As an example of a

card that she would not consider current or valid, Defendant Santillanes cited "a driver's

license that is 20 years old . . . particularly if you can't tell by the picture."   Defendant

Santillanes also would reject a photo ID card if the photo appearing on the card "was so

dramatically different from the person bringing in the card."   [Santillanes Dep. at 22-26.]

If, on the other hand, a person brought in a driver's license that had expired only a week earlier, Defendant Santillanes predicted that it "could" be rejected, but she did not "think it would be."   She also testified that she did not think it would matter if the driver's license were from another state or had a different address than the one shown in the City Clerk's records.   [Santillanes Dep. at 22-23, 35-36.]

Ultimately, however, and of significance to this Court, Defendant Santillanes stated that she could not give a definition of which photo ID cards were "valid," because she would leave it up to each election judge to "make the call."  [Santillanes Dep. at 23-24, 37-38.] According to Defendant Santillanes, the election judge makes the judgment as to whether or not the photographic image on the ID card sufficiently matches the physical appearance of the voter who presents it.  [Santillanes Dep. at 31-32.]

Defendant also offers the affidavit of Ms. Fulgenzi on this subject.  Ms. Fulgenzi's affidavit is not consistent with Defendant Santillanes's deposition testimony in some respects.  While Ms. Fulgenzi states in her affidavit that she "presently administer[s] City of Albuquerque elections" [Fulganzi Aff. ¶ 1], the deposition testimony indicates that Defendant Santillanes is "in charge of municipal elections," has "overall responsibility for all municipal elections," and "do[es] it all."  [Santillanes Dep. at 6, 16.]

Ms. Fulgenzi's affidavit also states that "[t]he City Clerk's training of election poll workers includes that expiration dates are not required to be on photo identification cards, but if a photo identification card has an expiration date, such card will not be accepted on a date after the expiration date."  According to Ms. Fulgenzi's affidavit, "[t]he City Clerk's

training of election poll workers" also includes an instruction that "photo identification cards that are forgeries may not be accepted for meeting the photo identification requirements of the Voter ID law." As examples of "[a]cceptable photo identification cards," Ms. Fulgenzi's affidavit cites "commercial transaction cards, such as Costco or Sam's Club membership cards." [Fulganzi Aff. ¶¶ 18, 19, 25.]

## II.   ANALYSIS

### A.   Plaintiffs' Standing

Before turning to the merits of Plaintiffs' claims that the October 2005 amendment to the City Charter is unconstitutional, the Court must first determine whether it has jurisdiction to adjudicate these claims. Defendants assert that this Court lacks jurisdiction because Plaintiffs do not have standing to sue. "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

The constitutional requirements for standing are derived from the wording of Article III of the United States Constitution, which limits the role of the federal Judiciary to the adjudication of actual cases or controversies. See Initiative and Referendum Inst. v. Walker, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). At this stage of the litigation, Plaintiffs can no longer rely solely on the allegations in their *Complaint* in order to establish standing. They must instead come forward with admissible evidence to support each element required

to establish an actual case or controversy under Article III.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992).

The Supreme Court has set forth three elements that Plaintiffs must satisfy to meet the constitutional requirements for standing.  See McConnell v. Fed. Election Comm'n,  540 U.S. 93, 225 (2003).  First, Plaintiffs must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent."  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted).  Second, Plaintiffs must establish "a causal connection between the injury and the conduct complained of--the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] some third party not before the court.'"  Lujan, 504 U.S. at 560-561 (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976)).  Third, Plaintiffs must show a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact."  Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (quoting Simon, 426 U.S. at 45).

Additional requirements must be satisfied when an organization seeks to assert claims on behalf of its members.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 180-181 (2000).  Defendant does not contend that the purposes of the organizational Plaintiffs lack

relevance to the interests at stake here or that this case requires the participation of individual members (in addition to the three individual Plaintiffs who are already named in the lawsuit). Thus, the organizational Plaintiffs' standing to sue on their members' behalf depends on their members' standing to sue in their own right.[6]

Defendant contends that both the individual Plaintiffs and the organizational Plaintiffs' members lack standing to sue in their own right because they have not shown an "injury in fact," which the Supreme Court has defined as "'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" Walker, 450 F.3d at 1087 (quoting Lujan, 504 U.S. at 560). Defendant asserts that this element of standing is lacking here because none of the Plaintiffs have conclusively shown that they or any of their members currently lack and are unable to obtain one of the forms of photo ID listed in the October 2005 amendment to the City Charter as of the date of the next municipal election.

Defendant furthers assert that Plaintiffs lack a legally protected interest in voting in person at their precinct polling place on future municipal election days because the Constitution does not guarantee them a right to vote in a specific manner (such as casting a ballot in person on election day in lieu of mailing an absentee ballot). Thus, according to

---

[6]Some of the organizational Plaintiffs also contend that they have standing to sue on the alternative theory that the October 2005 City Charter amendment will adversely affect their voter-education efforts. Because I conclude that at least some of the organizational Plaintiffs have standing to sue on behalf of their members, I find it unnecessary to address this alternative theory of organizational standing.

Defendant, the fact that Plaintiffs or their members might be personally offended by the prospect of showing a photo ID when they vote or being treated differently than absentee voters does not amount to an invasion of a legally protected interest.

To support these arguments, Defendant relies on the recent district court opinion in Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775 (S.D. Ind. Apr. 14, 2006), aff'd sub nom. Crawford v. Marion County Election Bd., 472 F.3d 949 (7th Cir. 2007). Rokita and other authorities support the proposition that Plaintiffs cannot show a "legally protected interest" simply by asserting that their personal feelings or beliefs are upset by the prospect of showing a photo ID when voting in person at their precinct polling place on municipal election days. "[T]he psychological consequence presumably produced by observation of conduct with which one disagrees ... is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485-86 (1982); accord Schaffer v. Clinton, 240 F.3d 878, 884 (10th Cir. 2001). This Court agrees that Plaintiffs may not rely on such psychological injuries to establish their standing to sue.

It is also true that the Constitution does not expressly guarantee Plaintiffs the right to vote in person at a polling place on election day, as opposed to some other method of voting such as the mailing of an absentee ballot, or *vice versa*. See McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 808 (1969); Griffin v. Roupas, 385 F.3d 1128, 1130 (7th Cir. 2004). Indeed, there is no constitutional guarantee that a home-rule municipality such as the City of Albuquerque must choose a form of local government that allows its citizens

-27-

to elect its municipal officials in the first place.  See N.M. Stat. Ann. § 3-15-7; Cottrell v. Santillanes, 120 N.M. 367, 368, 901 P.2d 785, 786 (Ct. App. 1995); cf. Bush v. Gore, 531 U.S. 98, 104 (2000) (per curiam) ("The individual citizen has no federal constitutional right to vote for electors . . . unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.").

This absence of constitutional guarantees does not end the Court's standing inquiry, however, because the Constitution's Bill of Rights is not the only source of legally protected interests that Plaintiffs may rely upon to establish their standing to sue.  It is on this point that Defendant's arguments about standing, and the district court's analysis in Rokita, go astray from the applicable Supreme Court and Tenth Circuit precedents.

For purposes of the standing inquiry, "the question is not whether the alleged injury rises to the level of a constitutional violation."  Walker, 450 F.3d at 1088.  The mere existence of a constitutional violation does not give everyone the right to file a lawsuit to redress it; only those who can show that they have been or are about to be injured by the violation have standing to sue.  And because the resulting injury can be distinct from the constitutional violation itself, a constitutional violation may cause injury to a legally protected interest that is not itself guaranteed by the Constitution, as when the government denies a class of persons a contractual or statutory benefit to which they could otherwise be entitled but for the government's violation of their constitutional right to equal protection. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211-12 (1995).  Thus, the ultimate question of whether the October 2005 City Charter amendment is unconstitutional

is distinct from the antecedent issue of whether Plaintiffs can show an injury-in-fact that gives them standing to sue.  See Schaffer, 240 F.3d at 883.  The question of standing "goes to the Article III jurisdiction of this Court ..., not to the merits of the case."  Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997).

In this case, Plaintiffs need not claim or rely upon a *constitutional* right to vote in person at a polling place on future municipal election days in order to establish their standing to sue, because there are already state statutes and municipal charter provisions which grant them that option.[7]  These election laws give Albuquerque residents (including Plaintiffs and the members of Plaintiffs' organizations) the options of either voting by absentee ballot or voting in person at a polling place on designated municipal election days.  Plaintiffs are simply asserting a right to exercise the latter option in a manner consistent with the constitutional guarantees of equal protection and freedom of expression.

For purposes of Plaintiffs' standing to assert their equal-protection claims, the "injury-in-fact" is not only the threatened loss of this statutory option to vote in person at the polling place on election day, but also the extent to which they are being treated on less favorable terms than other similarly situated voters.

---

[7]For example, see Albuquerque, N.M., City Charter, art. II, § 1 ("[R]egular municipal elections shall be held on the first Tuesday after the first Monday in October of odd-numbered years."); Albuquerque, N.M., Code of Ordinances § 2-4-5(A) (same); N.M. Stat. Ann. § 3-8-11 (designating polling places for municipal elections); N.M. Stat. Ann. § 3-8-38(D) ("Polls shall be opened at 7:00 a.m. on the date of the election and shall be closed at 7:00 p.m. on the same day.").

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993); accord Adarand Constructors, Inc., 515 U.S. at 211-12; Gratz v. Bollinger, 539 U.S. 244, 261-62 (2003).

When, as here, a statute or municipal charter has given registered voters the option of casting their ballots in person at a polling place on election day, those citizens may justifiably rely on the availability of that option without facing the prospect of unconstitutional discrimination or disenfranchisement when they do so. "[O]nce the franchise is granted to the electorate, lines may not be drawn that are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Harper v. Va. State Bd. of Educ., 383 U.S. 663, 665 (1966); accord Bush v. Gore, 531 U.S. at 105; McDonald, 394 U.S. at 807.

Thus, in this context, the law does not necessarily require Plaintiffs to wait until the next municipal election day to find out whether they are actually denied the right to vote or treated less favorably than similarly situated voters because of perceived inadequacies in their ID cards. Rather, the "injury in fact" required to establish standing to seek prospective relief may include a "'credible threat'" to Plaintiffs' or their members' right to vote or receive equal treatment in a future election that "'arise[s] from an objectively justified fear

of real consequences.'" Walker, 450 F.3d at 1088 (quoting D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir. 2004)).  A "plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.  But [one] does not have to await the consummation of the threatened injury to obtain preventive relief." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 299 (1979) (citations and internal quotation marks omitted); accord Walker, 450 F.3d at 1088.

Our Supreme Court has recognized important prudential and equitable reasons why "the injury in fact" requirement extends to such threatened injuries when raised in a prospective challenge to election procedures:   "Challengers to election procedures often have been left without a remedy in regard to the most immediate election because the election is too far underway or actually consummated prior to judgment." Babbitt, 442 U.S. at 301 n.12; see, e.g., Bush v. Gore, 531 U.S. at 110.  "Justiciability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election." Babbitt, 442 U.S. at 301 n.12.  And when judicial review is undertaken before an election, our Supreme Court has recognized the need for "clear guidance" so as to avoid "voter confusion and consequent incentive to remain away from the polls." Purcell v. Gonzalez, 127 S. Ct. 5, 7 (2006).

In this case, Plaintiffs have presented affidavits stating that they and their members have voted in the past and have specific plans to vote in person at their precinct polling places on future municipal election days in the City of Albuquerque.  For purposes of establishing their standing to sue, Plaintiffs also have presented evidence showing that they

have concrete and specific reasons for availing themselves of the option of voting in this manner, *e.g.*, their interest in obtaining additional information about the candidates which does not become available until just before election day, their interest in publicizing or displaying their exercise of their right to vote to other members of their communities, and their interest in avoiding the risk that an absentee ballot will not be received or counted.

By operation of law, municipal election days in the City of Albuquerque are scheduled to occur at regular four-year intervals beginning in October 2007, and Defendant has expressed an intention to enforce the October 2005 City Charter amendment at such future elections. Thus, there is no question that unless the City is enjoined from enforcing the October 2005 City Charter amendment, Plaintiffs will be confronted with the requirements of this new law when they next vote at a municipal election in Albuquerque.

For purposes of establishing their standing to sue, Plaintiffs also have identified distinct, palpable reasons why they believe their existing identification documents may not be available or acceptable as "current" and "valid" photo ID cards under the October 2005 City Charter amendment, or why this amendment may cause them to be treated less favorably than other similarly situated voters. In the case of Plaintiff Kazaras and some of the SAGE Council's membership, the addresses on their ID cards do not match the addresses on their voter-registration records. [Kazaras Aff. ¶¶ 2-15, Ex. F to Doc. 66; Kazaras Dep. at 14-16, Ex. G to Doc. 64; Albert Aff. ¶¶ 2-8, Ex. C to Doc. 66; Albert Dep. at 18-20, 38-39, Ex. E to Doc. 64.] In the case of Plaintiffs Kass and Grothus, the photographs on their

drivers' licenses no longer match their physical appearance.[8]  [Kass Aff. ¶¶ 2-9, Ex. D to Doc. 66; Grothus Aff. ¶¶ 1-4, Ex. E to Doc. 66; Kass Dep. at 4-6, Ex. H to Doc. 64; Grothus Dep. at 22, Ex. I to Doc. 64.]

The Coalition's homeless members lack any permanent physical address to list on their ID cards and also lack a secure place to store their ID cards and other belongings.[9] These aspects of being homeless make the documents of homeless individuals more prone to being lost, stolen, or not accepted for identification purposes.  And when homeless individuals' identification documents are lost, they have difficulty obtaining new or different forms of identification in a timely manner.  [Hughes Dep. at 3-4, 14-18, 23-30, 32-34, 41-43, Ex. F to Doc. 64; Thomas Dep. at 6, 32, 38-41, 64-72, Ex. J to Doc. 64.]

Plaintiffs also express concern that they cannot foresee and prepare in advance for the City's new photo ID requirement because City officials have given conflicting interpretations as to which ID cards will be considered "current" and "valid" under the new law.  For

---

[8]Defendant has included some of the Plaintiffs' photo IDs as Exhibits G, H, and I to *Defendant's Memorandum in Support of Motion for Summary Judgment.*  [Doc. 64.] These exhibits do not comply with the Court's amended privacy policy, available at http://www.nmcourt.fed.us., because they contain personal data identifiers (including dates of birth and drivers license numbers) that are not redacted from each exhibit or filed under seal.  The Court's policy implements Section 205(c)(3) of the E-Government Act of 2002, Pub. L. No. 107-347, § 205(c)(3), 116 Stat. 2899, 2914 (2002) (codified at 44 U.S.C. § 3501 note, as amended 2004).  The Court will order that these exhibits be placed under seal, and Defendant is admonished to comply with the Court's privacy policy in all future filings.

[9]As noted above, it is unclear whether the Coalition wishes to continue as a party in this lawsuit, because Plaintiffs filed a motion to dismiss the Coalition as a party but did not include language dismissing the Coalition in their proposed order.  [Doc. 62, 69.]  Regardless of the Coalition's status as a party, however, Defendant has cited deposition testimony from the Coalition's officers or employees in its motion papers, and that testimony is still part of the evidence of record.

example, future elections may occur after the expiration date listed on some of these Plaintiffs' ID cards, or their ID cards may contain no expiration date.  The evidence of record contains conflicting interpretations by City officials as to whether or under what circumstances the expiration date will be used to determine whether an ID card is "current" for voting purposes.

Some election officials (such as Defendant Santillanes) may consider a photo ID to be current and valid even if it has an expiration date that predates the election day by a few days or weeks, while other election officials (such as Ms. Fulgenzi) may apply a bright-line rule that any expiration date appearing on a photo ID must not predate the election day in order to be considered current and valid for voting purposes.  Defendant Santillanes stated in her deposition testimony that she will leave it to the discretion of each election judge to decide which photo IDs are "current" and "valid."  Thus, a particular Plaintiff's chances of being disenfranchised on the next election day may depend on which election judge was reviewing their documents at the time they appeared to vote at their polling place.

That said, it is true that Plaintiffs have not identified a single voter who has been denied the right to vote based on the photo ID requirement in the October 2005 City Charter amendment or who, as a matter of law, currently lacks and cannot obtain any of the forms

of photo ID listed in the new law by the date of the next municipal election.[10]  But Plaintiffs claim that their inability to determine, in advance of the election, whether any of these forms of photo ID are going to be considered "current" and "valid" is one of the reasons why the October 2005 City Charter amendment is unconstitutional.  In particular, Plaintiffs claim that neither the text of the October 2005 City Charter amendment nor the interpretations offered by the City Clerk provide clear and consistent instructions for answering this question.

For the foregoing reasons, I conclude that Plaintiffs have shown a realistic danger or threat of injury to their legally protected interests in voting in-person at polling places on future municipal election days, on terms that are equal with other, similarly situated voters. This danger or threat of losing the right to vote and receive equal treatment on future municipal election days is fairly traceable to Defendant's operation and enforcement of the October 2005 City Charter amendment, and there is a substantial likelihood that the prospective relief Plaintiffs request in this action will remedy this alleged injury.  Therefore, the individual Plaintiffs and the organizational Plaintiffs' members have standing to sue in their own right.  See Simon, 426 U.S. at 41-45.

---

[10]The significance of this point is limited, however, by the fact that the special election for the District 9 City Council seat held on November 21, 2005, is the only municipal election to which the October 2005 amendment has been applied as of this date.  [Fulgenzi Aff. ¶ 8.]  The record contains no evidence that any of the Plaintiffs reside in District 9 (a suburban area on the far eastern side of Albuquerque) or voted in the District 9 special election on November 21, 2005.  [Albert Aff. ¶ 9; Ex. 1 to Kass Dep.; Ex. 1 to Grothus Dep.]

**B.      The Applicable Standard of Review for**
**Constitutional Challenges to Election Laws**

The next inquiry relates to the proper standard of review to be applied in evaluating the merits of Plaintiffs' claims.  This question breaks down into two components, one addressing the traditional framework for granting summary judgment under Fed. R. Civ. P. 56, and another addressing the level of judicial scrutiny that the Court must apply in evaluating Plaintiffs' constitutional challenges to the October 2005 City Charter amendment. These two components are interrelated, because application of the summary-judgment standard depends in part on which party bears the burden of proof on a particular issue, and the latter question depends on what level of judicial scrutiny the Court applies.

**1.      The Summary-Judgment Standard**

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.

The same standards apply when parties file cross-motions for summary judgment or motions for partial summary judgment.  See Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 581 (6th Cir. 2001) (cross-motions); Boyd v. Cinmar of Gloucester, Inc., 919 F.

-36-

Supp. 208, 208-09 (E.D. Va. 1996) (motions for partial summary judgment).  The filing of cross-motions does not necessarily mean that the matter can be resolved by a summary judgment, nor does the denial of one party's cross-motion necessarily mean that the other party's cross-motion will be granted.  See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).

In addition to accounting for which party files the motion, the procedure for granting summary judgment must account for which party bears the burden of proof at trial.  When the movant is also the party bearing the burden of persuasion on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir. 1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

To the extent that the nonmovant bears the burden of coming forward with evidence to prove its claims or defenses, the movant may invoke the traditional rule that "[t]o survive

-37-

summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)). In this context, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995).

Thus, for example, unsworn and anecdotal information conveyed in third-party media reports or other publications generally cannot be considered in evaluating whether a nonmovant has met its burden of coming forward with evidence to prove its claims or defenses. See New England Mut. Life. Ins. Co. v. Anderson, 888 F.2d 646, 650-51 (10th Cir. 1989). In this context, such inadmissible hearsay "could not create a genuine issue of material fact for trial." Turner v. City of Taylor, 412 F.3d 629, 652 (6th Cir. 2005).

While expert witnesses may rely on inadmissible facts or data in forming their opinions, see Fed. R. Evid. 703, unsworn statements in a report by a party's proposed expert "'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting Adickes v. S.J. Kress & Co., 398 U.S. 144, 158 n.17 (1970)). Proposed expert testimony also must meet the standards of reliability and relevance required under Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), and Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). See Rokita, 458 F. Supp. 2d at 803.

On the other hand, courts routinely admit sworn testimony that is based on a lay witness's personal experience regarding methods of operation or "tools of the trade" used by the population he or she is charged with monitoring. See, e.g., United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000) (concluding that a trial court did not plainly err in admitting a law-enforcement agent's testimony regarding tools of the drug-trafficking trade); United States v. Davis, 397 F.3d 173, 178-79 (3d Cir. 2005) (concluding that a police officer's testimony about "the methods of operation for drug traffickers in the South Philadelphia area" was admissible). In this case, I apply the same principle to the sworn testimony of experienced election officials based on their own personal knowledge regarding the observed behaviors of an identifiable group or class of people they are charged with monitoring (e.g., New Mexico voters or election judges). Similarly, it does not violate the Rules of Evidence to consider such sworn testimony when it is based on the personal knowledge of witnesses in other professions who have an abundance of experience observing the behavior of a particular segment of the population (e.g., homeless individuals or Native Americans who reside in Albuquerque), so long as the witness's testimony is limited to describing personal observations and is not "cloaked under any scientific or technical methodology" containing the "indicia of an expert opinion." Weaver v. Blake, 454 F.3d 1087, 1092 (10th Cir. 2006).

The Court also may consider statements attributed to third parties when they are offered not for the truth of the matter asserted, but for other admissible purposes. In this case, for example, the evidence of record contains sworn statements of Defendant Santillanes

and Ms. Fulgenzi that are not consistent with one another.  Without resolving the dispute over which of these witnesses' inconsistent statements (if any) is true or credible, the Court may nevertheless consider both statements for the purpose of showing that the October 2005 City Charter amendment is subject to differing interpretations within the City Clerk's office.

Apart from the above limitations imposed by the Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## 2.    The Rational-Basis Test

In a case involving a constitutional challenge to an election law, the allocation of the burden of proof depends on the level of judicial scrutiny that a plaintiff's claims invoke. Under the more forgiving "rational basis" test, courts presume the constitutionality of a law, and it is the plaintiff's burden to prove otherwise.  See Kimel v. Florida Bd. of Regents, 528 U.S. 62, 84 (2000).  Because of this presumption, a defendant generally is not required to present any admissible evidence to demonstrate the existence of the problem its law is supposed to remedy.  Under rational-basis review, a governmental defendant is given more leeway to legislate as a preventive measure before such a problem is detected, or to address

only part of the problem by enacting an under-inclusive law which leaves no remedy for other aspects of the problem.  See id.; Rokita, 458 F. Supp. 2d at 844.

Defendant contends that the Court should apply the rational-basis test in evaluating Plaintiffs' constitutional challenge to the October 2005 City Charter amendment.  To support this contention, Defendant points out that Plaintiffs have not come forward with evidence that this new law was enacted for an invidious discriminatory purpose, such as targeting a "suspect class" of voters who, as a matter of law, could never qualify for any of the listed categories of photo ID cards by the next municipal election day or use the alternative of casting an absentee ballot.  Because the October 2005 City Charter amendment does not place such a categorical ban on voting, Defendant asserts that this new law is entitled to a strong presumption that it serves a good purpose and is not unconstitutional.  Under this presumption, Defendant asserts it is not necessary for the City to present any evidence showing that its photo ID requirement has a rational connection to the stated goal of preventing voter fraud.

I do not agree that the standard of review automatically defaults to the rational-basis test simply because Plaintiffs' have not conclusively shown that the October 2005 City Charter amendment invidiously targets a "suspect class" or has amounted to a categorical ban on voting.  As previously discussed, Plaintiffs' prospective challenge to the City's new photo ID requirement is based largely on their showing of a *threatened* injury rather than an *actual* injury, because they have not yet participated in a regular municipal election at which the October 2005 City Charter amendment applies.  In addition, part of the injury at issue here

is the inability of Plaintiffs and their members to reliably predict in advance what will be required of them at the next municipal election because of the vagueness in the wording of the new photo ID requirement and the consequent broad discretion it leaves to election officials to decide which forms of identification to accept and which to reject.   These concerns warrant more careful review than the rational-basis test implies.

### 3.    Strict Scrutiny of Election Laws

Plaintiffs assert that the Court should instead apply the strictest level of judicial scrutiny to the October 2005 City Charter amendment because it implicates their fundamental right to vote.   Under strict scrutiny, the presumption of constitutionality is lost and the government bears the burden of showing that the law in question is narrowly tailored to advance a compelling state interest.   See Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 126 S. Ct. 1211, 1219-20 (2006) (citing Ashcroft v. ACLU, 542 U.S. 656, 666 (2004)).

There is strong precedent for recognizing the fundamental nature of the right to vote and applying some form of heightened judicial scrutiny to laws which burden that right.   This precedent can be traced as far back as Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886), where the Supreme Court referred to "the political franchise of voting" as a "fundamental political right, because preservative of all rights."   When such a fundamental right is at stake, "more exacting judicial scrutiny" may be required because the burden imposed on that right "restricts those political processes which can ordinarily be expected to bring about the repeal of undesirable legislation."   United States v. Carolene Products Co., 304 U.S. 144, 153 n.4

(1938).  In other words, the elective franchise ordinarily operates as a self-correcting

mechanism whereby citizens can vote legislators out of office if they enact bad legislation,

without the need for intervention by the courts.  But when the legislation itself burdens the

right to vote, the efficacy of this self-correcting mechanism is diminished, because elections

no longer provide those who are burdened by the legislation with a viable way to challenge

those who enacted it.  For this reason, "[a]ny unjustified discrimination in determining who

may participate in political affairs or in the selection of public officials undermines the

legitimacy of representative government." Kramer v. Union Free Sch. Dist. No. 15, 395 U.S.

621, 626 (1969).  And under our system of checks and balances, it is the proper role of the

courts to closely guard the self-correcting mechanism which the elective franchise provides

in our form of representative government.  See Reynolds v. Sims, 377 U.S. 533, 562 (1964).

In the context of an equal-protection challenge, a classification which burdens the

fundamental right to vote may trigger strict scrutiny without the necessity of showing that

the burden falls disproportionately on a "suspect class" such as Hispanic or Native American

voters.  See, e.g., Dunn v. Blumstein, 405 U.S. 330, 336 (1972); Kramer, 395 U.S. at 626.

Thus, where voting rights are at stake, Plaintiffs need not show that the October 2005 City

Charter amendment will unfairly impact a "suspect class" in order to trigger some form of

heightened judicial scrutiny.

Defendant asserts that the precedents applying strict scrutiny to voting-rights cases

do not apply here because the Constitution does not recognize any "fundamental right" to

vote in person at a polling place on election day, as opposed to some other method of voting

such as casting an absentee ballot.  The premise underlying this assertion was previously rejected in the Court's discussion of Plaintiffs' standing.

No provision of the United States Constitution requires the City of Albuquerque to allow its citizens to vote in municipal elections, much less to vote in person at a polling place on election day.  Even with respect to the Presidency of the United States, "[t]he individual citizen has no federal constitutional right to vote for electors . . . unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college."  Bush v. Gore, 531 U.S. at 104.

But the Supreme Court's recognition of voting as a fundamental right does not depend on whether the Constitution itself requires the City of Albuquerque to allow its citizens to vote in person at a polling place on municipal election days.  Rather, the Constitution may recognize the right to vote as fundamental even when the source of that right lies in the applicable provisions of state and local law.  "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise."  Id. at 105.  And "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."  Harper, 383 U.S. at 665.  Thus, in this case, the Court may recognize the fundamental nature of the right to vote in the City of Albuquerque's municipal elections even though the source of that right arises from the City Charter and accompanying provisions of state law establishing such elections as a component of municipal home-rule.

On the other hand, Plaintiffs' constitutional claims are not automatically entitled to the strictest level of judicial scrutiny simply because they invoke a right to vote which the Supreme Court recognizes as fundamental.  Determining the appropriate level of judicial scrutiny in this context also depends on the *severity of the burden* that the challenged legislation imposes on the right to vote.  See Burdick v. Takushi, 504 U.S. 428, 433-34 (1992).

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects-at least to some degree-the individual's right to vote and his right to associate with others for political ends." Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.

Id. (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)).  The same concerns are applicable here, and thus the Court must turn to a third standard of review that lies between the rational-basis test and strict scrutiny.

### 4.    The Intermediate Level of Scrutiny and the *Burdick* Balancing Test

To leave sufficient room for states and local governments to impose "some sort of order" on the election process, more recent precedents apply an intermediate level of judicial scrutiny that provides a more flexible standard for reviewing constitutional challenges to election laws.   See id.  Under this intermediate level of scrutiny,

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against

-45-

> "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Id. at 434 (quoting Anderson, 460 U.S. at 789).  As the burden that an election law imposes on a person's First and Fourteenth Amendment rights becomes more severe, the State's interest in imposing that burden must become more compelling, and the burden the law imposes must become more narrowly tailored to serve that interest.  See id.  Under this approach, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 391 (2000); accord Homans v. City of Albuquerque, 366 F.3d 900, 905-06 (10th Cir. 2004) (principal opinion of Lucero, J.).

In this particular context, the merits of Plaintiffs' claims necessarily depend on an analysis that is prospective in nature, taking into account what is likely to happen at the next municipal election.  Such an analysis requires a subtle and detailed balancing between a plaintiff's right to vote and a defendant's interest in regulating elections, rather than a bright-line rule that leaves only a stark choice between the rational-basis test and strict scrutiny. On the one hand, the Court's scrutiny of the October 2005 City Charter amendment is not so strict as to require the Defendant to show beyond a reasonable doubt that this new law is the only possible means available to advance a compelling governmental interest.  On the other hand, the Court's review is not so deferential as to entirely relieve the Defendant of the

-46-

burden of coming forward with some admissible evidence to show that the photo ID law is tailored to advance the precise governmental interest for which it was enacted.

"No bright line separates permissible election-related regulation from unconstitutional infringements on First [and Fourteenth] Amendment freedoms." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 359 (1997); <u>accord</u> <u>Purcell</u>, 127 S. Ct. at 7.  "[N]o litmus-paper test ... separat[es] those restrictions that are valid from those that are invidious.... The rule is not self-executing and is no substitute for the hard judgments that must be made." <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1972).

This intermediate or "sliding scale" approach to determining the appropriate level of judicial scrutiny in voting rights cases bears some analogy to recent trends in the Supreme Court's jurisprudence in other areas involving fundamental rights and equal protection.[11] Our Supreme Court's recent jurisprudence in this area teaches that one cannot automatically exempt an otherwise suspect classification from heightened judicial scrutiny merely because the proponent of the classification claims it is intended to serve a good purpose.  Rather, it is only through a searching judicial inquiry that the Court may determine whether the classification is actually tailored to serve such a purpose.

---

[11]For example, see <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833, 874-89 (1992) (plurality opinion articulating an "undue burden" test that examines whether the challenged law places a "substantial obstacle" in the path of those seeking to exercise a fundamental right); <u>Richmond v. J.A. Croson Co.</u>, 488 U.S. 469, 493 (1989) (plurality opinion determining what classifications are "benign" or "remedial" by examining how closely the classification fits the goal or purpose it is intended to serve); <u>Adarand Constructors, Inc.</u>, 515 U.S. at 226 (similar).

Similarly, the Burdick balancing test calls for a careful and independent examination of the extent of the burdens that an election law imposes on First and Fourteenth Amendment rights in order to "smoke out" illegitimate or covert uses of such burdens. The Burdick balancing test also contemplates that an election law may impose an undue burden on a person's fundamental right to vote by means of bureaucratic hurdles which impose substantial obstacles on the exercise of that right.

But the test is flexible enough to allow for many election procedures which impose "very limited" burdens on the right to vote. Burdick, 504 U.S. at 437. In Burdick, for example, the Supreme Court upheld a challenge to a Hawaii law that prohibited voters from casting "write-in" votes for candidates, where this prohibition was "part of an electoral scheme that provides constitutionally sufficient ballot access" by other means. Id. at 441. That law, and other laws which the Supreme Court has upheld under the Burdick test, did not place restrictions on who could vote, but only regulated the manner in which candidates or propositions could appear on the ballot. See id.; Timmons, 520 U.S. at 363-64; cf. Walker, 450 F.3d at 1099-1105 (explaining why a supermajority requirement for placing wildlife-related citizens' initiatives on the Utah ballot did not trigger strict scrutiny). These authorities suggest that the Burdick test allows the government more leeway to control what appears on the ballot, as opposed to the more basic question of who is permitted to cast a

ballot, because there is a very specific and extensive history of election fraud and other abuses surrounding the content of ballots.[12]

In the context of election challenges, this intermediate level of judicial scrutiny applies to claims brought under the Equal Protection Clause of the Fourteenth Amendment, as well as those brought under the First Amendment.  See Burdick, 504 U.S. at 434. Accordingly, I first apply the Burdick balancing test to Plaintiffs' equal-protection claims, and then turn to their First Amendment claims.

### C.    Application of the *Burdick* Balancing Test to Plaintiffs' Equal Protection Claims

The first step in applying the Burdick balancing test is to " ascertain 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'"  Lopez Torres v. N.Y. State Bd. of Elections, 462 F.3d 161, 184 (2nd Cir. 2006) (quoting Anderson, 460 U.S. at 789).  The Court "must make that assessment not 'in isolation, but within the context of the state's overall scheme of election regulations.'"  Id. (quoting Lerman v. Bd. of Elections in the City of New York, 232 F.3d 135, 145 (2d Cir.2000)).  Such "review is neither formalistic nor abstract.  Instead, we must turn a keen eye on how the electoral scheme functions in fact; indeed, 'it is essential to examine in a realistic light the extent and nature of [the scheme's]

---

[12]This history is set forth in Burson v. Freeman, 504 U.S. 191, 200-06 (1992) (plurality opinion), which details how elections in the United States evolved from open, oral voting to the use of a variety of privately-issued unofficial paper ballots, which were eventually replaced by the requirement of a state-issued, standardized secret ballot in order to deter election fraud and voter intimidation at the polls.  See also Timmons, 520 U.S. at 1368-69.

impact on voters.'" Id. (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972).  It is only after performing this first step in the analysis that the Court can determine the corresponding weight of the government's interest in burdening the right to vote, as well as the degree of tailoring between such burdens and interests, that must be shown in order to survive judicial scrutiny.  See Timmons, 520 U.S. at 358-59.

In this case, Plaintiffs' equal-protection claims rest on the theory that the October 2005 City Charter amendment classifies Albuquerque residents into two similarly situated groups and then places burdens on the voting rights of one group that do not apply to the other.[13]  In particular, Plaintiffs claim that the October 2005 City Charter amendment makes a classification between absentee voters and in-person voters and then forces election judges to make further classifications among in-person voters when they interpret the new photo ID requirement on election day.  Plaintiffs contend that because the new law fails to provide clear guidance as to how these classifications are to be implemented when citizens appear at their polling places to vote on election day, arbitrary or discriminatory enforcement with respect to similarly situated voters is almost certain to result.

My analysis of these claims focuses on the *threat* of arbitrary or discriminatory enforcement among similarly situated voters who appear at the polls on election day, rather

---

[13]While the parties were conducting discovery and exchanging expert reports, Plaintiffs attempted to gather evidence that the October 2005 City Charter amendment will have a disparately adverse impact on Native American and Hispanic voters and therefore implies an invidious racial classification.  [Ex. 1, 2, 3, 4 to Doc. 44.]  Such a theory of racial discrimination is not considered here because Plaintiffs later withdrew their proposed expert testimony on this subject.  [Doc. 51.]

than the obvious practical differences between voting in person and voting by absentee ballot.  Voting in person at a polling place on election day imposes some unavoidable procedural burdens, such as physically showing up at the polls, which do not apply to absentee voters.  Such obvious and unavoidable differences between in-person voting and absentee voting are not subject to challenge here.

With respect to in-person voters, Plaintiffs contend that the October 2005 City Charter amendment imposes a new and more substantial obstacle than the simple task of showing up at the polling place on election day, because of the additional eligibility requirements for obtaining a photo ID, as well as the extra time and resources that are needed to ensure that one's photo ID will be considered current and valid by election officials at the time of the next municipal election.

With respect to these photo ID requirements, Plaintiffs contend that Defendant's interpretation and enforcement of the October 2005 amendment will result in arbitrary distinctions among similarly situated persons who appear at their precinct polling place to attempt to vote on election day.  The new law provides no definition of what makes a photo ID card "current" or "valid," and the deposition testimony of the City Clerk, Defendant Santillanes, states that it will be left up to each election judge at each precinct to decide which photo ID cards count as "current" and "valid" for voting purposes.  As a result, Plaintiffs contend that some otherwise qualified Albuquerque residents will likely be denied the right to vote for a variety of reasons (such as a physical appearance that no longer matches the photo on the ID card, an ID card that has passed its expiration date on election

day, an ID card that lists a different address than what is reflected in voting records, or an ID card that lists a different name due to recent marriage or divorce), while other similarly situated residents whose ID cards have the same characteristics will be accepted by different election judges as "current" and "valid" for voting purposes.

This equal-protection theory follows the reasoning of the Supreme Court's *per curiam* opinion in Bush v. Gore, 531 U.S. 98 (2000), which has its roots in earlier voting-rights cases such as Louisiana v. United States, 380 U.S. 145 (1965), and O'Brien v. Skinner, 414 U.S. 524, 530 (1974). Bush v. Gore involved the method by which the Florida Supreme Court ordered the manual recounting of punch-card ballots in the 2000 presidential election.

> Much of the controversy . . . revolve[d] around ballot cards designed to be perforated by a stylus but which, either through error or deliberate omission, have not been perforated with sufficient precision for a machine to register the perforations. In some cases a piece of the card-a chad-is hanging, say, by two corners. In other cases there is no separation at all, just an indentation.

Bush v. Gore, 531 U.S. at 105. One of the constitutional defects in Florida's method of recounting such ballots was that it required the recount teams to discern "the intent of the voter" solely by interpreting "the marks or holes or scratches on an inanimate object, a piece of cardboard or paper." Id. at 106.

Because they gave the recount teams no objective statewide criteria for deciding how to interpret the marks on the ballot, "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." Id. The result was that the votes of similarly situated voters (*e.g.*, those who did not press firmly enough to completely perforate their ballots) might be treated

differently depending on which recount team interpreted their ballots.  See id. at 107.  Even though these problems may have affected only a small percentage of the ballots, the Supreme Court determined that such arbitrary and disparate counting of ballots cast by similarly situated voters violated the Equal Protection Clause.  See id. at 109.

Bush v. Gore is not the first occasion on which our Supreme Court has found a constitutional violation where a state or local law leaves election officials with such unbridled discretion that arbitrary and disparate treatment of similarly situated voters is almost certain to result.  In Louisiana v. United States, 380 U.S. at 149, the Court struck down the State of Louisiana's "interpretation test," which required "every applicant thereafter to 'be able to understand' as well as 'give a reasonable interpretation' of any section of the State or Federal Constitution 'when read to him by the registrar'" in order to be eligible to vote.  Id. (quoting La. Const. Art. VIII, § 1(d)).  The problem with this test was that it

> vested in the voting registrars a virtually uncontrolled discretion as to who should vote and who should not. Under the State's statutes and constitutional provisions the registrars, without any objective standard to guide them, determine the manner in which the interpretation test is to be given, whether it is to be oral or written, the length and complexity of the sections of the State or Federal Constitution to be understood and interpreted, and what interpretation is to be considered correct.

Id. at 150; see also Schnell v. Davis, 81 F. Supp. 872 (S.D. Ala.), aff'd, 336 U.S. 933 (1949).

Another example of a law which relies on a "wholly arbitrary" classification to "discriminate between categories of qualified voters" is found in O'Brien, 414 U.S. at 530. At the time that case was decided, New York's absentee-voting law permitted "those held

in jail awaiting trial in a county other than their residence" to register by mail and vote by absentee ballot, but "completely denied the ballot" to "persons confined for the same reason in the county of their residence." Id. at 530. "Thus, under the New York statutes, two citizens awaiting trial-or even awaiting a decision whether they are to be charged-sitting side by side in the same cell, may receive different treatment as to voting rights," based solely on whether they are being detained inside or outside the county of their residence. Id. at 529. Rejecting the notion that such disparate treatment could be tolerated because it was the unanticipated consequence of a poorly drafted statute rather than the intentional result of "legal design," our Supreme Court concluded that the distinction between resident and non-resident detainees was "wholly arbitrary" and could not survive judicial scrutiny under the Equal Protection Clause. Id. at 530.

Both O'Brien and Louisiana v. United States predate the balancing test articulated in Burdick, 504 U.S. at 433-34, and Bush v. Gore does not explicitly reference the Burdick test either. Nevertheless, the classifications at issue in these cases could invoke heightened scrutiny under the Burdick test because the character and magnitude of the burden on the constitutional right at issue was substantial.

### 1.    Determining the Severity of the Burden Imposed by the October 2005 City Charter Amendment

In the present case, Plaintiffs are claiming that they and their members face a substantial risk that they will not be able to vote or their votes will not be counted in City elections because their photo ID cards will be rejected when they appear at the polling place

to vote on election day, and because there will not be enough time left for them to cast an absentee ballot or obtain another form of identification when they first learn that their existing photo ID card is rejected.[14]  Plaintiffs also claim that like Bush v. Gore and O'Brien, the different treatment of similarly situated voters resulting from City election officials' varying interpretations of the photo ID requirement will produce results that are "wholly arbitrary."

I agree with Plaintiffs that the bureacratic hurdles entailed by the October 2005 City Charter amendment may present a substantial obstacle in the path of Albuquerque voters even if they do not amount to a categorical ban on voting.  Both the Supreme Court and the Tenth Circuit reached a similar conclusion in determining the severity of the burden imposed by a Colorado law which placed a series of bureaucratic hurdles in the paths of individuals seeking to circulate and gather signatures to place citizens initiatives on that state's ballot. See Am. Const. Law Found., Inc. v. Meyer, 120 F.3d 1092, 1101-04 (10th Cir. 1997), aff'd sub nom., Buckley v. Am. Const. Law Found. Inc., 525 U.S. 182, 197-200 (1999).  Buckley is particularly relevant to the type of analysis required in the present case, and therefore it warrants more detailed discussion below.

The Colorado law at issue in Buckley required petition circulators to wear identification badges displaying their names at the time they are soliciting signatures from

---

[14]The October 2005 City Charter amendment provides for a grace period of 10 days during which City election officials may count the provisional ballots of those who failed to provide a current and valid photo ID card at the polls on election day if certain requirements are met.

voters.   Our Supreme Court concluded that this requirement imposed a substantial obstacle to the exercise of core political speech in election campaigns, citing evidence that it had the effect of discouraging people from acting as petition circulators due to fears of retaliation or harassment, and thereby limited the pool of people who were willing to act as petition circulators.  See Buckley, 525 U.S. at 197-98.

The State's justification for imposing the ID badge requirement was to make it easier for the public to identify (and for the State to apprehend) petition circulators who engage in misconduct, thereby helping to deter fraud and diminish corruption.  See id. at 198, 204-05. While recognizing the importance of the State's interest in deterring fraud and corruption, the Supreme Court nevertheless concluded that the ID badge requirement was not carefully tailored to advance this important interest and that less restrictive means for doing so were available.  In particular, the State could advance its interest in identifying petition circulators who engaged in misconduct through other provisions of the Colorado law which required petition circulators to include their name, address, and signature on an affidavit accompanying the petition when it is delivered to election officials.  See id. at 198-99, 204-05.

In striking down the ID badge provision, as well as other procedural requirements of Colorado law, the Supreme Court noted that its decision "is entirely in keeping with the 'now-settled approach' that state regulations 'impos[ing] "severe burdens" on speech . . . [must] be narrowly tailored to serve a compelling state interest.'"  Id. at 192 n.12 (quoting

-56-

Burdick, 504 U.S. at 434, and citing concurring opinion of Thomas, J.).[15]  Thus, Buckley shows that the Burdick test may require heightened scrutiny of an election law even when the burden imposed by that law only involves bureaucratic hurdles (such as registration and identification requirements) rather than an outright ban on a constitutionally protected activity (such as voting or engaging in core political speech).

A federal district court recently reached similar conclusions in assessing the severity of the burden imposed by a Georgia law establishing a photo ID requirement for voting in person at the polling place on election day.  See Common Cause/Georgia v. Billups, 439 F. Supp. 2d 1294, 1345-50 (N.D. Ga. 2006).  There the court reasoned that the Georgia photo ID requirement would impose an undue burden on the right to vote because voters who lacked the necessary photo ID card would have insufficient time and resources to learn of this new requirement and make arrangements to obtain the necessary form of identification before the next election.  As a result, voters were likely to be surprised or confused by the new requirement when they appeared at the polls to vote in that election, and at that point voters would lack both the time and the knowledge necessary for them to remedy any defects in their identification before the election was over.  See id. at 1345-50.

Interpreting Missouri's state constitution, the Missouri Supreme Court reached the same conclusion in enjoining the new photo ID requirement in that State's election laws.  See Weinschenk v. State, 203 S.W.3d 201, 212-15 (Mo. 2006).  The only permissible forms of

---

[15]The Tenth Circuit opinion which the Supreme Court affirmed on this point is more explicit in its reliance on the Burdick balancing test.  See Meyer, 120 F.3d at 1097-98, 1101-03.

identification available to some voters subject to the new Missouri law are a Missouri driver's license, a Missouri non-driver's license, or a United States passport. See id. at 212. The State's authority to make these forms of identification accessible to voters in the future is limited by the Federal REAL ID Act of 2005, Pub. L. 109-13, Div. B, Tit. II, which contains strict new documentation requirements for proving one's identity and citizenship for purposes of obtaining a passport or State-issued license or ID card. See id. at 207-08. Thus, the process of obtaining a qualifying photo ID card necessarily entails some expense and a significant degree of advance planning by the voter before the election. See id. at 208-10.

While both the facts and the legal claims at issue in the case at bar are distinguishable in some respects from those at issue in Billups and Weinschenk, I nevertheless find the reasoning of these cases to be instructive with respect to the burdens that Albuquerque's photo ID requirement will impose on voters. As of this date, the Federal REAL ID Act of 2005 remains in force, so the Missouri Supreme Court's assessment of the time and resources that may be needed to obtain a new state-issued ID card under that new federal law applies in New Mexico as well. The foreseeable result is that voters whose existing forms of identification are rejected by election judges at the polling place on election day may not be able to obtain a new ID card from the State within the 10-day time limit provided in the October 2005 City Charter amendment.

While obtaining the new form of photo ID card issued by the City Clerk's office may remain an option, the record in this case is very sparse with respect to any efforts the City

has undertaken, or plans to undertake in the future, to educate voters about this option.  This sparse record stands in contrast to <u>Billups</u>, where the State of Georgia made an extensive record of the efforts its election officials were making to educate voters about the new law and make photo ID cards accessible to them.[16]

In the case at bar, the parties have more time than Georgia voters to prepare for the next regular election at which the October 2005 City Charter amendment will be implemented for the first time on a City-wide basis, but there is much less evidence in the record of any efforts made or planned by the City Clerk's office or other City officials to educate voters and election personnel about the requirements of this new law and make city-issued photo ID cards more accessible to those who might need them in order to vote.  For example, the record does not contain any regulations or instructions issued by the City Clerk for implementing the October 2005 City Charter amendment.  Neither the text of the amendment nor the evidence of record contain any provision or plan for the City to appropriate  funds for voter-education efforts or otherwise inform voters in advance about the new photo ID requirements through public-service announcements, letters, and the like.

---

[16]These efforts included running public-service announcements on radio stations to educate voters about the new requirements (for which the State had a $250,000 voter-education budget), developing "a letter for voters that explains the 2006 Photo ID Act and the availability of Voter ID cards," providing equipment, training, and personnel for issuing photo ID cards to registrar's offices or "DDS service centers" in each of the state's counties, and operating a mobile facility for issuing photo ID cards known as the "GLOW bus" that could travel to voters with mobility or transportation problems.  <u>See</u> <u>id.</u> at 1345-46; <u>see also</u> <u>Common Cause/Georgia v. Billups</u>, 406 F. Supp. 2d 1326, 1338 (N.D. Ga. 2006) (explaining the GLOW bus and other measures in the context of granting a preliminary injunction to stop an earlier version of the Georgia photo ID statute from going into effect).

The form of photo ID card issued by the City Clerk's office is completely new and, therefore, previously unknown to voters.   And unlike Georgia's statewide law, the City of Albuquerque's photo ID requirement only applies in certain municipal elections, so voters may become confused about the difference between the requirements for voting in such municipal elections and the requirements for voting in statewide elections or school elections.

The Supreme Court has recognized that "conflicting orders" may "result in voter confusion and consequent incentive to remain away from the polls." Purcell, 127 S. Ct. at 7.  In addition to the conflict between the provisions of the October 2005 City Charter amendment governing Albuquerque's municipal elections and the provisions of HAVA and the State Election Code governing statewide elections, the evidence of record in this case also shows a conflict between Defendant Santillanes' interpretation of what forms of photo ID are "current" and "valid" under the October 2005 City Charter amendment, and the interpretation offered by her assistant, Ms. Fulgenzi.  Defendant Santillanes' deposition testimony indicates that she would leave it up to the election judges at each polling place to decide on election day which forms of photo ID are "current" and "valid."  [Santillanes Dep. at 23-24, 31-32, 37-38.]  Under this approach, Defendant Santillanes would allow a photo ID to be treated as current and valid if it has an expiration date that precedes the election day by a few days or weeks, while Ms. Fulgenzi would apply a bright-line rule that a photo ID is not current or valid if it contains an expiration date that precedes the election day. [Santillanes Dep. at 22-26, 35-38; Fulgenzi Aff. ¶¶ 18, 19, 25.]

This approach does not amount to the "clear guidance" that the Supreme Court recognized as necessary in <u>Purcell</u>, 127 S. Ct. at 8.  The apparent inconsistencies in the expressed opinions as to how the City Charter amendment will be enforced at the polling place are themselves inconsistent with the City's obligation to avoid arbitrary and disparate treatment of the voters.

For these reasons, I conclude that the October 2005 City Charter amendment imposes a significant burden on the right to vote.  Plaintiffs have shown that surprise or confusion about the photo ID requirement and the bureaucratic hurdles it imposes is likely to discourage--if not disenfranchise--a significant number of Albuquerque voters who appear at a polling place to vote on the next municipal election day, especially given the lack of clarity or definition in the text of the amendment itself, the absence of any specific plans for voter-education efforts to be undertaken by the City, and the fact that the City's photo ID requirement differs significantly from the identification requirements that voters have experienced in past elections (including the 2006 elections in which HAVA and the 2005 amendments to the State Election Code were implemented for the first time).

**2.      Determining Whether the October 2005 City Charter Amendment is Tailored to Prevent Future Instances of Voter Fraud**

The next step in the Court's equal-protection analysis is to evaluate the *nexus* between the burden it imposes and the governmental interest that it serves.  Because Plaintiffs' equal-protection claim invokes an intermediate level of judicial scrutiny, I conclude that Defendant must bear the burden of providing a reasoned explanation, supported by at least some

admissible evidence, to show the October 2005 amendment is tailored to advance an important governmental interest.

No one doubts that preventing voter fraud and giving voters confidence in the accuracy and integrity of municipal election results is an important and compelling governmental interest. It is also reasonable to infer that some forms of voting fraud are difficult to detect, and thus the absence of conclusive proof of their occurrence does not mean that they do not exist. In this regard, the City Council resolution placing the City Charter amendment on the October 2005 ballot contains several findings relating to irregularities in voter registration, and the evidence submitted with the parties' briefs suggests a variety of irregularities in absentee voting which may be difficult for election officials to detect.

But the <u>Burdick</u> test does not call for the Court to look for any conceivable, generalized interest that might serve as a justification for imposing a burden on the exercise of First and Fourteenth Amendment rights in the context of elections.[17] Rather, this test calls for the City to put forward "the *precise* interests [which serve] as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it *necessary* to burden the plaintiff's rights." <u>Burdick</u>, 504 U.S. at 434 (quoting <u>Anderson</u>, 460 U.S. at 789) (emphasis added).

---

[17]For example, the Court cannot look to the governmental interests which motivate photo ID laws in other contexts, such as commercial air travel or courthouse security.

The *precise* interest put forth by the City as its justification for imposing a photo-ID requirement at its municipal polling places is to prevent voter impersonation fraud among voters who vote in person at their polling place on election day.  Of significance, the text of the October 2005 City Charter amendment only addresses the procedure for voting in person at a polling place on election day and says nothing about fraud or other irregularities in voter registration or absentee voting.  The City Clerk does not administer voter registration, as she relies on the County Clerk for that function.  And the County Clerk's responsibilities with respect to voter registration are governed by HAVA and the 2005 amendments to the State Election Code, which provide a means for preventing the type of voter-registration problems identified in the City Council resolution even in the absence of the October 2005 City Charter amendment.  Thus, the October 2005 City Charter amendment has no discernible relationship to the goal of preventing fraud or other irregularities in *voter registration* or *absentee voting*.  See Billups, 439 F. Supp. 2d at 1350.

With respect to the City's narrower interest in preventing people from impersonating another voter at the polls in order to steal their vote, there is no admissible evidence in the record that such voter impersonation fraud has occurred with any frequency in past municipal elections.  The City Council resolution placing the City Charter amendment on the October 2005 ballot only refers to one alleged instance of voter impersonation fraud; that instance occurred in the 2004 presidential election, and the parties have presented no admissible evidence about the details or investigation of  that incident.  There was also no evidence of this type of fraud presented in Billups or Weinschenk.

While acknowledging that there was no specific evidence of voter impersonation fraud in Indiana, the majority opinion in <u>Crawford</u> instead points to the *possibility* of impersonating a deceased or non-existent voter due to inflated voter rolls.  <u>See</u> <u>Crawford</u>, 472 F.3d at 953-54.  In the case at bar, however, this possibility is reduced by HAVA and the 2005 amendments to the State Election Code, which strengthen the requirements for maintaining current and accurate voter-registration rolls on a statewide basis.  These portions of the 2005 amendments to the State Election Code will affect municipal elections, insofar as the City Clerk relies on the voter-registration records kept by the County Clerk, and the County Clerk is now subject to the fraud-prevention and recordkeeping requirements of these recently enacted state and federal laws.  <u>See, e.g.</u>, N.M. Stat. Ann. §§ 1-4-8, 1-5-30.

Unlike the record in <u>Crawford</u>, the Defendant in this case has made no showing that the State of New Mexico is behind in its compliance with HAVA, the State Election Code, or any other election law.  Thus, in examining whether compliance with the City of Albuquerque's new photo ID requirement is needed to combat the problem of deceased or non-existent voters appearing in voter-registration records, the Court cannot reasonably infer that the State of New Mexico and its county clerks will fail to comply with pre-existing provisions of state and federal election law that are aimed at correcting the same problem.

For these reasons, I conclude that Defendant has presented no admissible evidence that the October 2005 City Charter amendment actually serves to combat an existing problem with voter impersonation fraud in municipal elections.  I nevertheless examine the

plausibility of the alternative argument that this amendment may have some potential effect in preventing *future* instances of voter impersonation fraud.

Plaintiffs argue that the October 2005 City Charter amendment can have no such prophylactic effect because its definition of what constitutes a "current" and "valid" photo ID is so vague, and because it contains a number of provisions or features through which persons seeking to cast a fraudulent ballot or steal another's vote may circumvent the photo ID requirement and escape detection. First and foremost among these features is the exception for absentee voting, which is still governed by the procedure contained in the Municipal Election Code. Under that procedure, it is still possible to steal another person's vote without the need to personally appear before election officials and present a photo ID.

As noted above, it is not necessary to show a photo ID at any time under the procedure for absentee voting contained in the Municipal Election Code. Indeed, it is not even necessary to appear in person before an election official at any time during the process of applying for, receiving, and casting an absentee ballot, as all the required documents can be mailed or delivered by a person claiming to be an immediate family member. Thus, for example, it is entirely possible for an immediate family member to apply for, obtain, fill out, and cast an absentee ballot in the name of his or her spouse or parent. Defendant Santillanes acknowledges this possibility in her deposition testimony. [Santillanes Dep. at 12.] And when such a fraudulent application for an absentee ballot has been accepted by election officials, the voter listed on the application could be prevented from voting if he or she subsequently appeared at the polling place on election day, either because the voting rolls

would show that his or her vote already was cast by an absentee ballot, or because the voting rolls would show that an absentee ballot had been mailed to the address listed on the fraudulent application.  Under any of these scenarios, stealing or preventing someone else's vote by means of the absentee voting procedure appears much easier, and entails much less risk of getting caught, than attempting to impersonate another voter at the polls on election day.

To explain the exception for absentee voting, Defendant asserts that in-person and absentee voters are not similarly situated.  Thus, Defendant claims there is no basis for comparing the two groups under an equal-protection theory.  The Rokita court found this argument persuasive in evaluating an equal-protection challenge to an Indiana law that treated in-person voters differently from absentee voters with respect to photographic identification.  See Rokita, 458 F. Supp. 2d at 830-34.

Rokita is inapposite on this point, however, because the Indiana law at issue in that case imposed more restrictions on who was eligible to vote by absentee ballot than the New Mexico and City of Albuquerque laws at issue here.  Unlike the Indiana statute at issue in Rokita, New Mexico's Municipal Election Code and State Election Code make absentee voting available to the same class of voters who are eligible to vote in person at a polling place on election day, as long as they meet the deadlines for applying for and delivering their absentee ballot.  There is no contrary provision in Albuquerque's City Charter that would make the class of people who are eligible for absentee voting different in any meaningful way from the class of people who are eligible to vote in person at a polling place on election

day.  The only difference between these two classes is that the absentee voters have made the choice to apply for an absentee ballot and have met the applicable deadlines for doing so.

For the above reasons, the exception for absentee voting without presenting any identification documents or personally appearing before an election official presents a significant opportunity for circumventing the fraud-prevention requirement in the October 2005 City Charter amendment, and this exception is not explained by any meaningful differences between the situations of in-person and absentee voters.  The existence of this exception tends to undermine Defendant's argument that the amendment effectively targets the goal of preventing future instances of voter impersonation fraud.  See Billups, 439 F. Supp. 2d at 1350.

The fraud-prevention requirements of the October 2005 City Charter amendment also may be circumvented through the procedure for obtaining a City-issued ID card, because there is a significant disparity between the requirements for voting in person at a polling place on election day and the requirements for obtaining a City-issued photo ID card for voting purposes.  Under this new law, Albuquerque residents are required to show a current and valid photo ID card in order to vote on a regular ballot on election day.  Even to obtain a provisional ballot, they must provide their date of birth and the last four digits of their Social Security number, and then return to the City Clerk's office with a photo ID card within 10 days of the municipal election.

But the law contains no such requirements for obtaining a city-issued photo ID card from the City Clerk's office before or during election day.  The October 2005 City Charter amendment requires the City Clerk to issue a photo ID card to any person who provides the name of  a registered voter, claims that he or she is unable to provide any of the listed identification documents, and then "swear[s] or affirm[s] in writing under penalty of perjury that he or she is the registered voter."  City Charter art. XIII, § 14.  There is no requirement that a person requesting a city-issued photo ID card must provide any identifying information other than a name (such as a date of birth or last four digits of a Social Security number).  There is no provision requiring persons applying for a City-issued ID card to show that their address matches the address shown on voter-registration records.  There is no provision in the October 2005 amendment for an expiration date, current address, or other written information to appear on the City-issued photo ID cards, nor does the October 2005 amendment require any procedure for keeping track of which voters have had such cards issued in their names.  The only confirmation required of the City Clerk before issuing the card is to check with the County Clerk to make sure the name given by the applicant is the name of someone who is presently registered to vote.   Once an individual has obtained the City-issued voter ID card, the card is to be considered current and valid for purposes of voting in all of the City's future municipal elections, so long as the person whose identity is listed on the card remains on the voter rolls.

Finally, Plaintiffs contend that the October 2005 City Charter amendment will be ineffective in preventing voter impersonation fraud because the amendment is vague as to

what constitutes a "current" and "valid" form of photo ID.  The text of the amendment itself contains no definition of the terms "current" or "valid," and as noted above, there is conflicting testimony from City election officials as to whether the expiration date on an ID card provides a bright-line rule for determining whether it is current.  Moreover, the October 2005 amendment allows for alternative forms of photo ID which may not contain an expiration date (or other written information such as an address) that can be used in determining its currency or validity.  Indeed, there is no requirement that the photo ID cards issued by the City Clerk must contain such information for determining whether a card is no longer current.

Allowing for cards with no expiration date, including those issued by unions, professional associations, private businesses, and government agencies other than the State of New Mexico makes it less likely that municipal election officials will be able to discern and recognize the features that distinguish a fake or outdated card from a current and valid one.  Allowing cards that were issued several years ago or lack an expiration date increases the likelihood that the photographic image depicted on the card no longer matches the current appearance of the person presenting it to vote, and the absence of such a match significantly decreases the usefulness of requiring a photograph on the ID card for identification purposes. And without any discernible criteria for distinguishing between fake and real cards (or between current and outdated cards), election officials are more likely to implement and enforce the photo ID requirement in an arbitrary or inconsistent manner.

These considerations raise high the prospect, if not the likelihood, that the methods for determining what documents count as "current" and "valid" forms of photo ID under the amendment may be so open to the discretion of election judges that they produce completely arbitrary results, where two voters with the exactly the same type of photo ID card are treated differently depending on which polling place they use to vote in a particular municipal election.  And because the law allows provisional ballots to be given *only* in the case of voters who fail to produce the requisite photo ID card, it is possible for entire groups of voters to be arbitrarily disenfranchised if, for example, their polling place runs out of regular ballots, or the City is presented with any of the other situations in which a person might request a provisional ballot (*e.g.*, a voter goes to the wrong precinct to vote or there is a clerical error resulting in the voter's absence from the voting rolls for that precinct).  Such arbitrary or random results do not advance a legitimate state interest in any meaningful way. See Bush v. Gore, 531 U.S. at 109; O'Brien, 414 U.S. at 530.

My conclusion that the October 2005 City Charter amendment lacks a plausible, close-fitting relationship to the actual prevention of voter impersonation fraud does not imply that all laws which seek to prevent fraud in the conduct of elections suffer from the same defects.  In this regard, the 2005 amendments to the State Election Code provide an example of a law that provides less restrictive alternatives for identifying voters at the polls while at the same time leaving fewer loopholes available for stealing another person's vote.

The 2005 amendments to the State Election Code provide less restrictive alternatives than the October 2005 City Charter amendment because in addition to presenting a photo ID,

the former law allows voters to identify themselves by means of unique identifiers such as a date of birth and the last four digits of a Social Security number.  See, e.g., N.M. Stat. Ann. §§ 1-1-23, 1-1-24, 1-12-10.  The requirements for such unique identifiers also apply to absentee voting in statewide elections subject to the 2005 amendments to the State Election Code, see, e.g., N.M. Stat. Ann. §§ 1-6-4 to 1-6-9, so absentee voting provides less of a loophole, and less of a disparity, in comparison to the requirements for in-person voting in statewide elections.

The State Election Code also is less restrictive because it provides more options for using provisional ballots and does not restrict that option to instances where voters fail to present a current and valid photo ID.  See, e.g., N.M. Stat. Ann. §§ 1-12-7.1, 1-12-7.2, 1-12-8.  Thus, if election officials run out of regular ballots, or if there is some other type of clerical error which prevents a voter's name from appearing on the voting rolls for a particular precinct, the 2005 amendments to the State Election Code do not necessarily prevent that voter from casting a provisional ballot.

Further, the procedures for issuing statewide voter ID cards under the 2005 amendments to the State Election Code differ significantly from the procedure for City-issued photo ID cards stated in the October 2005 City Charter amendment.  The statewide voter ID card procedures are less burdensome because they place an affirmative obligation on County Clerks to mail a card to the address of record for each registered voter in the State, instead of requiring voters to take the initiative and travel to the City Clerk's office in order to apply for a card.  See, e.g., N.M. Stat. Ann. § 1-11-12.1.

The existence and availability of such less restrictive measures is a relevant consideration in applying the Burdick test.  In Buckley, for example, the Supreme Court concluded that there were existing provisions of Colorado law that provided the State with less restrictive means of meeting its need for identifying petition circulators.  See Buckley, 525 U.S. at 195-99.  Similarly, both the Billups court and the Weinschenk court concluded that there were less restrictive measures available for preventing the type of voter fraud that the photo ID requirements imposed by Georgia and Missouri law were intended to curtail. See Billups, 439 F. Supp. 2d at 1350-51; Weinschenk, 203 S.W.2d at 217-19.

Accordingly, I conclude that the October 2005 City Charter amendment at issue in the case at bar violates the Equal Protection Clause because it imposes a significant burden on the fundamental right to vote, and because that burden is not adequately tailored to meet the City's interest in preventing voter impersonation fraud at the polls.  The law is not likely to have a prophylactic effect in future elections because it contains many loopholes through which a person seeking to steal another's vote could pass.  Finally, the evidence of record contains conflicting interpretations of the new law by the City's own election officials. Plaintiffs have shown that this lack of clear guidance, and the unbridled discretion it leaves to election officials at each particular polling place, will likely result in arbitary and inconsistent treatment of similarly situated voters.  See Bush v. Gore, 531 U.S. at 106-07.

### D.   **Plaintiffs' First Amendment Claims**

In addition to their equal-protection claims, Plaintiffs contend that the October 2005 City Charter amendment violates their First Amendment right to freedom of speech.

Plaintiff's primary First Amendment theory is that the October 2005 City Charter Amendment falls under the "void for vagueness" doctrine because it provides no clear definition of what makes a photo ID card "current" and "valid." An impermissibly vague law may raise First Amendment concerns when one considers its tendency to have a chilling effect on the exercise of constitutionally protected forms of expression. See NAACP v. Button, 371 U.S. 415, 432-33 (1963).

In order to invoke the First Amendment, Plaintiffs contend that they and their members are engaging in "core political speech" when they go to the polls and display their exercise of the elective franchise in the presence of their neighbors and community members-as if voting was a symbolic gesture analogous to assembling for a demonstration or waving a picket sign on a public street or sidewalk. Under this First Amendment theory, Plaintiffs claim that the act of voting at the polling place on election day conveys a public message about the importance of democracy or representative government. Plaintiffs further assert that the October 2005 City Charter amendment seeks to discourage or restrict their efforts to convey this core political message by imposing a photo ID requirement that does not apply to absentee voting.

I question whether these concerns about the October 2005 City Charter amendment are properly raised under a First Amendment theory based on the right to freedom of speech. The problem with Plaintiffs' First Amendment theory is that it conflates the act of voting at the polling place with "core political speech" in a traditional public forum.

While recognizing the fundamental nature of the right to vote, the Supreme Court's First Amendment jurisprudence also recognizes that polling places are not traditional public forums for engaging in political speech. Indeed, the Supreme Court has recognized that it is sometimes necessary to restrict speech in order to protect the right to vote.

For example, a plurality of the Supreme Court upheld the constitutionality of a Tennessee law that "prohibits the solicitation of votes and the display of campaign materials within 100 feet of the entrance to a polling place." Burson v. Freeman, 504 U.S. 191, 193 (1992). The rationale for this ruling was that the political speech which came under the purview of the Tennessee law presented an impediment to the exercise of the fundamental right to vote, and the State had a sufficiently compelling interest for prohibiting the former in order to protect the latter. See id. at 199-200. The Court was careful to detail the historical circumstances which led to the adoption of the secret ballot, and to explain why the adoption of this procedure was necessary to prevent voters from being intimidated by persons campaigning for their votes as they "ran the gauntlet" to the polls in order to cast their ballot.[18] See id. at 200-06.

Because the act of voting in person at a polling place on election day is done in secret in a protected area where one is not immediately subject to the campaigning and political messages of others, I question whether Plaintiffs are sending a symbolic message to their

---

[18]As explained in a separate concurring opinion by Justice Scalia, the adoption of the secret ballot makes it difficult to say that a polling place is a "traditional public forum" where First Amendment rights are at their zenith. See id. at 214.

neighbors and communities by entering the voting booth to cast a secret ballot on election day.  If Plaintiffs and their members want to make a public demonstration in conjunction with going to the polls, the traditional public forum for such a demonstration is the sidewalk or street several feet outside the polling place.   The October 2005 City Charter amendment imposes no burden on Plaintiffs' ability to demonstrate publicly in that location.   The amendment only requires Plaintiffs to show a photo ID in order to enter the polling place and vote by secret ballot, not to demonstrate outside the polling place in view of their neighbors and the general public.  For these reasons, I conclude that Plaintiffs cannot construct a separate and distinct First Amendment theory based on their attempt to equate the act of voting by secret ballot with a form of symbolic expression in a public forum.

This conclusion is not fatal to Plaintiffs' claims, because Plaintiffs need not rely on such a separate and distinct First Amendment theory in order to invoke heightened scrutiny of the October 2005 City Charter amendment in this case.  As previously discussed, the rationale underlying First Amendment precedents such as Buckley applies just as easily to Plaintiffs' equal-protection theories in this case, even if these theories rely on the notion of voting as a fundamental right rather than the notion that voting at a polling place is core political speech in a traditional public forum.

Similarly, the "void for vagueness" doctrine invoked by Plaintiffs in this case is not limited to the First Amendment context.  This doctrine also encompasses claims that may be raised under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.   See, e.g., Hill v. Colorado, 530 U.S. 703, 732 (2000) (noting that an

impermissibly vague law raises equal-protection concerns because "it authorizes or even encourages arbitrary and discriminatory enforcement," and that such a law raises procedural due-process concerns because "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits").

Factors relevant to the "void for vagueness" doctrine were previously discussed in the Court's analysis of Plaintiffs' equal-protection claims.  Cf. Jordan v. Pugh, 425 F.3d 820, 825 (10th Cir. 2005) (considering "factors such as the enactment's purpose, the harm it attempts to prevent, whether there is a *scienter* requirement, and the interpretations of individuals charged with enforcement").   Thus, while I conclude that the "void for vagueness" doctrine does not provide the basis for a separate First Amendment theory as alleged in Count VI of Plaintiffs' *Second Amended Complaint*, the Court's previous discussion of these factors nevertheless leads to the conclusion that the October 2005 City Charter amendment is unconstitutional under the equal-protection theory asserted in Count I of Plaintiffs' pleading.

It follows from the above analysis that Plaintiffs are entitled to partial summary judgment on their claim that the October 2005 City Charter amendment violates the Equal Protection Clause of the Fourteenth Amendment, as asserted in Count I of their *Second Amended Complaint*, while Defendant is entitled to partial summary judgment on Plaintiffs' First Amendment claim asserted in Count VI of that pleading.

**E.**     **The Appropriate Remedy for the Violation of Plaintiffs'**
         **Constitutional Right to Equal Protection Under the Law.**

A determination that the October 2005 City Charter amendment is unconstitutional does not end the Court's inquiry, because "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." Ayotte v. Planned Parenthood of N. New England, 126 S. Ct. 961, 967 (2006) (citations omitted). The Court also may draw on traditional equitable factors in fashioning a form of injunctive relief that will remedy the constitutional flaws of which Plaintiffs complain in Count I of their *Second Amended Complaint*. See Lopez Torres, 462 F.3d at 204 (applying these principles in the context of a constitutional challenge to state election laws).

The Supreme Court has articulated three factors which inform the Court's inquiry into the severability of any portions of the October 2005 City Charter amendment that are found to be unconstitutional: (1) courts must try not to nullify more of the text of the amendment than is necessary, (2) courts must refrain from rewriting the text of the amendment to conform it to constitutional requirements, and (3) courts cannot use their remedial powers to circumvent the intent of the legislative body that enacted the amendment. Ayotte, 126 S. Ct. at 967-68. Similar considerations apply under state law. See 6001, Inc. v. City of Albuquerque, No. 02-97 MCA/DJS, slip. op. at 11-14 (D.N.M. Mar. 22, 2002) (unpublished memorandum opinion and order).

-77-

In this case, the main target of Plaintiffs' complaint is the requirement that the requested identification consist of a photo ID card, and the requirement that the ID card be current and valid.  While the Court has identified less restrictive alternatives through which the City of Albuquerque might remedy this complaint, it is not the Court's role to write such alternatives into the October 2005 City Charter amendment in place of the language the law's drafters have selected.  The Court cannot "rewrite a state [or local] law to conform it to constitutional requirements," Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 397 (1988), and this principle applies with special force when, as here, "'line-drawing is inherently complex.'"  Lopez Torres, 462 F.3d at 206 (quoting Ayotte, 126 S. Ct. at 968).

Another potential remedy is to sever the unconstitutional requirements from the October 2005 City Charter amendment by striking the words "current," "valid," and "photo" or "photographic" wherever they appear in the amendment's text.  The result would be a regulation that allows voters to use any form of ID card with their name on it regardless of whether it is outdated, invalid, or lacks a photograph.

It is doubtful that this result would accord with the legislative intent of the City Council, Mayor, and Albuquerque voters who approved this new law.  The requirement of a photographic form of identification that is both current and valid is the central component of the October 2005 City Charter amendment.  To delete these requirements from the text of the amendment would defeat the amendment's entire purpose.

The third potential remedy is to strike the entire text of the October 2005 amendment from the remainder of the City Charter.  In consideration of the principles set forth above and the relevant law, I apply this remedy here.

Striking the October 2005 amendment from the City Charter leaves the City of Albuquerque with a discernible procedure for conducting its municipal elections.  Under its choice-of-law provisions, the City Charter borrows the requirements of the Municipal Election Code when the City Charter is silent on matters of election procedure, and the Municipal Election Code in turn borrows some provisions from the State Election Code. Thus, the provisions of the Municipal Election Code, as supplemented by the State Election Code, would set forth the voting procedure the City is to use in future municipal elections, at least until the law is next amended.

The parties debate in their briefs whether, in the absence of the October 2005 City Charter amendment, the identification requirements in the 2005 amendments to the State Election Code would trump the less stringent requirements for voting in person on election day under the pre-existing provisions of the Municipal Election Code.  At this point, the parties have not shown that it is necessary for the Court to decide this question of state law.[19]

If the City is enjoined from enforcing the 2005 City Charter amendment, the parties

_____

[19]The task of determining the constitutionality of the October 2005 City Charter amendment does not depend on such a decision by this Court.  Even if the law defaults to the less stringent requirements for voting in person on election day under provisions of the Municipal Election Code which predate the 2005 amendments to the State Election Code, I would still hold that the October 2005 City Charter amendment is unconstitutional.

still have a number of options for resolving questions about which other provisions of state or local law apply in the absence of this amendment. For example, the parties could lobby the State Legislature to resolve such questions by amending the Municipal Election Code to bring it into conformity with HAVA and the 2005 amendments to the State Election Code. The City Council and Mayor could develop another, more carefully tailored proposal for amending the City Charter or the municipal election ordinance. These alternatives are more preferable than leaving it to the Court to rewrite the October 2005 City Charter amendment by artfully severing key words from its text or requiring the parties to follow a different law that does not accord with the choice-of-law principles set forth in other provisions of the Municipal Election Code and City Charter.

I therefore declare unconstitutional and enjoin the October 2005 City Charter amendment in its entirety without now deciding which of the many provisions of the Municipal Election Code or the State Election Code Defendant is required to follow in its place. I will defer entry of a final judgment in this matter for a brief period, however, in order to afford the parties an opportunity to raise and brief the issue of whether it is within this Court's equitable jurisdiction to resolve their apparent disagreement about which provisions of state or local law apply in the absence of the October 2005 City Charter amendment.

III.   **CONCLUSION**

For the foregoing reasons, Plaintiffs are entitled to partial summary judgment on their claim that the October 2005 City Charter amendment violates the Equal Protection Clause

of the Fourteenth Amendment, as asserted in Count I of their *Second Amended Complaint*, while Defendant is entitled to partial summary judgment on Plaintiffs' First Amendment claim asserted in Count VI of that pleading.  The appropriate remedy for the equal-protection violation that Plaintiffs have shown in this case is to strike the October 2005 amendment codified in Article XIII, Section 14 of the Albuquerque City Charter in its entirety.

In the absence of the stricken amendment, voting procedures for the City of Albuquerque's future municipal elections are to be determined by the choice-of-law provisions contained elsewhere in the City Charter, the Municipal Election Code, and the State Election Code.  The parties are directed to file simultaneous briefs with this Court by no later than February 26, 2007, stating their respective positions as to whether it is within this Court's equitable jurisdiction to resolve any remaining dispute about how to apply these choice-of-law provisions in the absence of the October 2005 City Charter amendment.

**IT IS, THEREFORE, ORDERED** that the *Defendant's Motion for Summary Judgment* [Doc. 63] is **GRANTED IN PART** with respect to the First Amendment claim in Count VI of Plaintiffs' *Second Amended Complaint* [Doc. 20] and **DENIED IN PART** with respect to the equal-protection claim in Count I of that pleading.

**IT IS FURTHER ORDERED** that the *Plaintiffs' Motion for Summary Judgment* [Doc. 65] is **GRANTED IN PART** with respect to the equal-protection claim in Count I of their *Second Amended Complaint* [Doc. 20] and **DENIED IN PART** with respect to the First Amendment claim in Count VI of that pleading.

-81-

**IT IS FURTHER ORDERED** that the October 2005 amendment codified in Article XIII, Section 14 of the Albuquerque City Charter is declared to be an unconstitutional infringement of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that Defendant, as well as other officers, agents, servants, employees, and attorneys of the City of Albuquerque, and any persons in active concert or participation with Defendant who receive actual notice of this Order by personal service or otherwise, are **PERMANENTLY ENJOINED AND RESTRAINED** from enforcing or implementing the requirements of the October 2005 amendment codified in Article XIII, Section 14 of the Albuquerque City Charter in any future municipal election.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to place Exhibits G, H, and I to *Defendant's Memorandum in Support of Motion for Summary Judgment* [Doc. 64] under seal so that they may comply with the Court's amended privacy policy regarding the disclosure of personal data identifiers.

**IT IS FURTHER ORDERED** that the parties are directed to file briefs with this Court by no later than February 26, 2007, stating their respective positions as to whether it is within this Court's equitable jurisdiction to resolve any remaining dispute about how to apply the choice-of-law provisions in the absence of the October 2005 City Charter amendment.

**SO ORDERED** this 12th day of February, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**